# EXHIBIT E

### IN THE HIGH COURT OF DELHI AT NEW DELHI
### (ORDINARY ORIGINAL CIVIL JURISDICTION)
### C.S. (OS) No.      OF 2020

**IN THE MATTER OF:**

Daniel Snyder, Through his SPA Holder                          ...Plaintiff

Versus

Eleven Internet Services LLP & Ors.                    ....Defendants

## MASTER INDEX

| S. NO. | PARTICULARS | PAGES | C.FEE |
|--------|-------------|-------|-------|
| 1. | **Index-I** | 1 | |
| 2. | Opening Sheet | 2-3 | |
| 3. | Urgent Application | 4 | |
| 4. | Notice of Motion | 5 | |
| 5. | Court Fee of Rs. | 6 | |
| 6. | Memo of Parties | 7-9 | |
| 7. | Synopsis & List of dates | 10-14 | |
| 8. | Suit for Permanent Injunctions and Damages with supporting affidavit | 15-54 | |
| 9. | **Index-II** | 1 | |
| 10. | Application under Order 39 Rule 1 and 2 Read with Section 151 of the Code of Civil Procedure alongwith Affidavit | 2-22 | |
| 11. | Application under Section 151 of the Code of Civil Procedure alongwith Affidavit | 23-27 | |
| 12. | Application under Section 151 of the Code of Civil Procedure seeking exemption from filing attested affidavits | 28-31 | |
| 13. | Application under Section 149 CPC read with Section 151 CPC seeking extension of time to | 32-36 | |

| | file court fee | | |
|---|---|---|---|
| 14. | **Index-III** | *1* | |
| 15. | Vakalatnama on behalf of Plaintiff | *2 - 3* | |

## INDEX – IV
## LIST OF DOCUMENTS

| Sl. No. | Details of Parties of Documents (s) | Documents in Power/Possession, Control, Custody of | Original or photo copies or office copies | Mode of execution/issuance of Report | Line of Custody | Page No. |
|---|---|---|---|---|---|---|
| | List of documents filed with the Plaint | N.A. | N.A. | N.A. | N.A. | *1 - 6* |
| 1. | Copy of SPA dated 05.08.2020 in favour of Col. (Retd.) Bhushan Lal executed by the Plaintiff | Plaintiff | Photocopy | Record of the Plaintiff | Sent by Plaintiff to Plaintiff's Counsel | *7 - 8* |
| 2. | Copy of internet printouts from the website https://meaww.com/washington-redskins-owner-dan-snyder-to-step-down-owing-to-sex-trafficking-allegations-fan-reactions showing news article published on the | Online record of Defendant No. 2 website | Internet Printout | Third Party Website | Downloaded from third party website | *9 - 10* |

| | Defendant No. 2 website | | | | | |
|---|---|---|---|---|---|---|
| 3. | Copy of internet printouts from the website https://meaww.com/washington-redskins-dan-snyder-jeffrey-epstein-sexual-harrasment-sex-trafficking-scandal-name-change showing news article published on the Defendant No. 2 website. | Online Record of Third Party Website | Internet Printout | Third Party Website | Downloaded from Third Party Website | 11-12 |
| 4. | Copies of internet printouts from the website of The Washingtonian at the URL washingtonian.com/2006/09/01/the-dan-snyder-you-dont-know/ showing news article establishing the reputation of the Plaintiff. | Online Record of Third Party Website | Internet Printout | Third Party Website | Downloaded from Third Party Website | 13-30 |
| 5. | Copies of internet printouts from the website of The Washington at the URL https://www.wash | Online Record of Third Party Website | Internet Printout | Third Party Website | Downloaded from Third Party Website | |

| | | | | | |
|---|---|---|---|---|---|
| | ingtonpost.com/archive/business/2000/02/22/snyder-to-sell-his-marketing-firm-for-2-billion/deab34bd-2e3e-4ac6-84e3-52deff4364b9/ showing news article establishing the reputation of the Plaintiff | | | | 31~35 |
| 6. | Copies of internet printouts from the website of Forbes at the URL https://www.forbes.com/sites/kurtbadenhausen/2018/07/18/full-list-the-worlds-50-most-valuable-sports-teams-of-2018/#679b6d2e6b0e showing news article establishing the reputation of the Plaintiff's football team | Online Record of Third Party Website | Internet Printout | Third Party Website | Downloaded from Third Party Website | 36~41 |
| 7. | Copies of internet printouts from the website https://www.entreprenerd.net/daniel-snyder-lauded-as-astute- | Online Record of Third Party Website | Internet Printout | Third Party Website | Downloaded from Third Party Website | 42~43 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | businessman-and-committed-philanthropist/ establishing the reputation of the Plaintiff. | | | | | |
| 8. | Copies of internet printouts from the website https://www.forbes.com/sites/kurtbadenhausen/2020/07/31/the-worlds-most-valuable-sports-teams-2020/#55923f6d3c74 establishing the reputation of the football team owned by the Plaintiff | Online Record of Third Party Website | Internet Printout | Third Party Website | Downloaded from Third Party Website | 41-72 |
| 9. | List of URLs/Weblinks | Plaintiff | Printout | Record of the Plaintiff | Sent by Plaintiff to Plaintiff's Counsel | 73 |
| 10. | Email dated 23.07.2020 describing the correspondence between the Ld. Counsels for the Plaintiff and the representative of the Defendants seeking removal of the impugned news articles/posts/URL's/weblinks | Plaintiff | Printout | Record of the Plaintiff | Sent by Plaintiff to Plaintiff's Counsel | 74 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | further seeking information qua names of persons/entities who had engaged the Defendants to publish the impugned news articles/posts. | | | | | |
| 11. | Email dated 24.07.2020 addressed by the Ld. Counsels for the Plaintiff to the counsels for the Defendants seeking information qua representation on behalf of the Defendants. | Plaintiff | Printout | Record of the Plaintiff | Sent by Plaintiff to Plaintiff's Counsel | 75 |
| 12. | Email dated 24.07.2020 issued by the Ld. Counsels for the Defendants apprising the Ld. Counsels for the Plaintiff that they had not received requisite sanction from the Defendants. | Plaintiff | Printout | Record of the Plaintiff | Sent by Plaintiff to Plaintiff's Counsel | 76 |
| 13. | Email dated 24.07.2020 addressed to the Ld. Counsels for the Plaintiff from the representative | Plaintiff | Printout | Record of the Plaintiff | Sent by Plaintiff to Plaintiff's Counsel | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | of the Defendants i.e. Ms. Alysha Tharani apprising the Ld. Counsel for the Plaintiff that the impugned weblinks had been removed and that there was nothing further required to be done at the end of the Defendants. | | | | | 77 |
| 14. | Emails dated 29.07.2020 exchanged between the Ld. Counsels for the Plaintiff and Mr. Charles R. Macedo | Plaintiff | Printout | Record of the Plaintiff | Sent by Plaintiff to Plaintiff's Counsel | 78 |
| 15. | Affidavit under Sec. 65A & Sec. 65B of Indian Evidence Act, 1872 | N.A. | N.A. | N.A. | N.A. | 79-84 |

Through:

D|4033|2018

**(SIMRANJEET SINGH, AADHAR NAUTIYAL)**
**ATHENA LEGAL**
Advocate(s) for the Plaintiff
37, Link Road, First Floor,
Lajpat Nagar-III,
Place: New Delhi                      New Delhi – 110024
Date: 01 /08/2020                      (M): 9205109664
aadhar.nautiyal@athenalegal.in

## IN THE HIGH COURT OF DELHI AT NEW DELHI
### (ORDINARY ORIGINAL CIVIL JURISDICTION)
### C.S. (OS) No.      OF 2020

**IN THE MATTER OF:**

Daniel Snyder, Through his SPA Holder                    ...Plaintiff

Versus

Eleven Internet Services LLP & Ors.                    ….Defendants

### INDEX-I

| S. NO. | PARTICULARS | PAGES | C.FEE |
|--------|-------------|-------|-------|
| 1. | Index | 1 | |
| 2. | Opening Sheet | 2 - 3 | |
| 3. | Urgent Application | 4 | |
| 4. | Notice of Motion | 5 | |
| 5. | Court Fee of Rs. | 6 | |
| 6. | Memo of Parties | 7 - 9 | |
| 7. | Synopsis & List of dates | 10 - 14 | |
| 8. | Suit for Permanent Injunctions and Damages with supporting affidavit | 15 - 54 | |

THROUGH:

**SIMRANJEET SINGH, AADHAR NAUTIYAL**
**ATHENA LEGAL**
37, Link Road, First Floor,
Lajpat Nagar-III,
New Delhi – 110024
9205109664
aadhar.nautiyal@athenalegal.in

Place: New Delhi
Date: 07/08/2020

2

## IN THE HIGH COURT OF DELHI AT NEW DELHI
## (ORDINARY ORIGINAL CIVIL JURISDICTION)
### C.S. (OS) No.    OF 2020

**IN THE MATTER OF:**

Daniel Snyder, Through his SPA Holder                              ...Plaintiff

Versus

Eleven Internet Services LLP & Ors.                              ....Defendants

| | |
|---|---|
| Nature of the matter | Suit for injunction and damages for defamation |
| Statutes invoked | Code of Civil Procedure, 1908, Constitution of India, 1950, Universal Declaration of Human Rights International Convention on Civil and Political Rights |

ADVOCATE

Mr. Aadhar Nautiyal                       …………………………..

Advocate for the Plaintiff                       …………………………..

Plaintiff(s)/Petitioner(s)        Defendant(s)/Respondent(s)

## INTERLOCUTORY APPLICATION (S)

| Sl. No. | No. of Yr. | Filled by Pltff/Deft | Provisions of Laws | Nature of Relief Sought | Remarks |
|---|---|---|---|---|---|
| 1. | 2020 | Plaintiff | Order 39 Rule 1 & 2 with Section 151 CPC | Ex-parte ad Interim and Ad Interim Injunction | |

3

| 2. | 2020 | Plaintiff | Under section 151 CPC | Application Section 151 CPC for exemption from filing original or certified and clearer copies of the documents | |
|----|------|-----------|-----------------------|---------------------------------------------------------------------------------------------------------------|--|
| 3. | 2020 | Plaintiff | Under section 151 CPC | Application Section 151 CPC for exemption from attested affidavit. | |
| 3. | 2020 | Plaintiff | Under Section 149 CPC | Application under Section 149 CPC read with Section 151 CPC seeking extension of time to file court fee with Affidavit | |

4

## IN THE HIGH COURT OF DELHI AT NEW DELHI
### (ORDINARY ORIGINAL CIVIL JURISDICTION)
#### C.S. (OS) No.     OF 2020

**IN THE MATTER OF:**

Daniel Snyder, Through his SPA Holder                    ...Plaintiff

Versus

Eleven Internet Services LLP & Ors.                    ....Defendants

### URGENT APPLICATION

The Registrar General,
High Court of Delhi at New Delhi,
Sher Shah Suri Road,
New Delhi – 110 001
Sir,

Kindly treat the accompanying application as urgent in accordance with the Delhi High Court Rules and Orders. The grounds of urgency are as under:

"That the impugned news articles/posts published on the website of the Defendant No. 2, owned by the Defendant No.1, further controlled by the Defendant Nos. 3-6 further being uploaded/posted/shared/disseminated over numerous social media platforms and also on other websites available for viewership across the globe are absolute false and defamatory and are continuously being shared/disseminated/uploaded thus causing immense harm and damage to the reputation of the Plaintiff globally and urgent interim directions are being sought from this Hon'ble Court by the Plaintiff against the Defendants.

THROUGH:

**SIMRANJEET SINGH, AADHAR NAUTIYAL**
**ATHENA LEGAL**
37, Link Road, First Floor,
Lajpat Nagar-III,
New Delhi – 110024
9205109664

Place: New Delhi
Date: 03/08/20200

**IN THE HIGH COURT OF DELHI AT NEW DELHI**
**(ORDINARY ORIGINAL CIVIL JURISDICTION)**
**C.S. (OS) No.        OF 2020**

**IN THE MATTER OF:**

Daniel Snyder, Through his SPA Holder                    ...Plaintiff

Versus

Eleven Internet Services LLP & Ors.                    ….Defendants

**NOTICE OF MOTION**

Sir,

Please take note that the Plaintiff has filed the present suit which is likely to be listed on or before

THROUGH:

D|4o53|201 8

**SIMRANJEET SINGH, AADHAR NAUTIYAL**
**ATHENA LEGAL**
Advocate(s) for the Plaintiff
37, Link Road, First Floor,
Lajpat Nagar-III,
Place: New Delhi                    New Delhi – 110024
Date: 05/08/2020                    9205109664
aadhar.nautiyal@athenalegal.in

**To: No notice of caveat or otherwise received from any Defendants**
1.    **Counsel for Defendant No. 1**
2.    **Counsel for Defendant No. 2**
3.    **Counsel for Defendant No. 3**
4.    **Counsel for Defendant No. 4**
5.    **Counsel for Defendant No. 5**
6.    **Counsel for Defendant No. 6**

6

# IN THE HIGH COURT OF DELHI AT NEW DELHI
## (ORDINARY ORIGINAL CIVIL JURISDICTION)
### C.S. (OS) No.     OF 2020

**IN THE MATTER OF:**

Daniel Snyder, Through his SPA Holder                    ...Plaintiff

Versus

Eleven Internet Services LLP & Ors.                    ….Defendants

### COURT FEE

THROUGH:

D|4033|2018

**SIMRANJEET SINGH, AADHAR NAUTIYAL**
**ATHENA LEGAL**
Advocate(s) for the Plaintiff
37, Link Road, First Floor,
Lajpat Nagar-III,
New Delhi – 110024
9205109664
aadhar.nautiyal@athenalegal.in

Place: New Delhi
Date: 07/08/2020

**\*Application under Sec. 149 CPC seeking exemption has been file**

7

**IN THE HIGH COURT OF DELHI AT NEW DELHI**
**(ORDINARY ORIGINAL CIVIL JURISDICTION)**
**C.S. (OS) No.____ OF 2020**

**IN THE MATTER OF:**

Daniel Snyder, Through his SPA Holder                    ...Plaintiff

Versus

Eleven Internet Services LLP & Ors.                    ....Defendants

**MEMO OF PARTIES**

**IN THE MATTER OF:**

1.    DANIEL SNYDER
      THROUGH SPA HOLDER
      MR. BHUSHAN LAL
      HAVING ITS OFFICE AT:
      105A, INDRAPRAKASH BUILDING,
      21 BARAKHAMBA ROAD,
      NEW DELHI-    110001
      bhushan.sapra@nucleion.com              ...PLAINTIFF

**VERSUS**

1.    ELEVEN INTERNET SERVICES LLP
      A-40, WALLFORT CITY,
      BHATAGAON, RAIPUR
      CHHATTISGARH
      ALSO AT
      1608, 7TH CROSS, OPP BMTC BUS DEPOT,
      AGARA VILLAGE, 1ST SECTOR,
      HSR        LAYOUT,      BENGALURU        560102
      KARNATAKA, INDIA
      nirnay.chowdhary@gmail.com        ...DEFENDANT NO.1

8

2.  MEAWW.COM
    1608, 7TH CROSS, OPP BMTC BUS DEPOT,
    AGARA VILLAGE, 1ST SECTOR,
    HSR          LAYOUT,          BENGALURU          560102
    KARNATAKA, INDIA
    contact@meawwworld.com          ...DEFENDANT NO. 2

3.  NIRNAY CHOWDHARY
    1608, 7TH CROSS, OPP BMTC BUS DEPOT,
    AGARA VILLAGE, 1ST SECTOR,
    HSR          LAYOUT,          BENGALURU          560102
    KARNATAKA, INDIA
    nirnay.chowdhary@gmail.com          ...DEFENDANT NO.3

4.  ANAY CHOWDHARY
    1608, 7TH CROSS, OPP BMTC BUS DEPOT,
    AGARA VILLAGE, 1ST SECTOR,
    HSR          LAYOUT,          BENGALURU          560102
    KARNATAKA, INDIA
    works@meaww.com          ...DEFENDANT NO.4

5.  PRARTHNA SAKAR
    1608, 7TH CROSS, OPP BMTC BUS DEPOT,
    AGARA VILLAGE, 1ST SECTOR,
    HSR          LAYOUT,          BENGALURU          560102
    KARNATAKA, INDIA
    prarthna.s@meawwworld.com          ...DEFENDANT NO.5

9

6.  JYOTSNA BASOTIA
    1608, 7TH CROSS, OPP BMTC BUS DEPOT,
    AGARA VILLAGE, 1ST SECTOR,
    HSR         LAYOUT,        BENGALURU         560102
    KARNATAKA, INDIA
    jyotsna.b@meawwworld.com         ....DEFENDANT NO. 6


7.  ASHOK KUMAR
    FATHER'S NAME NOT KNOWN
    TO PLAINTIFF
    ADDRESS & EMAIL ID NOT KNOWN TO PLAINTIFF
                              ...DEFENDANT NO. 7

                    THROUGH:

                    D/4033/2016

        SIMRANJEET SINGH, AADHAR NAUTIYAL
                              ATHENA LEGAL
                    Advocate(s) for the Plaintiff
                    37, Link Road, First Floor,
                              Lajpat Nagar-III,
                    New Delhi – 110024
Place: New Delhi                    9205109664
Date: 07/08/20200
                    aadhar.nautiyal@athenalegal.in

10

## SYNOPSIS

The Plaintiff is constrained to file this present suit due to them being made prey to illegal, *mala-fide*, malicious and vindictive acts of the Defendants in defaming the Plaintiff by publishing/uploading/sharing/dissemination of the impugned news articles/posts on the impugned URLs / Web-links on the basis of false and / or wrong and / or manipulated and / or misleading facts / documents / information.

On or about 16th of July, 2020, the Plaintiff came to know about the publishing/uploading/sharing/dissemination/publication of false, malicious, misleading and defamatory material on the website of the Defendants. The contents of these defamatory publications included grave allegations against the Plaintiff insinuating that the Plaintiff was facing allegations of sex trafficking which is a heinous crime across the globe, and is associated with sexual predator Jeffrey Epstein. It is submitted that the contents of the impugned news articles are absolutely false, frivolous, and baseless and are based on no material evidence whatsoever. The said news articles are freely available in the public domain and the defendants have proceeded to create false aspersions against the reputation of the Plaintiff. When these acts of the defendants

11

came to the knowledge of the Plaintiff, the Ld. Counsels on behalf of the Plaintiff immediately took affirmative steps whereby addressing an email to the Ld. Counsel on behalf of the Defendants dated 22.07.2020, thus directing that the impugned URL's/weblinks be taken down by the Defendants off their platforms. It is submitted that Ms. Alysha Tharani on behalf of the Defendants apprised the Ld. Counsel acting on behalf of the Plaintiff that they had already done the needful and that no further action was required to be done at the end of the Defendants vide email dated 24.07.2020. It is submitted that the Ld. Counsels acting on behalf of the Plaintiff had categorically directed the Defendants to take down the impugned URL's/weblinks and provide information qua the client who hired them and the source from where they garnered the information forming part of the impugned URL's/weblinks, albeit these directions were not complied with by the Defendants. That the acts of the Defendants clearly have had a detrimental impact on the massive reputation and goodwill enjoyed by the Plaintiff across the globe. Right to Reputation is an integral part of an individual's life and has further forms part of Article 12 of the Universal Declaration of Human Rights, further also forming part of Article 17 of the International Covenant on Civil and Political Rights. The aforementioned defamatory assertions of

12

the defendants are supported with no evidence at all and is in clear cut violation of Freedom of Speech and Expression under Article 19(1) of the constitution which is subject to reasonable restrictions under Article 19(2) of the Constitution and imposes a sense of responsibility on electronic and print media to function in a *bona-fide* manner.   The Defendants have published/ disseminated the impugned news on their website and the same based on no evidence and has further been published same without verifying facts and/or documents which goes against the basic tenets of ethical and fair journalism. The Defendants have a significant grip over internet, media and social media platforms and they have used their influence to exploit the identity of the Plaintiff by publishing and allowing uploading/sharing/dissemination of malicious, misleading, false and defamatory information against the Plaintiff which has caused severe loss to the identity of the Plaintiff. Thus, it is evident that the Defendants have blatantly disregarded the Rule of Law and have left no stone unturned to vilify, malign and denigrate the name, image, reputation and good will of the Plaintiff in the eyes of the general public thereby causing wrongful losses to the Plaintiff and wrongful gains to themselves. By bare perusal of the said news/posts, it is evident that the said posts / articles have maligned the

13

reputation, credibility and adversely affected the goodwill of the Plaintiff who have received frantic calls and inquiries from employees, acquaintances, business associates alike from across the globe regarding the correctness of the same and thus the said news/ posts have rendered a suspicious impression on the minds of the viewers regarding the image of the Plaintiff. The continued transmission of said news/ articles/URLs / Web-links which are not in any manner in public interest and have been published with utmost recklessness on the Defendant No.2 website, would gravely affect even the future endeavours of the Plaintiff. The deliberate inaction of the Defendants towards freely airing the said content despite the knowledge of the same being false and defamatory is an act of abetment in damaging the reputation of the Plaintiff. Thus, by way of the present suit the Plaintiff humbly seeks reliefs mentioned in the Prayer by this Hon'ble Court.

14

## LIST OF DATES

| 16.07.2020 | Impugned news articles i.e. https://meaww.com/washington-redskins-dan-snyder-jeffrey-epstein-sexual-harrasment-sex-trafficking-scandal-name-change & https://meaww.com/washington-redskins-owner-dan-snyder-to-step-down-owing-to-sex-trafficking-allegations-fan-reactions are published on the Defendant No. 2 website; further also being shared/disseminated on social media platforms such as Facebook and Twitter. |
|---|---|
| 23.07.2020 | Ld. Counsels from USA on behalf of the Plaintiff approach the counsels for the Defendant directing them to take down the impugned links and disclose details qua entities that engaged the Defendants to post the impugned articles. |
| 24.07.2020 | Ms. Alysha Tharani acting on behalf of the Defendants states that there is nothing further that is to be done at the end of the Defendants and that the Defendants have already complied with the request of the Plaintiff. |
| 29.07.2020 | Ld. Counsels from USA on behalf of the Plaintiff approach the counsels for the Defendants who are apprised that they are not representing the Defendants. |
| 05.08.2020 | SPA dated 05.08.2020 executed by the Plaintiff in favour of Col. (Retd.) Bhushan Lal. |
| 05.08.2020 | Impugned news articles/posts are still visible on the internet upon a basic search on Bing.com. Other articles reliant upon the news articles published on the Defendant No. 2 website are also available for viewership. |
| 07.08.2020 | Hence, the present suit. |

15

**IN THE HIGH COURT OF DELHI AT NEW DELHI**
**(ORDINARY ORIGINAL CIVIL JURISDICTION)**
**C.S. (OS) No. ___ OF 2020**

**IN THE MATTER OF:**

Daniel Snyder, Through his SPA Holder        ...Plaintiff

Versus

Eleven Internet Services LLP & Ors.       ....Defendants

**SUIT FOR PERMANENT AND MANDATORY INJUNCTION, PROHIBITORY INJUNCTION AND CONSEQUENTIAL DAMAGES**

**MOST RESPECTFULLY SHOWETH:**

The Plaintiff above-named respectfully submit as under:

1. The Plaintiff has been constrained to approach this Hon'ble Court through this present suit against the illegal, *mala-fide*, malicious and vindictive acts of the Defendants and especially the acts of Defendant No. 1 in defaming the Plaintiff by way of publishing defamatory, derogatory and libelous posts on its news website reliant upon false and/or wrong and/or manipulated and/or misleading facts/documents/information. Publishing such news as well as posts and further allowing the uploading/sharing/dissemination of the impugned posts by the defendants is clearly in breach/violation of the internationally recognized rights of the Plaintiff thereby causing defamation and loss of reputation to the Plaintiff.

16

2. The present suit is being filed through Colonel (Retd.) Bhushan Lal, S/o Mr. B.D Sapra, who is the Special Power of Attorney Holder of the Plaintiff duly authorized vide SPA dated 05-08-2020 executed in the United States.   Accordingly, Colonel Sapra, even otherwise, is well conversant with the facts and circumstances of the present case and is duly competent to file, sign, depose and conduct the present suit on behalf of the Plaintiff.

3. That the Plaintiff is a highly-accomplished and successful American entrepreneur, businessman and philanthropist residing in Maryland, USA and is the controlling owner of the Team, which is amongst the most prominent teams in the National Football League of America. The Plaintiff was also the founder, Chairman and Chief Executive Officer of Snyder Communications, Inc., which the Plaintiff had started from very modest beginnings and after continuous hard work, determination and persistence, led to the Plaintiff becoming the youngest ever CEO of a company listed on the New York Stock exchange in the year 1996. The Plaintiff through his tireless efforts has built the Washington Football Team into one of the most valuable professional athletic franchises in the world. The Plaintiff is also well known for his philanthropic donations to charitable causes involving support for children's hospitals, groups

17

combating exploitation of children, and victims of the September 11, 2001 terrorist attacks.

4. That the Defendant No. 1 is a Limited Liability Partnership firm incorporated in the year 2015 having its registered office at A-40, Wallfort City, Bhatagaon, Raipur Chhattisgarh which runs a news website known as 'meaww.com' i.e. Defendant No. 2. The impugned content has been uploaded on the website of the Defendant No. 2 which is viewable across the globe, without verifying the veracity and/or correctness of the same, whereby causing immense harm to the reputation and goodwill of the Plaintiff.

5. The Defendant No. 2 website claims to be, and holds itself out as, a news website.  The Defendant No. 2 website publishes news stories regarding a broad variety of matters, including pop culture, law and government, and media and entertainment. In actuality, however, its purpose is far more sinister.  In this search engine driven world we all live in, stories (no matter how false and defamatory) take on a life of their own when published, re-published, re-Tweeted and the like.   This type of disinformation campaign can be used to damage reputations, stoke fear, and even to drive the results of elections.  The Defendant No. 2 website on behalf of third parties who pay the Defendants, including Defendant

18

Nos. 3 & 4, also use other entities, including PubNinja and the Daily Net, to increase the reach of false messages that they wished to spread to readers. This powerful weapon has not gone unnoticed in Government and intelligence circles. As such, the Defendant No. 2 is frequently hired (many times anonymously) by Governments and intelligence services in order to spread misinformation on rivals. For this, the Defendant No. 2 website is paid handsomely. In addition to the above, the Defendant No. 2 website earns revenue as a mere "clickbait" enterprise. This part of its business model relies on maximizing page views, and therefore advertising revenue, by publishing articles with incendiary and misleading titles and URLs calculated to attract attention. Often, as in this case, this involves headlines that describe gruesome allegations, without context, as if they were proven fact. The Defendant No. 2 website claims a "social media following of over 15 million" across multiple jurisdictions. In a July 7, 2016 press release, the Defendant No. 2 website claimed to have reached 150 million registered users, receives one billion page views a month, and was ranked by Alexa (an Amazon company) as one of the top 500 websites in the world.

6. That the Defendant Nos. 3 & 4 are the partners of the Defendant No. 1 company thus exercising direct control over the affairs of the Defendant

19

Nos. 1 & 2 including control over the content that is published on the Defendant No. 2 website.

7. That the Defendant Nos. 5 & 6 are writers of the Defendant No. 2 website who have written the impugned articles published on the Defendant No. 2 website. It is submitted that the Defendant Nos. 5 & 6 have miserably failed to uphold the basic ethics and tenets of fairness and have written and published the impugned articles with reckless disregard towards the law, and without verifying the correctness of the allegations levied against the Plaintiff in the impugned articles published on the Defendant No. 2 website.

8. That Defendant No. 7 is a John Doe Party which represents every unknown and unnamed person who has been who has been posting, producing, sharing, disseminating, publishing or causing to publish on the internet or/and through social media platforms, the false and defamatory posts against the Plaintiff.

9. That the brief facts necessitating the filing of the present suit are stated herein under:

    a). That the Plaintiff on or about 16th July, 2020 came to know about publishing of false, highly defamatory and malicious news against the Plaintiff published on the Defendant No. 2 website, based on

20

absolutely    false    and/or    wrong    and/or    misleading facts/documents/statement wherein the headline of the defamatory Article at the URL https://meaww.com/washington-redskins-owner-dan-snyder-to-step-down-owing-to-sex-trafficking-allegations-fan-reactions read as *"Washington Redskins owner Dan Snyder faces sex trafficking allegations; Internet says, 'He was on Epstein's list[.]'* It had been alleged in the article that the minority owners of the Team owned by the Plaintiff were "apparently looking at bringing him down citing inappropriate and unchaste behavior as one of the major reasons."   It is stated that the article falsely accused the Plaintiff of personally committing extremely serious sexual misconduct, as well as association with convicted sex offender and infamous sexual predator Jeffrey Epstein, who committed suicide in prison while facing sex trafficking charges and is commonly alleged to have maintained a "list" of wealthy individuals in his social circle who participated in sexual misconduct involving minors in his presence. Another article published on the Defendant No. 2 website at the URL https://meaww.com/washington-redskins-dan-snyder-jeffrey-epstein-sexual-harrasment-sex-trafficking-scandal-name-change

21

which bears the headline *"#RedskinsScandal: Will Dan Snyder rename Washington Redskins the 'Epsteins'? Angry Internet screams 'throw him out[.]'"*. It is submitted that the said article expressly refers to, and repeats, the false allegations of the previous article as stipulated herein above *i.e.*, the false claims that the Plaintiff is linked to sexual predator Jeffrey Epstein and that the Plaintiff is or was involved in sexual misconduct, including sex trafficking. The said article also falsely claims, again citing an anonymous tweet that *"Dan Snyder has decided on a new team name:  [Jeffrey] Epsteins."*

It is submitted that the entire contents of the impugned post/article are highly defamatory, derogatory and libelous and based on no factual evidence at all. That the impugned post/article has caused irreparable loss and harm to the reputation and goodwill of the Plaintiff. The contents of the impugned article published on the Defendant No. 2 website are being filed along with the present suit and the Plaintiff craves leave to rely upon the contents of the same. It is submitted that the statements are extremely irresponsible, incendiary, and damaging false statements, made by Defendants without any investigation or basis in fact, with

22

deliberate malice toward the Plaintiff and with reckless disregard for the truth. The Defamatory Statements were and are utterly baseless, and represent nothing more than Defendants' attempt to generate attention and revenue from its hidden clients by publishing deliberately inflammatory headlines which they knew to be false and/or utterly failed to investigate.

b). That from a bare reading of the contents of the impugned URL's/weblinks consisting of the posts/articles published on the Defendant No. 2 website, it is amply clear that derogatory, libelous and malicious aspersions have been casted against the Plaintiff accusing the Plaintiff of sexual offences. The said allegations are absolutely false, frivolous, and made with absolute recklessness which has caused grave prejudice and damage to the hard-earned reputation, goodwill and image of the Plaintiff.

c). It is submitted that the false allegations published by way of the impugned articles/posts uploaded on the Defendant No. 2 website have been shared on numerous social media platforms as set forth above.

d). It is submitted that the entire impugned content is based on no evidence and has been published without verifying facts and/or

23

documents which goes against the basic tenets of ethical and fairness. It is submitted that the Defendants have published/broadcasted the impugned articles/posts on its website which has further been shared/uploaded/disseminated on numerous social media platforms without verifying the facts and/or ascertaining the veracity of the frivolous allegations that have been levelled against the Plaintiff. It is submitted that the impugned news has been published by the Defendant No. 1 with reckless disregard and without seeking any information qua the same from the Plaintiff, with the sole intention to malign and tarnish the image, reputation and goodwill of the Plaintiff.

10. That, the Ld. Counsels on behalf of the Plaintiff addressed a communication dated 22.07.2020 directing the Defendants to remove/take-down the impugned posts/articles from its website, further also requesting disclosing the details on who had hired Defendants to publish the stories and from where they had obtained information qua the said impugned articles, albeit, Ms. Alysha Tharani acting on behalf of the Defendants, vide email dated 24.07.2020 apprised the Ld. Counsels on behalf of the Plaintiff that

24

they were not required to take any such action, although the
offending articles had been removed. It is submitted that the
offending articles albeit removed, are still available for viewership
to a limited extent. A basic search upon the search engine bing.com
churned out the following result:



25

It is submitted that the Defendants in their correspondence claimed to have removed the impugned articles from its website, albeit a bare perusal of the image above, makes it abundantly clear that it has not been completely removed from the webpage. The 5th link from the top in the image as reproduced herein above displays an error upon opening, albeit, the contents of the said impugned article are still visible upon a basic search. Furthermore, numerous other websites have relied upon the derogatory and defamatory articles published by the Defendants. The same can be perused from the last result of the image reproduced herein above, wherein the author has reiterated the contents of the impugned articles/posts uploaded on the Defendant No. 2 website.

11. The Defendants here purport to run news sites and related companies but, in fact, truly are (to quote a popular phrase of the day) "fake news" published on behalf of hidden clients. Rather than being legitimate news sources and reporters, the Defendants intentionally sow misinformation at the behest of their well-heeled and well-placed clients – often national governments and intelligence services – with their clients generally cloaked behind several layers of anonymous corporate entities.

26

12.  While much of what Defendants publish is simply brushed aside as the clickbait or search engine drivers that it is; that stops now.  It is submitted that the Defendants, compensated by their clients, have published, worldwide, the most debased, untrue, and slanderous statements, maliciously and falsely accusing the Plaintiff Daniel Snyder of heinous crimes, that Defendants published with reckless disregard for their falsity.   Well-established law holds that, regardless of the fact that the Plaintiff Mr. Snyder is a public figure, Defendants' statements are flagrantly unlawful, and that the Defendants, by publishing these falsehoods, are liable to pay not only damages but also punitive damages in favor of the Plaintiff Mr. Daniel Snyder.

13.  That it is submitted that the Defendant No. 2 i.e. Media Entertainment Arts WorldWide ("MEAWW") is an Indian media company which operates in the United States as non-party New Content Media, Inc. and is owned by the Defendant No. 1 i.e. Eleven Internet Services LLP ("Eleven"), an Indian Limited Liability Partnership firm, controlled by the Defendant Nos. 3 & 4. The Defendant No. 2 website MEAWW publishes its news website at www.meaww.com, as well as running social media accounts on

27

Facebook, Twitter, and other platforms associated with MEAWW. It is submitted that the Defendant Nos. 3 & 4 i.e. brothers Nirnay Chowdhary and Anay Chowdhary both nationals and residents of India, control the affairs and operations of the Defendant Nos. 1 & 2 and are therefore directly responsible and liable for the content that is uploaded and published on the Defendant No. 2 website. The Defendant Nos. 3 & 4 i.e. Nirnay Chowdhary and Anay Chowdhary also run The Daily Net and PubNinja, media companies based in India that further their interests on social media. Defendant No. 5 i.e Ms. Prarthna Sarkar and Defendant No. 6 i.e. Ms. Jyotsna Basotia, both residents of India, are writers and authors with the Defendant No. 2 website i.e. MEAWW.

14. That it is submitted that the Defendant No. 2 website i.e. MEAWW has worldwide reach, as it publishes globally via the internet and receives internet traffic from India, the United States, and many other countries the world over. As has already been stated in the preceding Paras, the Defendant No. 2 website claims that it has reached 150 million registered users, receives one billion page views a month, and was ranked by Alexa (an Amazon company) as one of the top 500 websites in the world.

28

15. That it is submitted that the articles dated July 16, 2020, uploaded on the Defendant No. 2 website i.e. MEAWW written by the Defendant Nos. 5 & 6 respectively, published at the behest of the Defendant Nos. 3 & 4 i.e. Nirnay Chowdhary and Anay Chowdhary are absolutely untrue and wholly fabricated articles regarding the Plaintiff i.e. Mr. Snyder, falsely accusing him of a broad array of acts of criminal sexual misconduct, including involvement in sex trafficking and affiliating with sexual predator Jeffrey Epstein.

16. That it is submitted that these false and fabricated articles purported to be news, are utterly fabricated and have no legitimate basis whatsoever. In fact, like much of the Defendant No. 2 website i.e. MEAWW's content the impugned articles rely on "the internet" as a source.

17. It is submitted that the false allegations Defendants have seeded on the internet have taken root beyond the Defendant No. 2 website i.e. MEAWW itself. For instance, on or about July 16, 2020 – not coincidentally, the very same day as the defamatory articles by the Defendant No. 2 website were published– the following appeared on a Twitter account that has been

29

confirmed as a fake account existing for no purpose other than

to propagate false and misleading information:

> *According to insiders and anonymous Washington Post employees, the [upcoming] article will allege that: Dan Snyder abuses drugs and alcohol[;] Snyder paid off refs. Some refs have made $2 million from him. And Snyder is not the only team owner paying off refs. Others do it too. Snyder and former Redskins coach Jay Gruden, brother of Jon Gruden, pimped out their cheerleaders to season ticket holders while holding their passports from them in a foreign country. Jay Gruden and then Redskins running back Kapri Bibbs were sleeping with the same woman. When Jay found out, he got petty and benched Bibbs. During that game when Bibbs was on the bench, Bibbs' replacement missed a block and that resulted in quarterback Alex Smith suffering a broken leg. Alex hasn't been able to play football ever since[.] Snyder and Gruden would hold sex parties with rampant drug usage and some sexual assaults[.] Snyder held nude photoshoots with the Redskins cheerleaders[.] Lawyers are already involved[.]*

It is submitted that the Plaintiff is unaware as to whether the account

through which the aforementioned content had been uploaded on the

social media platform *Twitter* belonged to a real person or was one of

the "Bots" utilized to further propagate The Defendant No.2 website's

for-profit lies, and the same is required to be ascertained.

18.   That it is submitted that these false statements were further repeated on

the very same day without attribution to the Defendant No. 2 website

30

but without any further basis whatsoever in a Facebook account for a well-known fan group for the football team belonging to the Plaintiff. That statement also added (again falsely) that the U.S. Federal Bureau of Investigations "possibly" may be involved.

19. That the statements that Defendants published, and that were repeated and further propagated in the July 16 Tweet and Facebook post, about the Plaintiff i.e. Mr. Snyder are categorically false. Moreover, the Defendants published these slanderous, inflammatory statements about the Plaintiff with complete disregard for their basis in fact at best, and deliberate intent to damage the Plaintiff.

20. That it is submitted that it is correct that the Plaintiff owns the Washington Football Team in the National Football League in the United States, and yes, that subjects him and the Team to extensive coverage in the media. When that coverage touches on the play of the Team, the operations of the Team, or other legitimate issues surrounding the Team, it is fair game for true and accurate coverage albeit it is submitted that the Plaintiff is much more than the owner of the Team. He is a husband. He is the proud father of three children. He is a philanthropist. He has friends, family members, and business

31

associates throughout the world. None of them should be subject to reading such shocking, false statements about the Plaintiff in any event.

21. Accordingly, the Plaintiff has filed the present suit against the heinous false allegations against him made by the Defendants allegedly on behalf of a client in order to rectify the harm to his personal and professional reputation as a result of Defendants' false, defamatory statements, which constitute classic examples of defamation *per se*. Equally importantly, the present suit has been filed in order to deter Defendants and other "hired gun" misinformation providers from taking similar actions on behalf of their illicit clients against him or anyone else so that their family and friends can be spared the same terrible experience endured by the Plaintiff, his family, his friends and his business.

22. That the Defendants have singled out the Plaintiff by publishing the news article on their website and further allowing to upload/share/disseminate/publish the highly defamatory and malicious posts against the Plaintiff alone, in order to ensure that irreparable loss and injury is occasioned to the hard earned reputation and goodwill of the Plaintiff herein. Publishing of such news articles by the Defendants and further allowing the uploading/sharing/disseminating/publishing by

32

Defendants is against the internationally recognized Right to Reputation as granted under Article 12 of the Universal Declaration of Human Rights and Article 17 of the International Covenant on Civil and Political Rights, to which India is a signatory.

23. That the Right to Freedom of Speech and Expression of news broadcasters comes along with a duty and responsibility of not abusing such freedom in furtherance of their personal vendetta towards any particular entity. It is submitted that although the freedom of press is an inalienable right, the same is not absolute and is subject to be controlled under Article 19(2) of the Constitution of India as uncontrolled right to speech leads to anarchism. The Freedom of Speech and Expression as guaranteed by the Constitution does not confer an absolute right to speak or publish whatever one chooses and it is not an unrestricted or unbridled license that may give immunity and prevent punishment for abuse of the freedom. The right has its own natural limitation and supposed journalists are in no better position than any other person. They have no greater freedom than others to make any imputations or allegations sufficient to ruin the reputation of a citizen. A news item has the potentiality of bringing dooms day for an individual. It can cause far reaching consequences in an individual and

33

country's life. The media has great power in impressing minds of people and it is essential that persons responsible for publishing anything in newspapers should take good care before publishing anything which tends to harm the reputation of a person. Reckless defamatory comments as is the case in the present scenario are unacceptable. This Hon'ble Court, in a catena of judgements has held that speech that the Press enjoys can be curtailed with reasonable restrictions in instances where they are not entitled to either make or circulate defamatory statement, false statements made with the intention to deteriorate the image of a public figure, etc. The Defendant Nos. 5 & 6 who are the original authors of the impugned articles/posts uploaded on the Defendant No. 2 website have failed to exercise caution, have failed to verify and/or ascertain the truthfulness and correctness behind the said allegations, and have proceeded with publishing the impugned articles, with malicious intent so as to damage the Plaintiff's reputation and goodwill, and are thus liable to be proceeded against in accordance with law. Further, the Defendant Nos. 3 & 4 who exercise actual control over the Defendant Nos. 1 & 2 and thus have effective control over what is published on the Defendant No. 2 website have also failed in their duties, and have further failed in

34

ascertaining the correctness and veracity of the allegations levied against the Plaintiff in the impugned articles, with a view to tarnish the reputation of the Plaintiff, and have thus effectively led to the launch of a smear campaign against the Plaintiff. It is relevant to submit herein that the said Defendants have earned revenue by defaming and derogating the Plaintiff on behalf of undisclosed third-party clients and are therefore liable to be proceeded against in accordance with law.

24. Thus, the present defamatory, derogatory and vilification campaign initiated by the Defendants has been carried out with an ulterior motive of Defendants against the Plaintiff.

25. That the vilification campaign has been intensified by the constant sharing of the impugned post published/broadcasted on the Defendant No. 2 website, further being repeatedly shared/uploaded/disseminated on social media platforms as has been elucidated in the preceding Paras, with the sole objective of lowering the name, image, reputation, good will of the Plaintiff in the eyes of general public across the globe. Uploading/sharing/disseminating of such a post cannot be said to be news and/or fair reporting of the news.

26. That, as such the impugned news articles published by the Defendants which have been constantly uploaded/shared/disseminated on social

35

media platforms are garnering wide viewership in India as well as abroad including within the jurisdiction of this Hon'ble Court. The news articles published by the Defendants can still be viewed over the internet on personal computers or mobile devices through a basic search, despite the impugned articles having been taken down by the Defendant No. 2 as has already been elucidated upon herein above in the preceding Paras. Thus, the impugned news articles published by the Defendants which has further been shared/disseminated on social media platforms is easily accessible not only in India but across the globe. The Plaintiff has received frantic calls from friends, business associates as well as family members enquiring into the correctness of the allegations, and they have categorically told the Plaintiff that the image and reputation of the Plaintiff in their eyes has gone down considerably owing to the allegations levied in the impugned news articles published by the Defendants.

27. That the impugned news articles/posts as published on the Defendant No. 2 website have been repeatedly shared on social media platforms and have received a large number of comments from people which clearly establishes, that the defamatory news articles published by the Defendants have highly prejudiced the good will and reputation of the

36

Plaintiff. It is submitted that on the internet, information is accessible worldwide which is causing unwarranted irreparable reputational harm to the Plaintiff for no fault of the Plaintiff.

28. That the Defendants are misusing/overreaching the freedom guaranteed to the Press and supposed journalists under Article 19(1)(a) of the Constitution of India. Even a legitimate Journalist's right to know and their right to publish is neither more or less than that of the general public as they are trustees of the general public for this purpose. The Defendants are therefore expected to post articles on the basis of true, correct and verified facts objectively. It is respectfully submitted that this a fit case where restraint ought to be granted by this Hon'ble Court since the facts of this case clearly demonstrate that the reputation of the Plaintiff has been deliberately maligned/tarnished by the Defendants. It is submitted that the exercise of true and legitimate journalistic freedom lies at the core of speech and expression protected by Article 19(1)(a). The publishing of views and news articles falls within the ambit of the Right to Freedom of speech and expression under Article 19(1)(a). However, the exercise of that fundamental right is not absolute and is answerable to the legal regime enacted with reference to the provisions of Article 19(2).

37

29. That the entire campaign has been carried out with a premeditated object of tarnishing and maligning the hard earned reputation and goodwill of the Plaintiff as part of a malicious campaign / propaganda against the Plaintiff. That such abuse of the dominant position by the Defendants is against all canons of ethics especially when the object is to unfairly influence the reputation and good will of the Plaintiff by spreading wrong and incorrect information in the minds of the people across the globe.

30. That, since the Defendants in blatant disregard for the rule of law and legitimate journalistic ethics and by misusing the process of law, have left no stone unturned to vilify, malign and denigrate the name, image, reputation and good will of the Plaintiff in the eyes of the general public thereby causing wrongful losses to the Plaintiff and wrongful gains to themselves.

31. That the contents and the claims made in the impugned news articles/posts are baseless and reckless without any regard to the truth and without due care or verification. That the defamatory news has been published by the Defendants on the Defendant No. 2 website which is further being disseminated/shared on social media platforms only with an intention to defame, tarnish and malign the reputation and

38

goodwill of the Plaintiff. These facts also indicate that the Plaintiff is being targeted in order to malign his reputation and good will in the eyes of public at large.

32. That, the aforementioned assertion in the impugned news articles/posts is based on no evidence at all. This shows that the impugned news articles/posts are a mere hoax and the allegations are per se false, misleading and defamatory. It is clear that the intention is purely malicious and has been motivated to malign and affect the reputation and credibility of the Plaintiff. The false and defamatory news articles/posts published by the Defendants have been created, uploaded, and circulated with the sole intention of creating panic in the minds of the general public. That the said news is only with an intention to deceive the public at large and the same has been done only to cause wrongful losses to the Plaintiff.

33. That therefore, the impugned news articles/posts are further immensely defaming and derogating the image of the Plaintiff painstakingly built vide constant tireless efforts throughout the years.

34. That in view of the above, it is apparent that the said impugned news articles/posts are not in any manner in the interest of general public and the same have been published in utmost reckless manner without

39

ascertaining the veracity of the same. Thus making it evident that the same has been done, only with an intention to tarnish the image, reputation, goodwill and business of the Plaintiff.

35. That the Defendants, despite having actual knowledge of the false, derogatory and defamatory contents of the post, proceeded to publish the same, and have further failed to remove the said impugned articles from its website in their entirety, as has been elucidated in the preceding Paras, thus the Defendants are liable for the said acts of defamation and consequent damages suffered by the Plaintiff on account of loss of reputation and goodwill. That if a person knowingly permits another to communicate information which is defamatory, the said person who is allowing such dissemination would also be liable for causing defamation. Once the said Defendants have been informed of the defamatory contents of the post, the said Defendants became liable for the publication of defamation by acquiescence that is to say by permitting publication to continue for a period of time when they had the power to prevent it.

36. That the Defendants' deliberate inaction has built up a negative sentiment on the internet and social media against the Plaintiff and has severely tarnished and maligned his reputation and goodwill.

40

## CAUSE OF ACTION:

37. That the cause of action for filing the present suit for the first time arose on 16th July, 2020, when the Plaintiff came across the defamatory news articles/posts published by the Defendants on the Defendant No. 2 website which has further been uploaded/shared/disseminated on numerous social media platforms. The cause of action further arose on 22.07.2020 when the Ld. Counsels for the Plaintiff directed the Defendants to take down/remove the impugned URL's/weblinks comprising of the impugned post, further also directing the Defendants to disclose the details on who had hired Defendants to publish the stories and from where they had obtained information qua the said impugned articles uploaded on the Defendant No. 2 website. The cause of action further arose on 24.07.2020 when Ms. Alysha Tharani acting on behalf of the Defendants refused to provide any such information, although taking down the offending articles. The cause of action is still subsisting as the impugned news articles/posts are still receiving attention on social media platforms as well as the viewers of the Defendant No. 2 inasmuch as the impugned posts are

41

still technically visible over the Defendant No. 2 website upon a basic internet search, thereby causing massive loss in reputation and goodwill to the Plaintiff.

38. That the Plaintiff has suffered, and is likely to further suffer, irreparable harm and injury with regard to the goodwill and reputation of the Plaintiff. Therefore, monetary compensation alone would not be sufficient to address the continuing harm resulting from acts of defamation committed by the Defendants.

39. That the contents of the news articles/posts are utterly malicious and completely bereft of truth and there is an immediate pressing injury to Plaintiff. The Plaintiff apprehends that the Defendants will persist with their malicious conduct, and the Defendants will continue to further defame the Plaintiff which would result in further irreparable injury to the Plaintiff reputation and goodwill.

40. That the Plaintiff seeks damages on account of loss of reputation, goodwill and business caused to it across the globe by the Defendants on account of the acts of defamation and derogation. The Plaintiff enjoys considerable reputation across the globe. The Plaintiff states that the defamatory posts published by the Defendants have been shared and circulated as stated above, to a

42

large number of persons across the globe, causing serious damage to the reputation of the Plaintiff. It is stated that on account of the transmission of the defamatory news articles/posts by the Defendants, Plaintiff has suffered massive reputational loss, which the Plaintiff currently estimate at INR 75 Crores and the Plaintiff craves leave of this Hon'ble Court to ascertain further damages, if any, in favor of the Plaintiff on account of the vindictive and *mala-fide* acts of the Defendants qua defaming the Plaintiff. The Defendants are jointly and severally liable to pay the damages suffered by the Plaintiff.

41. That the Plaintiff has not filed any other or similar suit in this Hon'ble Court or in any other Court in this matter nor is any other case pending in any court.

42. That the Plaintiff confirms the authenticity of the documents and states that the documents filed along with the present suit are true copies of their respective originals along with internet print outs and supporting Section 65B certificate.

43. That the Plaintiff submits that all documents in its possession are being filed however the Plaintiff craves leave of this Hon'ble Court under Order II Rule 2 CPC to add further contentions, facts, claims,

43

reliefs and place reliance upon other such additional documents with respect to the cause of action stipulated herein at a later stage.

## JURISDICTION:

44. That this Hon'ble Court has territorial jurisdiction in the matter as the impugned news articles/posts had been accessed, viewed and read by various individuals including the SPA holder of the Plaintiff within the territorial jurisdiction of this Hon'ble Court. Furthermore, the impugned news articles/posts in question published on the Defendant No. 2 website were able to be seen and accessed by the general public across the world including in Delhi and as such this Hon'ble Court has the necessary territorial jurisdiction to try and entertain the present suit.

## COURT FEES:

45. The value of the present suit for the purposes of court fee and jurisdiction is as follows: -

a)     For a decree of permanent injunction in favour of the Plaintiff restraining the Defendants, their employees, agents, officers, assigns, representatives, group companies from in any manner

44

airing/publishing or propagating in any mode or manner either orally/writing/telecasting any material /article/ news / views/report etc. on their websites/webpages/channels including but not limited to 'meaww.com' which are false and/or misleading and/or defamatory and which relate to the Plaintiff including the impugned news articles/posts and/or any such programs/videos incidental thereto which lowers the goodwill and reputation of the Plaintiff in the eyes of the general public, the present relief is valued at Rs. 200/-, accordingly ad valorem court fees of Rs. 20/- is being affixed.

b)  For a decree of permanent injunction whereby directing the Defendants to permanently block/restrict access to the news/post mentioned in the list of documents attached with the present Plaintiff and/or any other active or similar posts which contain or purport to contain, the defamatory, derogatory and denigrating content or part thereof published and/or posted on their respective channels/websites, and also from all media in the control of the Defendants in India and globally, including but not limited to Defendants channels, website, webpages, mobile application, the

45

present relief is valued at Rs. 200/-, accordingly ad valorem court fees of Rs. 20/- each is being affixed.

c)     For a decree of mandatory injunction in favour of the Plaintiff thereby directing the Defendants, their employees, agents, officers, assigns, representatives, group companies to permanently block/restrict access to the news/post mentioned in the list of documents attached with the present Plaintiff and/or any other active or similar posts which contain or purport to contain, the defamatory, derogatory and denigrating content or part thereof published and/or posted on their respective channels/websites, and also from all media in the control of the Defendants in India and globally, including but not limited to Defendants' channels, website, webpages, mobile application, the present relief is valued at Rs. 200/-, accordingly ad valorem court fees of Rs. 20/- each is being affixed.

d)     For a decree of mandatory injunction in favour of the Plaintiff restraining the Defendants, their employees, agents, officers, assigns, representatives, group companies to permanently block/restrict access to the news/post mentioned in the list of documents attached with the present Plaintiff and/or any other

46

active or similar posts which contain or purport to contain, the defamatory, derogatory and denigrating content or part thereof published and/or posted on their respective channels/websites, and also from all media in the control of the Defendants in India and globally, including but not limited to Defendants' channels, website, webpages, mobile application; on receipt of any complaint in future from the Plaintiff with regard to the impugned post or any other URL/Weblinks containing or purporting to contain in part or whole the contents of the impugned news articles/posts, the present relief is valued at Rs. 200/-.

e)   For a decree of prohibitory injunction in favour of the Plaintiff restraining the Defendants, their employees, agents, officers, assigns, representatives, group companies from publishing any such news articles/posts in the future against the Plaintiff without ascertaining the veracity and truthfulness of the same from the Plaintiff the present relief is valued at Rs. 200/-, accordingly ad valorem court fees of Rs. 20/- each is being affixed.

f)   For an order directing the Defendants to disclose the details as to who had hired Defendants to publish the stories and from where they had obtained information qua the said impugned

47

articles uploaded on the Defendant No. 2 website to the Plaintiff, the present relief is valued at Rs. 200/-, accordingly ad valorem court fees of Rs. 20/- each is being affixed.

g) For a decree of damages the relief is provisionally valued for the purposes of court fee at Rs. 75,00,00,000/- qua the Plaintiff and ad volrem court fees of Rs. 74,30,000/- is affixed thereon. The Plaintiff undertakes to make up the deficiency of court fee, if any, once the actual damages are ascertained and awarded to the Plaintiff.

## LIMITATION:

46. The present suit is well within the period of limitation.

47. That the present dispute is not a commercial dispute as per Section 2(c) of the Commercial Courts. Commercial Division & Commercial Appellate Division of High Courts Act, 2015. Thus, the present suit is being filed as an ordinary suit.

## PRAYER

In the facts and circumstances of the present case, it is most respectfully prayed that this Hon'ble Court may be pleased to grant;

48

i. Pass a decree of permanent injunction in favour of the Plaintiff restraining the Defendants, their employees, agents, officers, assigns, representatives, group companies from in any manner airing/publishing or propagating in any mode or manner either orally/writing/telecasting any material /article/news/views/report etc. on their websites/webpages/channels including but not limited to 'meaww.com' which are false and/or misleading and/or defamatory and/or disparaging which relates to the Plaintiff including the impugned news articles/posts/programs/ videos which lowers the goodwill and reputation of the Plaintiff in the eyes of the general public.

ii. Pass a decree of permanent injunction whereby directing the Defendants to permanently block/restrict access to the news articles/posts/Weblinks/URLs mentioned in the list of documents attached with the present Plaintiff and/or any other active or similar posts which contain or purport to contain, the defamatory, derogatory and denigrating content or part thereof posted on their respective websites, and also from all media in the control of the Defendants across the globe, including but not limited to Defendants website, webpages, mobile application, across the globe;

49

iii.    Pass a decree of mandatory injunction in favour of the Plaintiff thereby directing the Defendants, their employees, agents, officers, assigns, representatives, group companies to permanently block/restrict access to the news/post mentioned in the list of documents attached with the present Plaintiff and/or any other active or similar posts which contain or purport to contain, the defamatory, derogatory and denigrating content or part thereof published and/or posted on their respective channels/websites, and also from all media in the control of the Defendants in India and globally, including but not limited to Defendants' channels, website, webpages, mobile application;

iv.    Pass a decree of mandatory injunction in favour of the Plaintiff restraining the Defendants, their employees, agents, officers, assigns, representatives, group companies to permanently block/restrict access to the news/post mentioned in the list of documents attached with the present Plaintiff and/or any other active or similar posts which contain or purport to contain, the defamatory, derogatory and denigrating content or part thereof published and/or posted on their respective channels/websites, and also from all media in the control of the Defendants in India and globally, including but not limited to

50

Defendants' channels, website, webpages, mobile application; on receipt of any complaint in future from the Plaintiff with regard to the impugned news article/post or any other URL/Weblinks containing or purporting to contain in part or whole the contents of the impugned news articles/posts;

v. Pass a decree of Prohibitory Injunction in favour of the Plaintiff restraining the Defendants, their employees, agents, officers, assigns, representatives, group companies from publishing any such news articles/posts in the future against the Plaintiff without ascertaining the veracity and truthfulness of the same from the Plaintiff;

vi. Pass an order whereby directing the Defendants to disclose the details as to who had hired Defendants to publish the impugned news articles/posts and the sources from where the Defendants had obtained information qua the said impugned articles uploaded on the Defendant No. 2 website, to the Plaintiff;

vii. Pass a decree of rendition of accounts of Defendants whereby conducting an enquiry as to assess the exact quantum of revenue generated by the Defendants by publishing or propagating the impugned news articles/posts and/or any such incidental

51

articles/videos/programs/posts/weblinks/URLs,   defaming   the

Plaintiffs;

viii.   Pass a decree of damages to the tune of Rs. 75,00,00,000/- in favour

of the Plaintiff and jointly and severally against the Defendants;

ix.   for costs of this suit;

x.   Any other and further reliefs as this Hon'ble Court may deem fit and

proper to meet the ends of justice.

**PLAINTIFF**
**Through its SPA HOLDER**

THROUGH:

DL4v33|2018

**SIMRANJEET SINGH, AADHAR NAUTIYAL**
**ATHENA LEGAL**
37, Link Road, First Floor,
Lajpat Nagar-III,
New Delhi – 110024
9205109664
aadhar.nautiyal@athenalegal.in

Place: New Delhi
Date: 07/08/20200

52

## VERIFICATION:-

Verified at New Delhi on this 5th day of August, 2020 that the contents of para nos. 1-21 & 36 of the present plaintiff are true and correct to the best of my knowledge and belief. The contents of paragraph nos. 22-35, 37-47 & Prayer are true and correct to the best of my knowledge and information and legal advice received and believed to be true. The content of last para is prayer before this Hon'ble Court.

**PLAINTIFF**
**Through its SPA Holder**

53

## IN THE HIGH COURT OF DELHI AT NEW DELHI
## (ORDINARY ORIGINAL CIVIL JURISDICTION)
### C.S. (OS) No.____ OF 2020

**IN THE MATTER OF:**

Daniel Snyder, Through his SPA Holder                    ...Plaintiff

Versus

Eleven Internet Services LLP & Ors.                    ....Defendants

### AFFIDAVIT

I, Col. (Retd.) Bhushan Lal, aged about 54 years, S/o Sh. R.D Sapra, Special Power of Attorney Holder of Plaintiff having my office at 105A, Indraprakash Building, 21 Barakhamba Road, New Delhi-110001, duly authorized vide SPA dated 05.08.2020 executed in the United States of America, the deponent above-named, do hereby solemnly affirm and declare as under:

1. I am the SPA Holder of the Plaintiff duly authorized vide SPA dated 05.08.2020, executed in the United States of America, in the above suit and competent to swear this affidavit.

2. I have read and understood the accompanying suit and state and verify that the averments made in the same are based on the records of the Plaintiff and based on legal advice received from the Plaintiff and are believed by me to be true and the averments made in the last unnumbered paragraph are in the nature of humble prayers of the Plaintiff before this Hon'ble Court.

3. That the documents filed herewith are true copies of their respective originals.

**DEPONENT**

S4

## VERIFICATION

I, Bhushan Lal, verify that the averments made in paragraph 1-3 of my affidavit are true to my knowledge, that no part of it is false and nothing has been concealed there from.

Verified at New Delhi on this the 5th day of August, 2020.

DEPONENT

1

## IN THE HIGH COURT OF DELHI AT NEW DELHI
## (ORDINARY ORIGINAL CIVIL JURISDICTION)
### C.S. (OS) No.      OF 2020

**IN THE MATTER OF:**

Daniel Snyder, Through his SPA Holder                    ...Plaintiff

Versus

Eleven Internet Services LLP & Ors.                    ….Defendants

### INDEX-II

| S. NO. | PARTICULARS | PAGES |
|--------|-------------|-------|
| 1. | Application under Order XXXIX Rules 1 and 2 read with Section 151 of the Code of Civil Procedure alongwith Affidavit | 2 – 22 |
| 2. | Application under Section 151 of the Code of Civil Procedure alongwith Affidavit | 23 – 27 |
| 3. | Application under Section 151 of the Code of Civil Procedure seeking exemption from filing attested affidavits. | 28 – 31 |
| 4. | Application under Section 149 CPC read with Section 151 CPC seeking extension of time to file court fee | 32 – 36 |

THROUGH:

D/4033/2018

**SIMRANJEET SINGH, AADHAR NAUTIYAL**
**ATHENA LEGAL**
Advocate(s) for the Plaintiff
37, Link Road, First Floor,
Lajpat Nagar-III,
New Delhi – 110024
9205109664
aadhar.nautiyal@athenalegal.in

Place: New Delhi
Date:03/08/2020

2

## IN THE HIGH COURT OF DELHI AT NEW DELHI
### (ORDINARY ORIGINAL CIVIL JURISDICTION)
C.S. (OS) No.      OF 2020

**IN THE MATTER OF:**

Daniel Snyder, Through his SPA Holder                    ...Plaintiff

Versus

Eleven Internet Services LLP & Ors.                      ....Defendants

## APPLICATION UNDER ORDER XXXIX RULE 1 AND 2 READ WITH SECTION 151 CPC PRAYING FOR AD-INTERIM INJUNCTION AND EX PARTE INJUNCTION AGAINST THE DEFENDANTS

The Plaintiff above-named respectfully submit as under:

1.    That the Plaintiff is filing the accompanying suit for declaration of permanent and mandatory injunction against the Defendants and craves leave of this Hon'ble Court to rely on the contents of the same which may be read as part and parcel of the present application and are not repeated herein for the sake of brevity of this Hon'ble Court.

2.    That the Plaintiff is a highly-accomplished and successful American entrepreneur, businessman and philanthropist residing in Maryland, USA and is the controlling owner of the Team, which is amongst the most prominent teams in the National Football League of America. The Plaintiff was also the founder, Chairman and Chief Executive Officer of Snyder Communications, Inc., which the Plaintiff had started from

3.

very modest beginnings and after continuous hard work, determination and persistence, led to the Plaintiff becoming the youngest ever CEO of a company listed on the New York Stock exchange in the year 1996. The Plaintiff through his tireless efforts has built the Washington Football Team into one of the most valuable professional athletic franchises in the world. The Plaintiff is also well known for his philanthropic donations to charitable causes involving support for children's hospitals, groups combating exploitation of children, and victims of the September 11, 2001 terrorist attacks.

3. That the Plaintiff on or about 16th July, 2020 came to know about publishing of false, highly defamatory and malicious news against the Plaintiff published on the Defendant No. 2 website, based on absolutely false and/or wrong and/or misleading facts/documents/statement wherein the headline of the defamatory Article at the URL https://meaww.com/washington-redskins-owner-dan-snyder-to-step-down-owing-to-sex-trafficking-allegations-fan-reactions read as *"Washington Redskins owner Dan Snyder faces sex trafficking allegations; Internet says, 'He was on Epstein's list[.]'* It had been alleged in the article that the minority owners of the Team owned by the Plaintiff were "apparently looking at bringing him down citing

4

inappropriate and unchaste behavior as one of the major reasons." It is stated that the article falsely accused the Plaintiff of personally committing extremely serious sexual misconduct, as well as association with convicted sex offender and infamous sexual predator Jeffrey Epstein, who committed suicide in prison while facing sex trafficking charges and is commonly alleged to have maintained a "list" of wealthy individuals in his social circle who participated in sexual misconduct involving minors in his presence. Another article published on the Defendant No. 2 website at the URL https://meaww.com/washington-redskins-dan-snyder-jeffrey-epstein-sexual-harrasment-sex-trafficking-scandal-name-change which bears the headline *"#RedskinsScandal: Will Dan Snyder rename Washington Redskins the 'Epsteins'? Angry Internet screams 'throw him out[.]'"*. It is submitted that the said article expressly refers to, and repeats, the false allegations of the previous article as stipulated herein above *i.e.*, the false claims that the Plaintiff is linked to sexual predator Jeffrey Epstein and that the Plaintiff is or was involved in sexual misconduct, including sex trafficking. The said article also falsely claims, again citing an anonymous tweet that *"Dan Snyder has decided on a new team name: [Jeffrey] Epsteins."* It is submitted that the entire contents of the

5

impugned post/article are highly defamatory, derogatory and libelous and based on no factual evidence at all. That the impugned post/article has caused irreparable loss and harm to the reputation and goodwill of the Plaintiff. It is submitted that the statements are extremely irresponsible, incendiary, and damaging false statements, made by Defendants without any investigation or basis in fact, with deliberate malice toward the Plaintiff and with reckless disregard for the truth. The Defamatory Statements were and are utterly baseless, and represent nothing more than Defendants' attempt to generate attention and revenue from its hidden clients by publishing deliberately inflammatory headlines which they knew to be false and/or utterly failed to investigate.

4.   That from a bare reading of the contents of the impugned URL's/weblinks consisting of the posts/articles published on the Defendant No. 2 website, it is amply clear that derogatory, libelous and malicious aspersions have been casted against the Plaintiff accusing the Plaintiff of sexual offences. The said allegations are absolutely false, frivolous, and made with absolute recklessness which has caused grave prejudice and damage to the hard-earned reputation, goodwill and image of the Plaintiff.

6

5.  It is submitted that the false allegations published by way of the impugned articles/posts uploaded on the Defendant No. 2 website have been shared on numerous social media platforms.

6.  It is submitted that the entire impugned content is based on no evidence and has been published without verifying facts and/or documents which goes against the basic tenets of ethical and fairness. It is submitted that the Defendants have published/broadcasted the impugned articles/posts on its website which has further been shared/uploaded/disseminated on numerous social media platforms without verifying the facts and/or ascertaining the veracity of the frivolous allegations that have been levelled against the Plaintiff. It is submitted that the impugned news has been published by the Defendant No. 1 with reckless disregard and without seeking any information qua the same from the Plaintiff, with the sole intention to malign and tarnish the image, reputation and goodwill of the Plaintiff.

7.  That, the Ld. Counsels on behalf of the Plaintiff addressed a communication dated 22.07.2020 directing the Defendants to remove/take-down the impugned posts/articles from its website, further also requesting disclosing the details on who had hired Defendants to publish the stories and from where they had obtained information qua

7

the said impugned articles, albeit, Ms. Alysha Tharani acting on behalf of the Defendants, vide email dated 24.07.2020 apprised the Ld. Counsels on behalf of the Plaintiff that they were not required to take any such action, although the offending articles had been removed. It is submitted that the offending articles albeit removed, are still available for viewership to a limited extent and the same has been duly elucidated upon in the accompanying Plaint. It is submitted that numerous other websites have relied upon the derogatory and defamatory articles published by the Defendants. The same can be perused from the last result of the image reproduced herein above, wherein the author has reiterated the contents of the impugned articles/posts uploaded on the Defendant No. 2 website.

8. The Defendants here purport to run news sites and related companies but, in fact, truly are (to quote a popular phrase of the day) "fake news" published on behalf of hidden clients. Rather than being legitimate news sources and reporters, the Defendants intentionally sow misinformation at the behest of their well-heeled and well-placed clients – often national governments and intelligence services – with their clients generally cloaked behind several layers of anonymous corporate entities.

8

9.  It is submitted that the Defendants, compensated by their clients, have published, worldwide, the most debased, untrue, and slanderous statements, maliciously and falsely accusing the Plaintiff Daniel Snyder of heinous crimes, that Defendants published with reckless disregard for their falsity.

10.  That it is submitted that the Defendant No. 2 website i.e. MEAWW has worldwide reach, as it publishes globally via the internet and receives internet traffic from India, the United States, and many other countries the world over.  The Defendant No. 2 website claims that it has reached 150 million registered users, receives one billion page views a month, and was ranked by Alexa (an Amazon company) as one of the top 500 websites in the world.

11.  That it is submitted that the articles dated July 16, 2020, uploaded on the Defendant No. 2 website i.e. MEAWW written by the Defendant Nos. 5 & 6 respectively, published at the behest of the Defendant Nos. 3 & 4 i.e. Nirnay Chowdhary and Anay Chowdhary are absolutely untrue and wholly fabricated articles regarding the Plaintiff i.e. Mr. Snyder, falsely accusing him of a broad array of acts of criminal sexual misconduct, including involvement in sex trafficking and affiliating with sexual predator Jeffrey Epstein.

9

12. That it is submitted that these false and fabricated articles purported to be news, are utterly fabricated and have no legitimate basis whatsoever. In fact, like much of the Defendant No. 2 website i.e. MEAWW's content the impugned articles rely on "the internet" as a source.

13. That it is submitted that the false allegations Defendants have seeded on the internet have taken root beyond the Defendant No. 2 website i.e. MEAWW itself.   For instance, on or about July 16, 2020 – not coincidentally, the very same day as the defamatory articles by the Defendant No. 2 website were published– the following appeared on a Twitter account that has been confirmed as a fake account existing for no purpose other than to propagate false and misleading information:

> *According to insiders and anonymous Washington Post employees, the [upcoming] article will allege that: Dan Snyder abuses drugs and alcohol[;] Snyder paid off refs. Some refs have made $2 million from him. And Snyder is not the only team owner paying off refs. Others do it too. Snyder and former Redskins coach Jay Gruden, brother of Jon Gruden, pimped out their cheerleaders to season ticket holders while holding their passports from them in a foreign country. Jay Gruden and then Redskins running back Kapri Bibbs were sleeping with the same woman. When Jay found out, he got petty and benched Bibbs. During that game when Bibbs was on the bench, Bibbs' replacement missed a block and that resulted in quarterback Alex Smith suffering a broken leg. Alex hasn't been able to*

|0

> *play football ever since[.]   Snyder and Gruden*
> *would hold sex parties with rampant drug usage*
> *and some sexual assaults[.]   Snyder held nude*
> *photoshoots with the Redskins cheerleaders[.]*
> *Lawyers are already involved[.]*

It is submitted that the Plaintiff is unaware as to whether the account

through which the aforementioned content had been uploaded on the

social media platform *Twitter* belonged to a real person or was one of

the "Bots" utilized to further propagate The Defendant No.2 website's

for-profit lies, and the same is required to be ascertained.

14. That it is submitted that these false statements were further repeated on

the very same day without attribution to the Defendant No. 2 website

but without any further basis whatsoever in a Facebook account for a

well-known fan group for the football team belonging to the Plaintiff.

That statement also added (again falsely) that the U.S. Federal Bureau

of Investigations "possibly" may be involved.

15. That the statements that Defendants published, and that were repeated

and further propagated in the July 16 Tweet and Facebook post, about

the Plaintiff i.e. Mr. Snyder are categorically false.   Moreover, the

Defendants published these slanderous, inflammatory statements about

the Plaintiff with complete disregard for their basis in fact at best, and

deliberate intent to damage the Plaintiff.

11

16. That the Defendants have singled out the Plaintiff by publishing the news article on their website and further allowing to upload/share/disseminate/publish the highly defamatory and malicious posts against the Plaintiff alone, in order to ensure that irreparable loss and injury is occasioned to the hard earned reputation and goodwill of the Plaintiff herein. Publishing of such news articles by the Defendants and further allowing the uploading/sharing/disseminating/publishing by Defendants is against the internationally recognized Right to Reputation as granted under Article 12 of the Universal Declaration of Human Rights and Article 17 of the International Covenant on Civil and Political Rights, to which India is a signatory.

17. That the Right to Freedom of Speech and Expression of news broadcasters comes along with a duty and responsibility of not abusing such freedom in furtherance of their personal vendetta towards any particular entity. It is submitted that although the freedom of press is an inalienable right, the same is not absolute and is subject to be controlled under Article 19(2) of the Constitution of India as uncontrolled right to speech leads to anarchism. The Freedom of Speech and Expression as guaranteed by the Constitution does not confer an absolute right to speak or publish whatever one chooses and

12

it is not an unrestricted or unbridled license that may give immunity and prevent punishment for abuse of the freedom. The right has its own natural limitation and supposed journalists are in no better position than any other person. They have no greater freedom than others to make any imputations or allegations sufficient to ruin the reputation of a citizen. Reckless defamatory comments as is the case in the present scenario are unacceptable. This Hon'ble Court, in a catena of judgements has held that speech that the Press enjoys can be curtailed with reasonable restrictions in instances where they are not entitled to either make or circulate defamatory statement, false statements made with the intention to deteriorate the image of a public figure, etc. The Defendant Nos. 5 & 6 who are the original authors of the impugned articles/posts uploaded on the Defendant No. 2 website have failed to exercise caution, have failed to verify and/or ascertain the truthfulness and correctness behind the said allegations, and have proceeded with publishing the impugned articles, with malicious intent so as to damage the Plaintiff's reputation and goodwill, and are thus liable to be proceeded against in accordance with law. Further, the Defendant Nos. 3 & 4 who exercise actual control over the Defendant Nos. 1 & 2 and thus have effective control over what is published on the Defendant

13

No. 2 website have also failed in their duties, and have further failed in ascertaining the correctness and veracity of the allegations levied against the Plaintiff in the impugned articles, with a view to tarnish the reputation of the Plaintiff, and have thus effectively led to the launch of a smear campaign against the Plaintiff. It is relevant to submit herein that the said Defendants have earned revenue by defaming and derogating the Plaintiff on behalf of undisclosed third-party clients and are therefore liable to be proceeded against in accordance with law.

18. Thus, the present defamatory, derogatory and vilification campaign initiated by the Defendants has been carried out with an ulterior motive of Defendants against the Plaintiff.

19. That the vilification campaign has been intensified by the constant sharing of the impugned post published/broadcasted on the Defendant No. 2 website, further being repeatedly shared/uploaded/disseminated on social media platforms, with the sole objective of lowering the name, image, reputation, good will of the Plaintiff in the eyes of general public across the globe. Uploading/sharing/disseminating of such a post cannot be said to be news and/or fair reporting of the news.

20. That, as such the impugned news articles published by the Defendants which have been constantly uploaded/shared/disseminated on social

14

media platforms are garnering wide viewership in India as well as abroad including within the jurisdiction of this Hon'ble Court. The news articles published by the Defendants can still be viewed over the internet on personal computers or mobile devices through a basic search, despite the impugned articles having been taken down by the Defendant No. 2. Thus, the impugned news articles published by the Defendants which has further been shared/disseminated on social media platforms is easily accessible not only in India but across the globe. The Plaintiff has received frantic calls from friends, business associates as well as family members enquiring into the correctness of the allegations, and they have categorically told the Plaintiff that the image and reputation of the Plaintiff in their eyes has gone down considerably owing to the allegations levied in the impugned news articles published by the Defendants.

21. That the impugned news articles/posts as published on the Defendant No. 2 website have been repeatedly shared on social media platforms and have received a large number of comments from people which clearly establishes, that the defamatory news articles published by the Defendants have highly prejudiced the good will and reputation of the Plaintiff. It is submitted that the Defendants are misusing/overreaching

15

the freedom guaranteed to the Press and supposed journalists under Article 19(1)(a) of the Constitution of India.

22. That the entire campaign has been carried out with a premeditated object of tarnishing and maligning the hard earned reputation and goodwill of the Plaintiff as part of a malicious campaign / propaganda against the Plaintiff. That such abuse of the dominant position by the Defendants is against all canons of ethics especially when the object is to unfairly influence the reputation and good will of the Plaintiff by spreading wrong and incorrect information in the minds of the people across the globe.

23. That, since the Defendants in blatant disregard for the rule of law and legitimate journalistic ethics and by misusing the process of law, have left no stone unturned to vilify, malign and denigrate the name, image, reputation and good will of the Plaintiff in the eyes of the general public thereby causing wrongful losses to the Plaintiff and wrongful gains to themselves.

24. That the aforementioned assertion in the impugned news articles/posts is based on no evidence at all. This shows that the impugned news articles/posts are a mere hoax and the allegations are per se false, misleading and defamatory. It is clear that the intention is purely

16

malicious and has been motivated to malign and affect the reputation and credibility of the Plaintiff. The false and defamatory news articles/posts published by the Defendants have been created, uploaded, and circulated with the sole intention of creating panic in the minds of the general public. That the said news is only with an intention to deceive the public at large and the same has been done only to cause wrongful losses to the Plaintiff.

25. That the Defendants, despite having actual knowledge of the false, derogatory and defamatory contents of the post, proceeded to publish the same, and have further failed to remove the said impugned articles from its website in their entirety, thus the Defendants are liable for the said acts of defamation and consequent damages suffered by the Plaintiff on account of loss of reputation and goodwill.

26. That the Defendants' deliberate inaction has built up a negative sentiment on the internet and social media against the Plaintiff and has severely tarnished and maligned his reputation and goodwill.

27. That the balance of convenience lies in favor of the Plaintiff and the Plaintiff has no other, better, alternate, efficacious and expeditious remedy available against the Defendants to protect its reputation and respect all across the globe and there is no legal impediment for grant

17

of relief being sought herein as otherwise in case the Defendants would succeed in their nefarious designs in the absence of such ad interim injunction besides the Plaintiff suffering irreparable loss and injury the whole purpose for filing the present suit shall become redundant.

28. That the Plaintiff has a prima facie good case and there is every likelihood of the Plaintiff succeeding before this Hon'ble Court against the defendants.

29. That the present application is made *bonafide* and in the interest of justice;

### P R A Y E R

In view of the facts and circumstances stated herein above and in the interest of justice, it is most respectfully prayed that this Hon'ble Court may be pleased:

i.      Pass an order granting ad-interim injunction in favour of the Plaintiff and against the Defendants whereby directing the Defendants to permanently take down, remove and/ or block/restrict access to the news articles/posts/URLs/weblinks mentioned in the list of documents attached with the present Plaint and/or other active news articles/posts//URLs/weblinks which contain or purport to contain, the defamatory impugned news/articles or part thereof posted on their

respective websites, and also from all media in the control of the Defendants, including but not limited to meaww.com website, mobile application;

ii.    Pass an order granting ad-interim injunction in favour of the Plaintiff restraining the Defendants, its agents, officers, assignees, representatives thereby directing the Defendants to forthwith block/remove the impugned news articles/channels/posts/weblinks/URLs from channels, websites, webpages, mobile application in its control;

iii.    Pass an order granting ad-interim injunction in favour of the Plaintiff and against the Defendants thereby directing the Defendants to block/remove the impugned news articles/posts from its websites on receipt of any complaint in future from the Plaintiff or its officials in regard to the same news articles/posts or containing the same/similar subject matter; and also from all media in the control of the Defendants, including but not limited to meaww.com website, mobile applications, another platforms;

iv.    Pass an order granting ad-interim Injunction in favour of the Plaintiff and against the Defendants for restraining the Defendants or other news agencies from reporting any news with respect to the impugned news    articles/posts/URLs/Weblinks    or    any    other    news

19

articles/posts/URLs/Weblinks containing the same or similar subject matter;

v.   Pass an ad-interim order directing the Defendants to disclose the source from where the information forming part of the impugned news articles/posts has been procured from by the Defendants, to the Plaintiff;

vi.   Pass such other or further orders as this Hon'ble Court may deem fit and proper in the interest of justice.

**PLAINTIFF**
**Through its SPA HOLDER**

THROUGH:

**SIMRANJEET SINGH, AADHAR NAUTIYAL**
**ATHENA LEGAL**
37, Link Road, First Floor,
Lajpat Nagar-III,
New Delhi – 110024
9205109664
aadhar.nautiyal@athenalegal.in

Place: New Delhi
Date: 03/08/20200

20

**VERIFICATION:-**

Verified at New Delhi on this 5th day of August, 2020 that the contents

of para nos. __2-15__ of the present application are true and correct to

the best of my knowledge and belief. The contents of paragraph nos.

__1, 16- 27, 28 & 29__ are true and correct to the best of my

knowledge and information and legal advice received and believed to be

true. The content of last para is prayer before this Hon'ble Court.

**PLAINTIFF**
**Through its SPA Holder**

21

## IN THE HIGH COURT OF DELHI AT NEW DELHI
## (ORDINARY ORIGINAL CIVIL JURISDICTION)
### C.S. (OS) No.____ OF 2020

**IN THE MATTER OF:**

Daniel Snyder, Through his SPA Holder                    ...Plaintiff

Versus

Eleven Internet Services LLP & Ors.                    ….Defendants

### AFFIDAVIT

I, Col. (Retd.) Bhushan Lal, aged about 54 years, S/o Sh. R.D Sapra, Special Power of Attorney Holder of Plaintiff having my office at 105A, Indraprakash Building, 21 Barakhamba Road, New Delhi-110001, duly authorized vide SPA dated 05.08.2020 executed in the United States of America, the deponent above-named, do hereby solemnly affirm and declare as under:

1.   I am the SPA Holder of the Plaintiff duly authorized vide SPA dated 05.08.2020, executed in the United States of America, in the above suit and competent to swear this affidavit.

2.   I have read and understood the accompanying application under Order XXXIX Rules 1 & 2 read with Sec. 151 CPC and state and verify that the averments made in the same are based on the records of the Plaintiff and based on legal advice received from the Plaintiff and are believed by me to be true and the averments made in the last unnumbered paragraph are in the nature of humble prayers of the Plaintiff before this Hon'ble Court.

**DEPONENT**

22

## VERIFICATION

I, Bhushan Lal, verify that the averments made in paragraph 1-2 of my affidavit are true to my knowledge, that no part of it is false and nothing has been concealed there from.

Verified at New Delhi on this the 5th day of August, 2020.

DEPONENT

23

## IN THE HIGH COURT OF DELHI AT NEW DELHI
## (ORDINARY ORIGINAL CIVIL JURISDICTION)
### C.S. (OS) No.    OF 2020

**IN THE MATTER OF:**

Daniel Snyder, Through his SPA Holder                    ...Plaintiff

Versus

Eleven Internet Services LLP & Ors.                    ....Defendants

## APPLICATION ON BEHALF OF THE PLAINTIFF UNDER SECTION 151 CPC FOR SEEKING EXEMPTION FROM FILING ORIGINAL/DIM DOCUMENTS

The Plaintiff above-named most respectfully submits as under:

1.    That the Plaintiff has filed the present suit against the Defendants praying *inter alia* that the Defendants be restrained by a permanent and mandatory injunction from broadcasting the false or/ and defamatory news articles being published/uploaded/posted/shared/disseminated at the respective news channels/applications/websites/portal/URLS. The aforesaid suit is pending adjudication before this Hon'ble Court.

2.    That the Plaintiff has filed the photocopies of some documents before this Hon'ble Court which are true copies of its originals. The Plaintiff undertakes to produce the originals of the documents, the true copies of which are filed along with the accompanying suit before this Hon'ble Court at the time of evidence and/or at all other dates and when this

*24*

Hon'ble Court directs the Plaintiff to do so.

3.  That the Plaintiff further states that though it has taken care to file absolutely clear copies of the documents, if the same is found to be illegible or not with clear prescribed margin, the Plaintiff undertakes to file such clear copies of the said documents before this Hon'ble Court.

### PRAYER

It is, therefore and in the interest of justice prayed that this Hon'ble Court may be pleased to:

a)  An exemption may kindly be granted to the Plaintiff from filing of the original / certified / fair typed copies of the said documents with proper margins. All documents filed herewith are the true copies of the originals; and

b)  Pass such other and further orders as this Hon'ble Court deem fit and proper in the facts and circumstances of the case.

**PLAINTIFF**
**Through its SPA Holder**

Through:

**SIMRANJEET SINGH, AADHAR NAUTIYAL**
**ATHENA LEGAL**
Advocate(s) for the Plaintiff
37, Link Road, First Floor,
Lajpat Nagar-III,

25

Place: New Delhi
Date: 07/08/2020

New Delhi – 110024
9205109664
aadhar.nautiyal@athenalegal.in

26

## IN THE HIGH COURT OF DELHI AT NEW DELHI
## (ORDINARY ORIGINAL CIVIL JURISDICTION)
### C.S. (OS) No.     OF 2020

**IN THE MATTER OF:**

Daniel Snyder, Through his SPA Holder                    ...Plaintiff

Versus

Eleven Internet Services LLP & Ors.              ....Defendants

### AFFIDAVIT

I, Col. (Retd.) Bhushan Lal, aged about 54 years, S/o Sh. R.D Sapra, Special Power of Attorney Holder of Plaintiff having my office at 105A, Indraprakash Building, 21 Barakhamba Road, New Delhi-110001, duly authorized vide SPA dated 05.08.2020 executed in the United States of America, the deponent above-named, do hereby solemnly affirm and declare as under:

1. I am the SPA Holder of the Plaintiff authorized vide SPA dated 05.08.2020, executed at United States of America, in the above suit and competent to swear this affidavit.

2. I have read and understood the accompanying application under Sec. 151 CPC seeking exemption from filing original/dim documents and state and verify that the averments made in the same are based on the records of the Plaintiff and based on legal advice received from the Plaintiff and are believed by me to be true and the averments made in the last unnumbered paragraph are in the nature of humble prayers of the Plaintiff before this Hon'ble Court.

**DEPONENT**

27

## VERIFICATION

I, Bhushan Lal, verify that the averments made in paragraph 1-2 of my affidavit are true to my knowledge, that no part of it is false and nothing has been concealed there from.

Verified at New Delhi on this the 5th day of August, 2020.

**DEPONENT**

28

### IN THE HIGH COURT OF DELHI AT NEW DELHI
### (ORDINARY ORIGINAL CIVIL JURISDICTION)
### C.S. (OS) No.     OF 2020

**IN THE MATTER OF:**

Daniel Snyder, Through his SPA Holder                    ...Plaintiff

Versus

Eleven Internet Services LLP & Ors.                    ….Defendants

**APPLICATION ON BEHALF OF THE PLAINTIFF UNDER SECTION 151 CPC FOR SEEKING EXEMPTION FROM FILING ATTESTED AFFIDAVIT**

The Plaintiff above-named most respectfully submit as under:

1.   That the Plaintiff has filed the present suit against the Defendants praying *inter alia* that the Defendants be restrained by a permanent and mandatory injunction from broadcasting the false or/ and defamatory news articles being aired/published/uploaded/posted/shared/disseminated at the respective news channels/applications/websites/portal/URLS. The aforesaid suit is pending adjudication before this Hon'ble Court.

2.   That the Plaintiff seeks accommodation of this Hon'ble Court to file non-attested affidavits inasmuch the same cannot be attested on account of the ongoing lockdown in the country implemented on account of the spread of the COVID-19 virus. The Plaintiff undertakes to file original attested copies of the affidavits immediately upon

29

reopening of the courts.

3. That the present application has been preferred *bonafide* and in the interests of justice. No prejudice shall be caused to the Defendants if the present application is allowed albeit the Plaintiff shall suffer irreparable injury if the present application is disallowed.

## PRAYER

It is, therefore and in the interest of justice prayed that this Hon'ble Court may be pleased to:

a) An exemption may kindly be granted to the Plaintiff to file the present plaint without attested affidavits and allow the Plaintiff to file the same upon reopening of the Hon'ble Court post lockdown.

b) Pass such other and further orders as this Hon'ble Court deem fit and proper in the facts and circumstances of the case.

**PLAINTIFF**
**Through its SPA Holder**

Through:

D/4633/2018

**SIMRANJEET SINGH, AADHAR NAUTIYAL**
**ATHENA LEGAL**
Advocate(s) for the Plaintiff
37, Link Road, First Floor,
Lajpat Nagar-III,
New Delhi – 110024
9205109664

Place: New Delhi
Date: 04/08/2020

20

## IN THE HIGH COURT OF DELHI AT NEW DELHI
## (ORDINARY ORIGINAL CIVIL JURISDICTION)
### C.S. (OS) No.      OF 2020

**IN THE MATTER OF:**

Daniel Snyder, Through his SPA Holder                    ...Plaintiff

Versus

Eleven Internet Services LLP & Ors.                    ....Defendants

### AFFIDAVIT

I, Col. (Retd.) Bhushan Lal, aged about 54 years, S/o Sh. R.D Sapra, Special Power of Attorney Holder of Plaintiff having my office at 105A, Indraprakash Building, 21 Barakhamba Road, New Delhi-110001, duly authorized vide SPA dated 05.08.2020 executed in the United States of America, the deponent above-named, do hereby solemnly affirm and declare as under:

1.   I am the SPA Holder of the Plaintiff duly authorized vide SPA dated 05.08.2020, executed at United States of America, in the above suit and competent to swear this affidavit.

2.   I have read and understood the accompanying application under Sec. 151 CPC seeking exemption from filing attested affidavits and state and verify that the averments made in the same are based on the records of the Plaintiff and based on legal advice received from the Plaintiff and are believed by me to be true and the averments in the last unnumbered paragraph are in the nature of humble prayers of the Plaintiff before this Hon'ble Court.

**DEPONENT**

31

## VERIFICATION

I, Bhushan Lal, verify that the averments made in paragraph 1-2 of my affidavit are true to my knowledge, that no part of it is false and nothing has been concealed there from.

Verified at New Delhi on this the 5th day of August, 2020.

**DEPONENT**

32

### IN THE HIGH COURT OF DELHI AT NEW DELHI
### (ORDINARY ORIGINAL CIVIL JURISDICTION)
### C.S. (OS) No.    OF 2020

**IN THE MATTER OF:**

Daniel Snyder, Through his SPA Holder                ...Plaintiff

Versus

Eleven Internet Services LLP & Ors.                ....Defendants

## APPLICATION UNDER SECTION 149 CPC READ WITH SECTION 151 CPC SEEKING EXTENSION OF TIME TO FILE COURT FEE

**MOST RESPECTFULLY SHOWETH:**

1. That the Plaintiff has filed the present suit against the Defendants praying *inter alia* that the Defendants be restrained by a permanent and mandatory injunction from broadcasting the false or/ and defamatory news articles being aired/published/uploaded/posted/shared/disseminated at the respective news channels/applications/websites/portal/URLS. The aforesaid suit is pending adjudication before this Hon'ble Court. The Plaintiff herein has further sought damages of Rs. 75,00,00,000/- (Rupees Seventy Five Crores only). The aforesaid suit is pending adjudication before this Hon'ble Court.

2. It is most respectfully submitted that the Plaintiff has valued the present suit for the purposes of court fees & jurisdiction at Rs.

33.

75,00,00,000/- (Rupees Seventy Five Crores) and court fees of Rs. 74,30,000/- (Rupees Seventy Four Lacs and Thirty Thousand Only) is liable to be paid on the same.

3.  It is most respectfully submitted that the Plaintiff contacted its attorneys to proceed with drafting and filing of the present suit on 4th August, 2020 and the SPA Holder executed and signed Plaint and supporting documents on 5th August, 2020. It is also submitted that the Plaintiff has already undertaken the necessary steps to obtain the court fee. However, the Plaintiff has been unable to obtain the same till now.

3.  As the present suit is being filed in haste and urgent reliefs are being prayed for, the Plaintiff is filing the present suit without the requisite Court fee and crave liberty and leave of this Hon'ble Court to file the same subsequently. The Plaintiff undertakes to file the entire court fee within four weeks' time.

## PRAYER

In view of the facts and circumstances mentioned hereinabove, it is most humbly prayed that this Hon'ble Court may be pleased to:

a.  Grant four weeks' time for filing of the court fees of 74,30,000/- (Rupees Seventy Four Lacs Thirty Thousand Only); and

34

b. Pass such order(s) as this Hon'ble Court may deem fit and proper in the interest of justice and equity;

**PLAINTIFF**
**Through its SPA Holder**

Through:

D/4033/2018

**SIMRANJEET SINGH, AADHAR NAUTIYAL**
**ATHENA LEGAL**
Advocate(s) for the Plaintiff
37, Link Road, First Floor,
Lajpat Nagar-III,
New Delhi – 110024
9205109664
aadhar.nautiyal@athenalegal.in

Place: New Delhi
Date: 07/08/2020

35

## IN THE HIGH COURT OF DELHI AT NEW DELHI
## (ORDINARY ORIGINAL CIVIL JURISDICTION)
## C.S. (OS) No.____ OF 2020

**IN THE MATTER OF:**

Daniel Snyder, Through his SPA Holder                    ...Plaintiff

Versus

Eleven Internet Services LLP & Ors.                    ....Defendants

### AFFIDAVIT

I, Col. (Retd.) Bhushan Lal, aged about 54 years, S/o Sh. R.D Sapra, Special Power of Attorney Holder of Plaintiff having my office at 105A, Indraprakash Building, 21 Barakhamba Road, New Delhi-110001, duly authorized vide SPA dated 05.08.2020 executed in the United States of America, the deponent above-named, do hereby solemnly affirm and declare as under:

1.  I am the SPA Holder of the Plaintiff duly authorized vide SPA dated 05.08.2020, executed at United States of America, in the above suit and competent to swear this affidavit.

2.  I have read and understood the accompanying application under Sec. 149 CPC seeking extension of time to file Court-Fees and state and verify that the averments made in the same are based on the records of the Plaintiff and based on legal advice received from the Plaintiff and are believed by me to be true and the averments in the last unnumbered paragraph are in the nature of humble prayers of the Plaintiff before this Hon'ble Court.

**DEPONENT**

36

### VERIFICATION

I, Bhushan Lal, verify that the averments made in paragraph 1-2 of my affidavit are true to my knowledge, that no part of it is false and nothing has been concealed there from.

Verified at New Delhi on this the 5th day of August, 2020.

**DEPONENT**

1

**IN THE HIGH COURT OF DELHI AT NEW DELHI**
**(ORDINARY ORIGINAL CIVIL JURISDICTION)**
**C.S. (OS) No.      OF 2020**

**IN THE MATTER OF:**

Daniel Snyder, Through his SPA Holder                    ...Plaintiff

Versus

Eleven Internet Services LLP & Ors.                    ....Defendants

**INDEX-III**

| S. NO. | PARTICULARS | PAGES |
|--------|-------------|-------|
| 1. | Vakaltnama on behalf of the Plaintiff | 2 - 3 |

THROUGH:

**SIMRANJEET SINGH, AADHAR NAUTIYAL**
**ATHENA LEGAL**
37, Link Road, First Floor,
Lajpat Nagar-III,
Place: New Delhi                    New Delhi – 110024
Date: 07/08/2020                    9205109664
aadhar.nautiyal@athenalegal.in

2

## VAKALATNAMA
## IN THE HIGH COURT OF DELHI AT NEW DELHI
**IN THE MATTER OF:**

Daniel Snyder, Through his SPA Holder                    ...Plaintiff

Versus

Eleven Internet Services LLP & Ors.                    ....Defendants

KNOW ALL to whom these present shall come that I/We Col. (Retd.) Bhushan Lal, Special Power of Attorney Holder on behalf of the Plaintiff, duly authorized vide SPA Dated 05.08.2020        ,the above named, do hereby appoint:

**Mr. Simranjeet Singh, Adv. [D/819/2008],        Mr. Gautam Talukdar adv. [D/1202/2007], Mr. Rohan Ahuja, Adv. [D/2065/2009], Ms. Neha Gupta Adv. [D/3882/2009], Ms. Sonali Dhir, adv. [MP/1161/2012], Mr. Aadhar Nautiyal, Adv. [D/4033/2018], Ms. Rhea Dube [CG/54/2018], Mr. Mizan Siddiqui[D/2270/2017] for**

**ATHENA LEGAL**
1st Floor, 37, Link Rd, Block A,
Lajpat Nagar III, Lajpat Nagar,
New Delhi 110024
correspondence@athenalegal.in
011-42004400

(herein after called the advocate/s)to be my/our Advocate in the above-noted case authorize him :-

To act, appear and plead in the above-noted case in this court or in any other Court in which the same may be tried or heard and also in the appellate court including High Court subject to payment of fees separately for each court by me/us.

To sign file, verify and present pleadings, appeals cross-objections or petitions for executions review, revision, withdrawal, compromise or other petitions or affidavits or other documents as may be deemed necessary or proper for the prosecution of the said case in all its stages subjects to payment of fees for each stage.

To file and take back documents to admit and/or deny the documents of opposite party.

To withdraw or compromise the said case or submit to arbitration any differences or disputes that may arise touching or in any manner relating to the said case.

To take execution proceedings.

The deposit, draw and receive money, cheques, cash and grant receipts hereof and to do all other acts and things which may be necessary to be done for the progress and in the course of the prosecution of the said case.

To appoint and instruct any other Legal Practitioner authorising him to exercise the power and authority hereby conferred upon the Advocate whenever he may think fit to do so and to sign the power of attorney on our behalf.

3

And I/We the undersigned do hereby agree to ratify and confirm all acts done by the Advocate or his substitute in the matter as my/our own acts, as if done by me/us to all intents and purpose.

And I/We undertake that I/We or my/our duly authorised agent would appear in court on all hearings and will inform the Advocate for appearance when the case is called.

And I/We undersigned do hereby agree not to hold the advocate of his substitute responsible for the result of the said case. The adjournment costs whenever ordered by the court shall be of the Advocate which he shall receive and retain for himself.

And I/We undersigned do hereby agree that in the event of the whole or part of the fee agreed by me/us to be paid to the advocate remaining unpaid he shall be entitled to withdraw from the prosecution of the said case until the same is paid up. The fee settled is only for the above case and above Court. I/We hereby agree that once the fee is paid, I/We will not be entitled for the refund of the same in any case whatsoever and if the case prolongs for more than 3 years the original fee shall be paid again by me/us. **IN WITNESS WHERE OF** I/We do hereuntoset my/our hand to these presents the contents of which have been understood by me/us on this 5th day of August 2020.

Accepted subject to the terms of the fees

**Advocate**

**Client**

**Client**

ADVOCATES WELFARE FUND
DELHI · DELHI
10 · Rs 10
0480037 TEN RUPEES

ADVOCATES WELFARE FUND
DELHI · DELHI
10 · Rs 10
0480045 TEN RUPEES

ADVOCATES WELFARE FUND
DELHI · DELHI
5 · Rs 5
1186399 FIVE RUPEES

1

**IN THE HIGH COURT OF DELHI AT NEW DELHI**
**(ORDINARY ORIGINAL CIVIL JURISDICTION)**
**C.S. (OS) No.     OF 2020**

**IN THE MATTER OF:**

Daniel Snyder, Through his SPA Holder                    ...Plaintiff

Versus

Eleven Internet Services LLP & Ors.                    ….Defendants

**INDEX-IV**

**LIST OF DOCUMENTS**

| Sl. No. | Details of Parties of Documents (s) | Documents in Power/Possession, Control, Custody of | Original or photo copies or office copies | Mode of execution/issuance of Report | Line of Custody | Page No. |
|---|---|---|---|---|---|---|
| | List of documents filed with the Plaint | N.A. | N.A. | N.A. | N.A. | 1 - 6 |
| 1. | Copy of SPA dated 05.08.2020 in favour of Col. (Retd.) Bhushan Lal executed by the Plaintiff | Plaintiff | Photocopy | Record of the Plaintiff | Sent by Plaintiff to Plaintiff's Counsel | 7 - 8 |
| 2. | Copy of internet printouts from the website https://meaww.com/washington-redskins-owner-dan-snyder-to-step-down-owing- | Online record of Defendant No. 2 website | Internet Printout | Third Party Website | Downloaded from third party website | 9 - 10 |

2.

| | | | | | | |
|---|---|---|---|---|---|---|
| | to-sex-trafficking-allegations-fan-reactions showing news article published on the Defendant No. 2 website | | | | | |
| 3. | Copy of internet printouts from the website https://meaww.com/washington-redskins-dan-snyder-jeffrey-epstein-sexual-harrasment-sex-trafficking-scandal-name-change showing news article published on the Defendant No. 2 website. | Online Record of Third Party Website | Internet Printout | Third Party Website | Downloaded from Third Party Website | 11-12 |
| 4. | Copies of internet printouts from the website of The Washingtonian at the URL washingtonian.com/2006/09/01/the-dan-snyder-you-dont-know/ showing news article establishing the reputation of the Plaintiff. | Online Record of Third Party Website | Internet Printout | Third Party Website | Downloaded from Third Party Website | 13-30 |
| 5. | Copies of internet | Online | Internet | Third Party | Downloade | |

3

| | | | | | | |
|---|---|---|---|---|---|---|
| | printouts from the website of The Washington at the URL https://www.washingtonpost.com/archive/business/2000/02/22/snyder-to-sell-his-marketing-firm-for-2-billion/deab34bd-2e3e-4ac6-84e3-52deff4364b9/ showing news article establishing the reputation of the Plaintiff | Record of Third Party Website | Printout | Website | d from Third Party Website | 31~35 |
| 6. | Copies of internet printouts from the website of Forbes at the URL https://www.forbes.com/sites/kurtbadenhausen/2018/07/18/full-list-the-worlds-50-most-valuable-sports-teams-of-2018/#679b6d2e6b0e showing news article establishing the reputation of the Plaintiff's football team | Online Record of Third Party Website | Internet Printout | Third Party Website | Downloaded from Third Party Website | 36~41 |
| 7. | Copies of internet printouts from the | Online Record of | Internet Printout | Third Party Website | Downloaded from | |

4

| | | | | | | |
|---|---|---|---|---|---|---|
| | website https://www.entre prenerd.net/daniel -snyder-lauded- as-astute- businessman-and- committed- philanthropist/ establishing the reputation of the Plaintiff. | Third Party Website | | | Third Party Website | 42-43 |
| 8. | Copies of internet printouts from the website https://www.forbe s.com/sites/kurtba denhausen/2020/0 7/31/the-worlds- most-valuable- sports-teams- 2020/#55923f6d3 c74 establishing the reputation of the football team owned by the Plaintiff | Online Record of Third Party Website | Internet Printout | Third Party Website | Downloade d from Third Party Website | 44-72 |
| 9. | List of URLs/Weblinks | Plaintiff | Printout | Record of the Plaintiff | Sent by Plaintiff to Plaintiff's Counsel | 73 |
| 10. | Email dated 23.07.2020 describing the correspondence between the Ld. Counsels for the Plaintiff and the representative of the Defendants | Plaintiff | Printout | Record of the Plaintiff | Sent by Plaintiff to Plaintiff's Counsel | 74 |

5

| | | | | | | |
|---|---|---|---|---|---|---|
| | seeking removal of the impugned news articles/posts/ URL's/weblinks further seeking information qua names of persons/entities who had engaged the Defendants to publish the impugned news articles/posts. | | | | | |
| 11. | Email dated 24.07.2020 addressed by the Ld. Counsels for the Plaintiff to the counsels for the Defendants seeking information qua representation on behalf of the Defendants. | Plaintiff | Printout | Record of the Plaintiff | Sent by Plaintiff to Plaintiff's Counsel | 75 |
| 12. | Email dated 24.07.2020 issued by the Ld. Counsels for the Defendants apprising the Ld. Counsels for the Plaintiff that they had not received requisite sanction from the Defendants. | Plaintiff | Printout | Record of the Plaintiff | Sent by Plaintiff to Plaintiff's Counsel | 76 |
| 13. | Email dated | Plaintiff | Printout | Record of | Sent by | |

6

| | | | | | | |
|---|---|---|---|---|---|---|
| | 24.07.2020 addressed to the Ld. Counsels for the Plaintiff from the representative of the Defendants i.e. Ms. Alysha Tharani apprising the Ld. Counsel for the Plaintiff that the impugned weblinks had been removed and that there was nothing further required to be done at the end of the Defendants. | | | the Plaintiff | Plaintiff to Plaintiff's Counsel | 77 |
| 14. | Emails dated 29.07.2020 exchanged between the Ld. Counsels for the Plaintiff and Mr. Charles R. Macedo | Plaintiff | Printout | Record of the Plaintiff | Sent by Plaintiff to Plaintiff's Counsel | 78 |
| 15. | Affidavit under Sec. 65A & Sec. 65B of Indian Evidence Act, 1872 | N.A. | N.A. | N.A. | N.A. | 79-84 |

_7

## SPECIAL POWER OF ATTORNEY ("SPA")

This Deed of Special Power of Attorney has been executed under the laws of the United States of America on this 5⁶ day of August, by Mr. Daniel Snyder of the address 1600 FedEx Way, Landover, Maryland 20785 USA (hereinafter referred to as the "Executant"), in favor of Mr. Bhushan Lal, S/O Mr. B.D.Sapra, R/o Flat No. 1A, Anand Niketan, CGHS, Plot No. 16, Sector-52, Gurgaon, Haryana, India having his office at 105A, Indraprakash Building, 21, Barakhamba Road, New Delhi-110001, as my true and lawful Special Attorney by way of this Special Power of Attorney to act in the name and on behalf of the Executant and to do the following acts, deeds and things:

### NOW THEREFORE KNOW WE ALL AND THESE PRESENTS WITNESSETH AS UNDER

1. To represent the Executant before any/all the Courts of Law including the Hon'ble Supreme Court of India, the Hon'ble High Court of Delhi, all District Courts and any court of competent jurisdiction in respect of any/ all the legal proceedings initiated by or against the Executant within the territorial jurisdiction of India.

2. To engage or appoint any solicitor, counsel, advocate pleader or lawyer to conduct the said case.

3. To prepare sign, verify, swear affidavits, sign pleadings, applications, etc in the said proceedings including any arbitration proceedings initiated by or arising against the Executant.

4. To file and institute any other proceedings related thereto or arising therefrom and to do all actions that are required for filing, conducting, defending the said proceedings on behalf of the Executant, including filing, instituting and representing me in Suits/Appeals/Review/Revisions from orders passed in the said proceedings.

5. To represent, make statements, lead evidence, give undertakings, sign affidavits, sign Vakalatnama and  applications and to receive and take back documents on behalf of the Executant.

6. To deposit, withdraw and receive any money or moneys and documents in any case or execution of the decree or otherwise from the court or from the defendants and issue due and proper discharges and acknowledgements on receipt of payment and/ or possession of any property moveable or immoveable to the effective dealing with respect of the property of the Executant or any portion thereof.

TRUE COPY

8

7.  To apply for inspection and inspect documents and records, to obtain copies/certified copies of documents and do all necessary acts such as payment of fees/court fees/charges and give valid receipt/acknowledgement on behalf of the Executant.

8.  To compromise the cases in such manner as the said attorney shall think fit including referring the matter for amicable settlement through mediation.

9.  To do generally all other lawful acts, deeds and things for the conduct of the said cases as I could do the same if I was personally present and all and whatever my said attorney shall lawfully do, I do hereby agree to ratify and confirm.

IN WITNESS WHEREOF the executant has signed the Special Power of attorney in presence of witnesses on the date, month and year mentioned above.

EXECUTANT

Signed/before me on August 5, 2020

Notary Public

PATRICIA MICHAUD
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
September 25, 2020

WITNESSES:-

1.

2.



TRUE COPY

9

HOME / NEWS / CELEBRITY

# Washington Redskins owner Dan Snyder faces sex trafficking allegations; Internet says, 'He was on Epstein's list'

The minority shareholders are apparently looking at bringing him down citing inappropriate and unchaste behavior as one of the major reasons

**By Prarthna Sarkar**

Updated On : 00:10 PST, Jul 16, 2020



Daniel Snyder (Getty Images)

National Football League team Washington Redskins' majority owner Daniel Snyder has found himself in trouble yet again and this time it's allegedly for sex trafficking. The minority shareholders are apparently looking at bringing him down citing inappropriate and unchaste behavior as one of the major reasons.

Although there has been no official mention of this major development and has apparently only been teased as a 'disappointing news" by the Washington Post, a Reddit page has revealed that the publication is all set to crack down on Daniel and so that he will be forced to give up his share in the team resulting in his removal. Allegedly, Jay Gruden, Larry Hess and Eric Schaffer are in trouble too.

TRUE COPY

10

Daniel had been at the center of similar controversies back in the day when the Redskins cheerleaders were sent off to Costa Rica for a week-long trip that included topless photoshoots. In a Times story, several unnamed girls shared detailed accounts of what went down at the resort they were put up in. This was followed by a spate of accusations against the Redskins' management team that they were pimping out cheerleaders to male sponsors and suite holders. "At one of my friend's shoots, we were basically standing around her like a human barricade because she was basically naked, so we could keep the guys from seeing her," a cheerleader told Times.

Meanwhile, fans are coming down hard on Daniel and possibly hoping that the alleged news about him being removed the team comes true.

"It's been the worst run sports franchise of the last 20 yrs and one man is to blame. I'm sure it's awful," a fan wrote, while another shared: "I can't imagine literally anything short of dan snyder single handedly running the wayfair sex trafficking ring out of the ref locker rooms in fedex field that could make that org look worse than they already have for years."

Meanwhile, other users on the internet wondered if the article would be about his alleged involvement in sex trafficking as one user wrote, 'Dan Snyder was sex trafficking? Yeah I knew he was an unlikeable ass but I didn't think it would be that extreme. My god." Another added, 'Dan Snyder. The Washington Redskins owner is getting popped for sex trafficking. He was on Epstein's list too. We've been known."

*MEA WorldWide (MEAWW) cannot independently verify the claims or accusations being made on the Internet.*

TRUE COPY

11

# #RedskinsScandal: Will Dan Snyder rename Washington Redskins the 'Epsteins'? Angry Internet screams 'throw him out'

The report does not directly accuse Dan Snyder of misconduct, it paints a sorry picture of the toxic culture at the Washington Redskins

By Jyotsna Basotia
Updated On : 18:09 PST, Jul 16, 2020



Dan Snyder (Getty Images)

National Football League team Washington Redskins' majority owner Daniel Snyder has been found to be embroiled in sexual harassment and threats of retaliation. After days of speculation, rumors started floating around on social media on July 16 when a Reddit thread shed light on alleged sex trafficking claims, as reported by <u>MEA WorldWide</u> (MEAWW).

The claims were made public after The Washington Post released a story detailing the accounts of 15 women who spoke to the newspaper. While the report does not directly accuse Snyder of misconduct, it paints a sorry picture of the toxic culture at the workplace. While 14 of 15 women refuse to be identified due to fears of litigation arising from nondisclosure agreements, the report explicitly states: "No woman accused Snyder or former longtime team president Bruce Allen of inappropriate behavior with women, but they expressed skepticism the men were unaware of the behavior they allege."

Emily Applegate, a former marketing coordinator, spoke to the newspaper and detailed how women were regularly subjected to sexual remarks and inappropriate touching. Not just Dan — who has run the organization since 1999 — but Jay Gruden, Larry Hess and Eric Schaffer

TRUE COPY

*12*

are allegedly in trouble too. No sooner did it come in the public eye, people started slamming Snyder on Twitter.

"After reading that WaPo article, one thing is abundantly clear: the NFL needs to force Dan Snyder out. He does not deserve to own a football team. What a disgrace that organization is," one tweet read and another said, "It's clear from the Post story that the men who were harassing reporters and coworkers in the Washington organization felt like they could operate with impunity. Their behavior was awful, and it's on Daniel Snyder to create a culture where there are repercussions. He did not."

"The fact the Redskins wouldn't deny the allegations and pull the non-disclosure agreement for victims to speak out, says all you need to hear about owner Daniel Snyder #redskinsscandal," one tweet read and another said, "Keep in mind If women quit every time men behaved inappropriately in the workplace there would be literally 0 women in the workforce. Miss me with the 'why didn't they just quit' comments. #redskinsscandal."

One even went on to joke: "Dan Snyder has decided on a new team name: Epsteins."

Many other women came forward on Twitter to share their experiences. "1.) Current news about #redskinsscandal is just the beginning 2.) I met Larry Michael once. You could smell his misogyny & objectifying nature 3.) We have to raise better people. No more "boys will be boys" crap - boys will be men & held responsible 4.) These women are awesome!" one posted.

Another said, "First of all, F**K the Washington football team. Disgusting behavior. Women can't do ANYTHING or go ANYWHERE without falling prey to "men" who opt to abuse their position and platform. And also F**K every media outlet that tried to exploit this story for clicks! #redskinsscandal." One tweet even went on to say: "And they are changing their name. Meanwhile, despite all this virtue signaling and transparent outrage, no one gives two flying f*cks about the actual plight of native Americans #redskinsscandal."

If you have a news scoop or an interesting story for us, please reach out at (323) 421-7514

TRUE COPY

13

TRENDING NOW IN NEWS

NEWS

# The Dan Snyder You Don't Know

To disgruntled fans, the Redskins owner Is a spoiled rich kid who treats the team like a toy--
and a money machine. People close to him say it ain't so.

WRITTEN BY HARRY JAFFE 🐦 ✉ | PUBLISHED ON SEPTEMBER 1, 2006

*National editor Harry Jaffe, born and raised in Philadelphia, is an Eagles fan who has rooted against the
Redskins all his life. Editorial intern Caleb Hannan helped with research for this article.*

Joe Gibbs first met Dan Snyder at a group home for teenagers in early 1999. Gibbs, the legendary Redskins
coach, was out of football and into racing cars on the NASCAR circuit; he was in Washington to raise funds for
Youth for Tomorrow, a residential facility in Manassas for at-risk teens that he had founded in 1986.

Snyder was making a run at buying the Washington Redskins that winter. He was relatively unknown in the
business community. He was 34, owned a marketing company, was worth about a half a billion dollars, and
worshipped the Redskins.

At a fundraising meeting, someone suggested that Gibbs hit Snyder up for a donation to the home. Gibbs said
he didn't know him.

"I'll handle it," Dwight Schar said.

Schar, owner of NVR, a residential builder, had met Snyder several times. He got through to him and made the
pitch.

"For $10,000 you can be one of the boys," Schar told Snyder. "For $25,000 you can be one of the big boys."

Snyder wrote a check for $25,000. He then met with Gibbs and became a regular contributor. After buying the
Redskins in April 1999, he became closer with Schar and Gibbs through their charity work.

"There was no reason for Dan Snyder to come and do that," Gibbs told me. "There was no thought I was ever
coming back to football. I was not trying to get anything from him, and he wasn't trying to get anything from
me."

The episode in 1999 presaged the relationship among three men now at the helm of the Redskins: Snyder is
starting his seventh year as owner; Gibbs is going into his third year as coach; Schar has become part-owner
and one of Snyder's closest friends and advisers.



8/7/2020                                    The Dan Snyder You Don't Know | Washingtonian (DC)



It also reveals a side of Snyder that has been overlooked by many disgruntled fans and most members of the media, who like to pillory him as a spoiled rich kid who treats the Redskins like his latest toy.

*Washington Post* columnist Sally Jenkins wrote in 2003 that Snyder "runs the franchise with such lunatic impatience and excess. Self-restraint is apparently not an option."

Another *Post* story that year said the media saw Snyder as "an arrogant, interfering amateur." âž

The "'Tank McNamara" comic strip named him Sports Jerk of the Year.

But friends, business partners, and employees describe Snyder as "a great listener," a man who is loyal and generous.

Joe Mendes, who worked in player development with the Redskins before and during Snyder's regime, said Snyder "went the extra mile" to help him when his father was ill and his wife's father died. Mendes had an office across from Snyder's at Redskins Park. They saw or spoke to each other several times a day during the season. He lost a power struggle with Vinny Cerrato, vice president of football operations, in 2003 and now runs Cornerstone, a sports consulting company.

"I genuinely like Dan Snyder," says Mendes. "He is a good person." Mendes had lunch one day at Snyder's mansion and saw his kids crawl all over him. He says, "It validated my sense that he's a warm and caring individual."

Warm and caring. Arrogant and interfering. Which is it?

I set out to square these opposing perspectives and to see if Snyder had changed since he bought the team for $800 million in 1999. We know that he has used his business acumen to turn the Redskins into a brand that mints money. That he has used aggressive marketing to make the Redskins franchise the most valuable in professional sports. That he's expanding his empire into radio stations that will air Redskins games and sports talk. That he's sinking millions into the amusement-park business. That he is at war with the *Washington Post*.

Is he still the billionaire brat he was made out to be? Was he ever?

Snyder's cell phone rings with the jingle that introduces *Monday Night Football*. He picks it up.

"Hey, Lynn," he says.

As in Lynn Swann, the former star receiver for the Pittsburgh Steelers who's running for governor of Pennsylvania.

"Sorry I couldn't be there with you all," Snyder says. "Good luck."

Schar, a major Republican contributor, was holding a fundraiser for Swann. Snyder had written a check.

I ask Snyder if he's a Republican.

"Yes," he says. He says he voted for George Bush. "But I am very angry with Bush. I don't like what he's doing in foreign affairs, and I think he's messing up the economy."

We are in a booth in the back corner of Olives restaurant in Aspen's St. Regis Hotel. Snyder has arrayed himself feet-up on a banquette. He's wearing a short-sleeve T-shirt with a small Redskins insignia, loose workout pants, sandals. His face is unlined. If not for flecks of gray in his hair, he looks like he's in his twenties.



8/7/2020                                  The Dan Snyder You Don't Know | Washingtonian (DC)



Snyder's entourage consists of Karl Swanson, his key press guy. Swanson is big enough to pass for a retired linebacker. Actually, he's a reporter turned PR man. He's been with Snyder since 1997.

Aspen, the playground of the super-rich, is Snyder's summertime base. Saudi prince Bandar bin Sultan just put his place there up for sale for $135 million. Snyder bought a Tuscan-style mansion on Buttermilk Mountain four years ago. His mother and sister spend summers there. He can visit other NFL owners, such as Jerry Jones (Cowboys), Zygi Wilf (Vikings), Lamar Hunt (Chiefs), and Steve Tisch (Giants), in the Rocky Mountain air.

"Most of them rent," he says.

Snyder doesn't stay put for long. Redskins One, his 14-passenger jet, is parked at the Aspen airport. He's just back from a meeting of NFL owners in Detroit. Before that he took his wife and three young children for a private cruise in the Mediterranean with Dwight Schar's family. Was it a big ship?

"*Kogo,*" he says. "'Two hundred and thirty-five feet long."

In Aspen he mixes work and play. Joe Gibbs brought some friends out for a few days. Mark Shapiro, whom Snyder plucked from ESPN to become CEO of his Six Flags venture, is there with his wife and children. And he's meeting a reporter—a major rarity.

Snyder quit giving substantive interviews in 2002. First he stopped talking to reporters during the season. Then, with very few exceptions, he went mute to the media. Says Snyder, "I was tired of getting beat up."

My request for an interview at first got a maybe. Midway through the long process, Swanson wrote, "It still isn't a NO." To get to a yes I started interviewing his friends and business partners. Each session was part interview, part audition. Then we negotiated: If I would agree to not use unidentified sources and promise to give Snyder a chance to react to critics, he would sit for an interview. I agreed and flew to Colorado.

I have covered plenty of spoiled, greedy, power-hungry rich guys in my 30 years as a reporter. Snyder is not even close. I found him competitive, playful, and shockingly normal.

His cell phone went off one more time during our extended lunch. It was his wife, Tanya, trying to arrange a birthday dinner for his sister, Michele. Snyder doesn't do BlackBerries or Palms or iPods. He doesn't even use e-mail.

"I go to meetings, and everyone is bent over their BlackBerries," he says. "I have a friend who's so addicted he answers it when it beeps at 2 am."

If Snyder has a regular routine in Washington, it is working at home in the morning, then going to Redskins Park, stogie in hand, where he eats takeout at a conference table and conducts business. He might fly to New York for a meeting and return to read to the kids. It helps having your own jet.

Snyder and Swanson order tomato bisque with lobster. I start with tuna tartare.

As a kid, did Dan Snyder dream of owning the Washington Redskins?

"Never," he says.

Among the Dan Snyder myths is that he grew up privileged in a wealthy area of Montgomery County.

"We didn't have any money," Snyder says. Or a television. "There were times when my father and I walked down the street to the TV store to watch Redskin games."



8/7/2020                                    The Dan Snyder You Don't Know | Washingtonian (DC)

16

His father, Gerald Snyder, was a freelance writer. Having been one, I know the financially uncertain lifestyle. Jerry Snyder worked a while for *National Geographic*, authored books, and wrote for anyone who would pay.

Through grade school, Snyder lived in the Oak Hill Apartments on New Hampshire Avenue with his parents and older sister, Michele. The high rise is on the working-class side of Silver Spring, across from a Sears department store. He went to Hillandale Elementary School.

When his son was 12, Gerald Snyder took a book assignment in England, and the family moved to Henley-on-Thames, a small town near London. Dan enrolled in a private school.

"I wore a blazer and tie every day," he says. "They were very strict. I didn't turn in my homework one day, and the teacher caned me on the knuckles. I never forgot to do my homework after that. It made a big impression on me."

After two years abroad, the Snyders moved back to the States and lived with Jerry's mother in Queens, in part because Jerry's brother Charles had died at 33. Charlie was Dan's godfather.

Says Dan: "You want to talk about tough? Queens made Oak Hill look like a country club. My treat was walking with my father across Queens Boulevard to get ice cream."

And getting back safely.

A year later the family moved back to Montgomery County and lived in the Pavillion Apartments, on Montrose Road behind Congressional Plaza. Dan went to Woodward High School, which has since closed.

From most accounts, Snyder was not a standout student or a jock. He had buddies like Don Batson, who now works for Snyder's investment company, and Tony Roberts, now a Bethesda eye doctor.

Says Batson: "Dan and I were new to the school. We were branded as newcomers. The cliques were set. He had been in England; they called him the English kid."

They hung out in Georgetown on some weekends, Batson recalls. They threw the football around and played basketball. They were Redskins fans.

Here's what Snyder remembers:

"I was embarrassed to tell my friends that I couldn't hang out with them on weekends because I had to work. I liked working. I still do."

His first job was at the B. Dalton bookstore in White Flint Mall—"so I could read." He read novels and books about business.

After high school Snyder tried college, first at Montgomery College and then at the University of Maryland. It didn't engage him. What did engage him were ideas about starting a business.

"It surprised me at first," Batson says. "He completely changed the first year of college. He exploded. It was like a ball of energy waiting to come out."

Snyder says it came out of nowhere, but when I press him, he gives credit to Uncle Charlie, who had worked as a controller for Loews Hotels. "He was the only real businessman in the family," says Snyder, "and I thought highly of what he said."



8/7/2020                          The Dan Snyder You Don't Know | Washingtonian (DC)



Snyder's first venture, when he was 20, was a travel business aimed at college students. Working out of a bedroom in his parents' apartment, he sold trip packages and leased jets to fly kids to beaches for spring break. Then he told his father he wanted to start a magazine for the college crowd— *Campus USA*.

One of Jerry Snyder's gifts to his son was not forcing him to follow a path through college to grad school. Instead, the father joined the magazine project as editor, columnist, and writer under an assumed name. As publisher, the son sold ads and ran the business—which grew fast and needed capital.

Looking around for money in the mid-1980s, Dan Snyder set his sights on Mort Zuckerman, real-estate magnate and publisher of *U.S. News & World Report*. The kid needed $3 million. Why not hit up a publisher who was worth hundredsof millions?

With chutzpah and unrelenting persistence, Snyder called and pitched and called and pitched and finally got through to Zuckerman. Snyder told Zuckerman he was 25; he was 23. Zuckerman and a partner, Fred Drasner, loaned Snyder $3 million. In two years he lost it all because he couldn't get enough ads to support the magazine. He broke the news to Zuckerman over lunch at the Waldorf-Astoria.

"Zuckerman hated me," he says.

But his family still loved him. So in 1989, when Snyder started a marketing company with no cash, his family chipped in. The idea was to develop wallboard advertising and distribute product samples—such as soaps and packages of medicine—to colleges and doctors' offices. His sister used seven credit cards to raise $35,000; his father took a second mortgage on his property in England.

The business—Snyder Communications—took off.

"By 1990 it was hot," Snyder says. "It was doubling and doubling and doubling. We started to acquire companies that were doing product sampling in different areas." When new mothers were sent home from the maternity ward, they were given goodie bags of creams and diapers—through Dan Snyder's company.

"I bought everybody," says Snyder.

We are halfway through our first course when Snyder gets into a debate with the restaurant manager.

"This isn't the first Olives in Aspen," he says. "There used to be one in the village."

No, she says. Yes, he says. She goes to the kitchen to consult; he gets on the cell phone to check his sources.

Snyder can talk for days about restaurants; he loves to eat out—Ben's Chili Bowl in DC at 1 am with his buddies; or Matsuhisa, the sushi joint in Aspen where he and Shapiro and Swanson dined last evening past midnight; or the Palm in Tysons Galleria, where he consumes steaks with Dwight Schar.

Maybe it's because the biggest treat growing up was an ice-cream cone at the corner parlor.

I ask when he first felt rich.

"In 1991," he says, "when I bought my first jet. That was a pretty rich feeling."

He was 26.

He had an even better feeling in 1993 when his friends set him up with a blind date. Tanya Ivey was a former fashion model from Atlanta who was selling lines of designer clothes. "We became instant pals," says Snyder. They married in April 1994.





Mark Jennings was a business partner and friend to Dan Snyder in those days. Jennings was in private equity; Snyder Communications was hungry for capital. Jennings helped the kid get financing and took a seat on Snyder's board.

"Dan went a mile a minute," Jennings says in a phone interview. "He was the classic entrepreneur."

Jennings, now a managing partner in Generation Partners, an investment-banking firm in Greenwich and San Francisco, is still part of Snyder's inner circle. Their families vacation together; Jennings has served on several of Snyder's boards.

"Dan started a company that didn't work, then changed it again and again," Jennings says. "He grew Snyder Communications organically and then by acquisitions."

Jennings chaired its audit committee. He saw the guts of the growth and the deals. He had fiduciary duty to make sure the books were clean and the profits were real.

No one has questioned Snyder's corporate dealings. He likes to say he has never been in court.

"I am a goody two-shoes," he says. "Business ethics are important to me."

The key to Snyder's success, Jennings says, is that "he really listens to people. He makes assumptions, asks questions, absorbs information. He has that ability not to get wedded to his opinions. He knows that he doesn't know everything. He has hundreds of ideas. No idea gets left on the table. If it's good, he follows up."

Snyder's success is not a great advertisement for MBA programs. The only degree on his résumé is an honorary one from Post University, when Snyder gave a commencement address.

"Dan could run the creative side of an ad agency," says Jennings. "He could also run an investment bank."

In 1992 Snyder expanded his company into telemarketing, aiming at the untapped immigrant market. His revenues rose from $2.7 million in 1991 to $4.1 million in 1992 and $9 million a year later.

"Boring but booming" was the way *Washington Post* business columnist Jerry Knight described Snyder Communications.

In 1996 the company went public. Through the sale of stock, Snyder's top investors turned a huge profit. Among them were Hollywood mogul Barry Diller, New York investor Dan Lufkin, and lawyer and Democratic Party icon Robert Strauss.

To repay Zuckerman and Drasner's $3-million investment in the failed magazine project, Snyder gave them a piece of his company; their share is now worth about $500 million. His parents cashed out for $60 million; Jerry and Arlette bought their first detached house with a yard, in Potomac.

At 31, Dan Snyder became the youngest CEO of a company on the New York Stock Exchange.

He continued to buy marketing and advertising companies. His most high-profile acquision was Arnold Communications in 1997. By 1998 he sat atop a corporation with 12,000 employees, 77 offices in 16 countries, and nearly $1 billion in annual revenues. No question, he was a winner.

But he lost the restaurant argument with the staff at Olives. Turns out the eatery in the back of the St. Regis was the first and only one in Aspen.

Snyder does not like to lose at anything. He put on a sheepish grin and said, "I guess I was wrong."

TRUE COPY

8/7/2020                              The Dan Snyder You Don't Know | Washingtonian (DC)

19

In the fall of 1998 Dan Snyder called Thomas McCormick, his lawyer and adviser. "Have you read the paper?" he asked. "The Redskins are up for sale." Longtime owner Jack Kent Cooke had died in April 1997, and his estate was selling the hometown team.

"You want to buy it?" McCormick asked. "That's crazy. It will be expensive."

"Can you get me the book?" Snyder asked, referring to the sales document. The team's price tag was $800 million.

Four groups had formed to compete for the team. One included Joe Gibbs; another brought together a Texas banker and Washington real-estate man Ted Lerner.

New York real-estate moguls Howard and Edward Milstein emerged as the front-runners. Snyder asked Mort Zuckerman to set up a meeting. He and the Milsteins hit it off. Snyder put up $100 million and joined their ownership group as a junior partner.

"I was so excited," he says. "My father loved it."

But the NFL owners didn't love the Milsteins or their offer and declined their bid. Snyder thought, "Hell, I'll go do it myself."

The process, he says, was brutal. He pulled together cash from his bedrock investment team—about $120 million from his accounts; $90 million from his family; $90 million from Zuckerman and Drasner—and borrowed the rest. The financing was solid. What remained was romancing the NFL owners.

Snyder flew around the country and tried to meet every owner. He shook hands with many of them, from Bob Kraft of the New England Patriots to Al Davis of the Oakland Raiders.

He produced and distributed a binder about himself and his company. He asked CEOs he had worked with over the years to write reference letters, including Wizards owner Abe Pollin.

"They liked it. They accepted it," he says. "That was it."

On May 25, 1999, the NFL owners met in Atlanta and approved the sale 31–0. Snyder walked out of the conference to phone Jerry Snyder.

"Dad," he said, "we got it."

In rushing to call, Snyder breezed right by the row of TV cameras and reporters who had been camped out all day to record the first words of the new owner.

Snyder recalls the moment. "I didn't know what to do," he says.

George Michael, the king of sportscasting in DC, watched him walk by and, like most of the journalists, took it as an affront. The reporters turned to one another and traded epithets about the young man's arrogance.

Says Michael: "It started that first damn day in Atlanta."

"It" being Dan Snyder's image as dismissive of the press. "He had no idea what he was headed for," Michael says.

From age 20, Dan Snyder was a master at selling himself in small rooms to other businessmen. He became a taskmaster to his staff. He had never faced a camera to speak to the press.

TRUE COPY

20

"I just wanted to disappear," he says.

George Michael has seen a few owners in his 26 years as sportscaster for NBC affiliate WRC-TV. He and the rest of the DC press were used to Jack Kent Cooke, who became majority owner in 1969. Besides being 50 years older than Snyder, Cooke was a cosmopolitan character who had owned newspapers and knew how to handle the media, even though some called him, in private, the "billionaire bully."

Cooke would often begin a press conference with "My dear boys" and charm the reporters. He also had won three Super Bowls, which helped inoculate him from criticism.

Michael would become close to Snyder; both had cancer at the same time: Snyder's was thyroid, Michael's was melanoma. "When word got out that I was sick," Michael says, "the first call came from Dan."

Michael also had a business relationship with the Redskins: He and WRC-TV broadcast Redskins preseason games for five seasons. Through friendship and business, he watched Snyder and the camera.

"He's different once the camera comes on," Michael says. "It's as if he's on the witness stand with you as the prosecutor."

After the Atlanta debacle in May 1999, Snyder sought out George Michael and Sonny Jurgensen at the Kemper Open golf tournament. He apologized.

Is it possible, I ask, that Snyder is shy?

"That's true," he says. "I'm shy until you get to know me. Then I'm fun. I'm the daddy-o at home."

Snyder is also an educator—through his foundation work.

Take Dave Kiehn, an academic coach at DC's Dunbar High whose position is funded by the Redskins' foundation.

Kiehn graduated from the University of Pennsylvania and joined Teach for America. At Dunbar, he tutors members of the football team. "The only reason I'm here is because of the Redskins," he says.

Snyder won approval to own the team in May 1999 but didn't take the reins until July. He used the interim to create the Redskins' charitable apparatus.

"He had been a fan a long time," says Karl Swanson, "but he couldn't tell what the Redskins did for the community."

Snyder asked researchers at his communications company to find out what other NFL teams did on the charitable end. The employees reported that most teams gave money to other charities, such as United Way, or donated team jerseys or hats and tickets. "I think I know what to do to raise money," Snyder told Swanson.

His idea was to set up a leadership council of business leaders. It would be a club. Membership cost at least $10,000 a year. Twenty executives quickly signed up. The number is now 28, including developer Adam Bernstein, FedEx chair Fred Smith, and TV talker Larry King, and rates go to $60,000. The council raises more than $250,000 a year. Snyder matches their contributions.

In exchange, the members get to spend a day at Redskins training camp and lunch with Snyder and the coaches. Just before the NFL draft, Snyder hosts a dinner at FedEx Field, where coaches discuss prospects.

"Pretty soon we'd raised over $1 million," Swanson says. It's now close to $2 million.

TRUE COPY

2)

The foundation has renovated football fields and erected scoreboards throughout the region, including at DC's Spingarn, Anacostia, and Ballou high schools. The Fourth and Life program brings senior high-school players to talk to pro players about life after football. The Rookie Reading Program sends first-year pros into local schools.

Dave Kiehn at Dunbar High says the Redskins foundation funds bus trips to college fairs. "It's the first time many of our kids spent a night in a hotel," he says. Dunbar also got a grant to build a locker room.

"We didn't have one," says Kiehn. "All we had were hooks on a wall and milk crates. The Redskins sent two players to help us put the room together. They brought our kids to FedEx Field."

"I can't put a dollar figure on that. They taught my kids to reach for success."

Snyder would rather not talk about his family foundation, which is separate from the Redskins charitable arm, or his personal charitable work. "That's more of a private matter," he says.

I knew he had contributed to children's causes.

"My first daughter was born at 27 weeks," he says. "My wife lived for three months at George Washington hospital while she was in treatment."

His daughter has thrived. When she came home, Snyder called Ned Zechman, CEO of Children's National Medical Center. "Come see me," he said. "I want to do something for kids."

That something turned out to be $6 million for an emergency wing.

He has helped build a communications center for the National Center for Missing and Exploited Children in Alexandria.

Snyder stops there, but Swanson says the Snyders wrote checks totaling $1 million to help victims of the September 11 attacks. He contributed close to $600,000 to help victims of Hurricane Katrina. When the tsunami hit Indonesia in December 2004, a community group got together a planeload of food but ran out of money to finance the flight. Word got to Snyder. He called the shipping company and said, "Ship it."

In his first three years as owner of the Redskins, Dan Snyder was much more successful at establishing a foundation and giving away money than at running the franchise.

"I made some real stupid decisions," he says. "I made a lot of mistakes. I'm human."

We have progressed to the second course at Olives. Snyder forks a chunk of his tuna tartare. He tests it and doesn't like it. He prefers the crab cakes Swanson is having and orders a pair. He likes my mushroom pizza. I give up a slice.

Snyder took over the Washington Redskins on July 14, 1999. He inherited Norv Turner as coach and Charley Casserly as general manager.

"They were fighting like cats and dogs," he says. "We were in trouble. I couldn't have these two guys sniping at one another."

So he fired Casserly in September.

"You fired the wrong guy," Casserly told him.

TRUE COPY

*22*

"If you're right," Snyder shot back, "you'll be one of the first to know."

Snyder also fired a bunch of longtime front-office workers. He brought in his own PR team, lead by Karl Swanson.

Hoping for a quick trip to the Super Bowl, he paid big money for aging stars Bruce Smith and Deion Sanders.

Snyder stuck with Norv Turner through the 1999 season, which was lackluster. With three games left in the 2000 season, the Redskins had a 7–6 record, and Snyder lost patience. He called Turner into his office at 11 am on December 4 and let him go.

"It was one of my worst moves," he says. "It was plain stupid. I was a new owner pissed about losing."

It was also the first move that showed fans and reporters Dan Snyder's impatient side. In business, Snyder could replace a manager in the dead of night with a phone call. The Redskins were considered a public utility, and every move was blared in the media and dissected on sports-radio talk shows.

After Snyder fired Turner, he says, he called Casserly and said, "You were right."

Snyder called his friend Fred Smith, CEO of FedEx, and said he wanted to talk football. "I can talk shipping," Smith said. "If you want to talk football, you want Pepper Rodgers."

Pepper Rodgers knew everyone in football, from college to pro. In 1952 he was the quarterback who won the Orange Bowl for Georgia Tech. He went on to hold coaching jobs at Kansas, UCLA, and Georgia Tech. He got close to Smith when the two tried to bring an NFL team to Memphis. Snyder invited Rodgers to the owner's box and later hired him as vice president of football operations.

"I talked football with Dan," Rodgers says. "I was basically his friend. My job was to advise him on football-related things without getting in the paper."

Rodgers's wife, Livingston, would babysit Dan's two daughters; their second was also premature. Doctors warned against another pregnancy. When the Snyders traveled to be with the surrogate who gave birth to their son, the Rodgerses went along.

Says Rodgers: "I wouldn't say I mentored Dan, but I was someone he could trust, who could speak the language of football."

After Turner's firing, Snyder and Rodgers flew out to visit Dick Vermeil, who had retired from the St. Louis Rams after winning the Super Bowl. Vermeil wasn't interested in being coach. He suggested Marty Schottenheimer. The former Kansas City coach was doing TV work at the time and had been critical of Snyder.

Snyder hired Schottenheimer to lead the 2001 season. Schottenheimer, a square-jawed veteran with a tough demeanor, insisted he become both coach and personnel director. Snyder agreed.

"I let him have too much oversight over personnel decisions," Snyder says. "That was new to him. He was a good coach."

The Redskins went 8–8 under Schottenheimer. Snyder called him in and said he wanted him to stick to coaching and give up hiring and firing players. Schottenheimer said no. Snyder fired him.

"He was not Dan's guy," Rodgers says.

TRUE COPY

23

Says Snyder: "My mistake." To give Schottenheimer control beyond coaching, that is.

Snyder says he and the coach are good friends now.

Pepper Rodgers knew Dan's guy was Steve Spurrier, the flashy coach at University of Florida, where his "fun and gun" offense had racked up 122 victories against 27 losses.

"He wanted Spurrier in the worst way," says Rodgers.

Rodgers and Spurrier came up together in the Southern football clan. Rodgers had coached Spurrier at Florida and then hired him to help coach at Georgia Tech. He brought Snyder and Spurrier together. With much fanfare, Snyder hired Spurrier.

Spurrier lasted two losing seasons. His record was 12–20.

Spurrier brought his college coaching buddies up from Florida rather than hire coaches with NFL experience. He could not measure up to the intensity of a pro-football season. "The whole thing wasn't working," he told the Washington Post.

"He quit," Snyder says.

Says Rodgers: "Steve called me to call Dan."

In five seasons Snyder had run through four coaches, counting Terry Robiskie, who finished Turner's last season.

"Dan is smart," Rodgers says, "and people who are smart think they are smarter than the coach."

A fan spoke for many with a sign reading fire snyder.

Snyder is finishing crab cakes; for dessert, he eats more humble pie.

In 2003 Snyder moved training camp from Carlisle, Pennsylvania, to Redskins Park in Loudoun County. He opened it to fans. He charged admission. And a parking fee.

"That was another mistake," he says. "Charging fans to see training camp. Dumb move."

Snyder always says he loves Redskins fans. But from the perspective of those who have to deal with hassles at FedEx Field—from traffic jams to parking hassles to getting frisked at the gate to getting bombarded by advertising in the stadium to dealing with rowdy drunks—the joy of being at the game has declined.

Steve Lann's family has had season tickets since the 1950s, when the Redskins played at Griffith Stadium. He's got a pair of seats at FedEx Field, in the lower bowl at the 45-yard line.

"There's too much hoopla," he says. "Fireworks. Loud music. It's not about the game anymore. They're trying to generate excitement in an artificial way. It's a distraction. Redskins fans are loyal and loud—they can do it by themselves."

Many of the problems, like Beltway traffic, are beyond Snyder's control. FedEx Field was built by former owner Jack Kent Cooke. Swanson claims the Redskins don't make a dime in profits from parking at FedÂEx Field. But Snyder is a master at marketing. and he has spun gold from the fans' loyalty to the Redskins.

TRUE COPY

24

According to filings with the Securities and Exchange Commission, the team's annual revenues have increased from $162 million in 1999 to more than $300 million today. Snyder has pumped up revenues by selling naming rights to Federal Express for $200 million over 27 years; added 10,000 seats to make the field the largest in the NFL, with 92,000; increased the number of luxury suites from 199 to 208; added loge seats and "dream seats" with a better view sold at premium prices; automated concession stands and opened new restaurants; created the Tailgate Club for special access at a price and the Touchdown Club, whose members can vault over the season-ticket waiting list for $7,500. He increased sponsorship revenue from $4 million to $48 million.

By 2004 the Redskins were the most profitable franchise in the NFL. Forbes said the Redskins were worth more than $1.26 billion, making it the most valuable team in US sports.

Snyder rolled out some moneymaking clinkers along the way. He told a Washington Post reporter he wanted to sell Redskins cola with star Redskins players pictured on the can. He tried to establish a Redskins charge card that season-ticket holders had to use to buy seats. Neither idea panned out.

In Snyder's view, he was milking the luxury-suite and -seat market because they are paid for by corporations and wealthy fans. And he was fattening team coffers so he could invest more in it to accomplish one goal: win the Super Bowl.

The disconnect between the fans and Snyder might come from the fact that he never had season tickets; he rarely even sat in the stadium until he took over the owner's box.

Snyder did not need cash from the Redskins. He had sold Snyder Communications in 2000 for about $2.3 billion; Snyder took away more than $275 million of stock in the new owner's company.

But he might need fans willing to pay the freight and brave the hassles at FedEx Field. The waiting list for tickets is still miles long, but I have heard many ticket holders say they would not renew, especially after a recent round of ticket price hikes.

In the spring of 2003, Dan Snyder invited Dwight Schar to lunch at the Capital Grill on Pennsylvania Avenue.

"I have a list of 100 people I would consider selling part of the Redskins to," he said. "You are in the top three."

Snyder didn't need the cash, but he wanted to pay down the team's debt.

Schar, a native of Norfolk, came to the Washington area in 1973 and started working for Ryan Homes. He left four years later and started his own residential development company. NVR is now the region's biggest homebuilding company and among the top ten in the country.

"Are you interested?" Snyder asked.

Schar bought a 15-percent interest in the team for $200 million.

Snyder sold a similar share to Robert Rothman, a Florida financier he met through contacts at Bank of America. Snyder brought in Federal Express founder Fred Smith for a 5-percent stake. That gave the three minority investors 35 percent of the franchise and left 65 percent with Snyder and his family.

What the change in ownership really meant was the end of the Zuckerman-Drasner era in Snyder's life. Zuckerman, never an avid fan, had sold his stake to Drasner and Snyder in 2000. Drasner loved the locker-room, cigar-smoking, jet-setting camaraderie of being an owner. If there was a brash and impetuous member of the early ownership circle, it was Drasner.

TRUE COPY

25

Joe Mendes describes Drasner as "a kid in a grownup body." Says Pepper Rodgers: "He was a little bit of an agitator."

I ask Snyder why Drasner sold his interest in 2005.

"He got married and checked out," Snyder says. "He sold everything. I miss Fred."

Drasner could not be reached; rumor has it he's sailing in parts unknown.

If there has been a change in the way Snyder handles himself as owner of the Redskins, his friends attribute part of the transformation to the switch from Drasner to Schar.

"Dwight Schar is as solid as any part of the Redskins organization," says George Michael.

Says Pepper Rodgers: "Dwight Schar has done so much for Dan in helping him become the man he is right now. He gave good advice, good friendship—a real steadying influence."

When I read this back to Snyder, he almost falls on the floor laughing.

"You have to be kidding," he says. "Our wives won't let us be together because we kid and laugh all the time."

Take the time Redskins general counsel Dave Donovan went to his first away game at the St. Louis Rams' domed stadium. Snyder and Schar saw him calling his wife and family on his cell phone to say how cool it was to be in the stadium before the game. They called the head of security and asked him to send two cops and "arrest" Donovan, saying it was illegal to use a cell phone in the stadium.

Donovan was escorted across the field. It wasn't until he got to the other sideline that they told him it was a joke.

"We were laughing so hard we almost peed in our pants," says Snyder.

But Schar's help in bringing Joe Gibbs back was no joking matter.

As Schar tells it, he and Snyder were talking after the Redskins lost another game under Steve Spurrier in the fall of 2003.

"Do you think Joe Gibbs would ever come back?" Snyder asked.

"No way," Schar said. "He's busy with his NASCAR team. He has some health issues. He has part interest in the Atlanta Falcons team. If he coaches, it might be there."

"My dad really loved him," Snyder said.

Snyder had invited Gibbs to his home for dinner in 1999 to see if he could lure him back. No dice. The two had kept up at foundation banquets.

Says Gibbs: "I would see him with his wife and children and his mom. I saw how close he was to everybody. He was a family man. That's how I got to know him."

On December 30, 2003, Spurrier resigned. Could this be the Gibbs moment?

Through Gary Jones, CEO of Gibbs's Youth for Tomorrow group home, Schar and Snyder found the former coach in North Carolina. Schar called first.

TRUE COPY

26

"Would you be interested in coming back to the Redskins?" he asked.

"Maybe," he said. "Let me make some calls."

Days before, Gibbs had been talking to Atlanta Falcons owner Arthur Blank when he got a call that Spurrier had quit. Gibbs was immediately interested in returning to the Redskins.

Schar called Snyder in Potomac. Snyder usually gets by on three to four hours of sleep, but that morning he was asleep at 9 am. Schar asked that he be awakened.

"Dan," he said, "I think we have a shot at Joe Gibbs."

Snyder had intended to fly to the West Coast to interview prospective coaches. Instead he flew south to Concord, North Carolina, and met for eight hours with Gibbs in a conference room at the airport.

Schar says Gibbs took him aside at one point. "I've heard all these things about Dan," Gibbs said. "I don't know whether I can work with him."

"One thing about the guy," Schar told him, "he's got a good heart."

Snyder met with Gibbs and Vinny Cerrato for a second round that lasted 11 hours. Gibbs and Snyder left the room.

"Do you want to do it?" Snyder asked.

"Make me an offer," Gibbs responded.

The offer was five years as coach and head of football operations for more than $5 million a year.

"It was done in 30 seconds," says Snyder. That's all it took for Snyder to hand over the Redskins and give up his role as owner/coach: "I just had to find the right guy to run the team."

When Snyder hired Gibbs, the *Washington Post* covered it as if the Messiah had returned: front-page stories, banner headlines, genuflecting columnists.

But after his first season was a disappointing 6–10, one *Post* article wondered if Gibbs was too "old." Which prompted Gibbs to exchange angry words with Post Company chairman Don Graham.

Every sports franchise believes the hometown paper should be a bit of a cheerleader; every newspaper believes its job is to provide balanced coverage. But to say the *Post* and Snyder are at loggerheads is an understatement.

The Redskins embraced longtime *Post* reporter Mark Maske, who had covered the team for years, worked hard to develop sources in the organization, and played racquetball with Snyder. Relations soured when the *Post* assigned Nunyo Demasio to the beat. A pro-basketball reporter from the Seattle paper, Demasio developed sources among players, agents, and coaches who didn't sing the Redskins tune. Stories about contract disputes and disaffected athletes started to appear in the sports pages.

When one of Snyder's nannies sued the couple over a wage dispute, the *Post* gossip columnists found it delicious. "Evil," he says.

A *Post* profile of Tanya Snyder dubbed her "the babe in the box," as in owner's box.

TRUE COPY

27

Then there was "treegate."

Snyder wanted to clear trees from the hillside below his Potomac mansion that spilled down to the Potomac River and the C&O Canal, which is controlled by the National Park Service. Snyder's lawyers negotiated for three years with NPS officials.

The talks resulted in a signed approval to cut the trees, and Park Service officials supervised the clearing. But when neighbors objected, the *Post* wrote stories casting Snyder as a cavalier landowner.

In fact, a 19-page report by the Department of the Interior inspector general said the Park Service "granted permission to Mr. Snyder to cut down native trees in 2004" and that "NPS failed to follow any of its established policies and procedures."

Readers came away with the sense that Snyder had raped the forest.

In similar fashion, when the Redskins added some seats to FedEx Field that were partially obstructed by pillars, the team invited reporters and fans to sample the seats. Neither the *Post* nor the fans objected. The Redskins advertised the seats as they were. When "several" disgruntled fans protested to the *Post*, the paper covered it as another affront by a greedy owner.

The skirmish turned ugly in March 2005, when the team announced that it would not renew 279 general-admission season tickets the *Post* had owned since the 1950s. Redskins officials said *Post* employees were scalping the tickets, which can go for $4,000 each for prime Dallas Cowboys games. Swanson says police seized a parking pass belonging to Don Graham from a stadium scalper. Graham apologized in a handwritten note.

The *Post* claimed the seats were rewards for "newspaper-delivery people—and their families" who paid for the tickets themselves.

In the war of words, the *Post* drove home the image of an owner who didn't care about nannies or trees or fans. Snyder's side rarely got out, partly because he remained silent.

Beyond what they heard in the media, the perception of many fans at FedEx Field was that Snyder was greedy because food was expensive and parking a nightmare. They blamed the owner for making their lives miserable just getting to the stadium.

Behind the scenes of Snyder's life, his friends say, Dwight Schar and Joe Gibbs have been instrumental in the mellowing of the man.

Snyder tells me his true change of heart took place in the spring of 2003.

Snyder had come face to face with some of his human frailties. He had been diagnosed with thyroid cancer in 2001; it had been successfully removed. He and his wife had had trouble with childbirth.

In the spring of 2003 his father returned from a trip to Japan complaining of chest pains. Gerald Snyder, 69, had been suffering from diabetes and heart disease. He had bypass surgery.

Jerry had been Dan's partner in business and life. They had teamed up on Snyder's college magazine; they'd shared defeats and victories; when Dan bought the Redskins, his dad sat in the owner's box.

"He was my best friend in the world," Snyder says. "He was gentle. He had a great sense of humor."

TRUE COPY

28

Even in the hospital. One day father and son called in the doctors to check out a lump Jerry had developed on his chest. The worried doctor pulled up the blanket to discover a football.

When he was being wheeled into surgery to repair his faulty heart valve, he said, "Why don't you guys take me around a couple of times. I'm not really in a rush."

Gerald Snyder didn't make it much beÂyond the surgeries. He died in late May 2003.

"It was the worst ever thing for me," Snyder says. "I miss him every day. I still pick up the phone to call him."

Snyder contributed funds to B'nai Israel, their congregation in Rockville, which dedicated its original building to his father.

Has his father's death changed him?

"I feel a sense of reality that I never had before," he says. "You realize you may not wear a cape and be Superman.

"Life is precious. My youngest son turns four in two days. I wish he could be there."

After Joe Gibbs went 6–10 his first season back with the Redskins, he then went 10–6 and took the team to the playoffs for the first time in a decade.

I caught up with Gibbs a week before training camp.

How are things going between him and Snyder?

"Anyone will tell you the relationship between an owner and a coach is close and complicated," he says. "You go through bad times and you go through high times."

"Dan and I have gotten into a real partnership," he says. "But he is the boss."

Gibbs has seen a lot of owners in action.

"A certain number of owners want to run a business, and others want to win," he says. "Dan Snyder wants to win.

"Since I have been here there's nothing I have ever discussed with him where he has ever said no. Such support and partnership is phenomenal."

How does Snyder compare with Jack Kent Cooke?

"Both are more focused on winning than making money. Both are super smart."

But it's clear that Snyder is more present than his predecessor was.

"We talk a lot," Gibbs says. "We are back and forth all the time. We work down the hall from one another.

"I count on his opinion. He's very instrumental on the draft, the salary-cap, free agency, strategy on how the team should be built."

TRUE COPY

29

After talking to Gibbs and Snyder, I see their strategy more clearly. There's a salary cap on players, and all teams operate with the same amount of money. But there's no limit on how much an owner can spend on coaches. That's where Dan Snyder is pumping extra money. His coaches are the highest-paid in NFL history.

"No question he's invested heavily in the coaching staff," says Gibbs. "Will it pay off? We'll see."

with the washington Redskins in good hands, Dan Snyder has gone on the prowl for new prey in the business world.

RedZone Capital, his private-equity firm, is looking for acquisitions. He's buying radio stations to broadcast Redskins games. He pounced last fall on Six Flags, the nation's largest theme-park operator, awash in debt and poor earnings. He bought stock. He went on a crusade to persuade the corporation's board to give him control without his having to buy the company.

Snyder needed a partner in the hunt. Three years ago he took notice of Mark Shapiro, a rising star at ESPN responsible for taking the sports channel into original programming and talk shows such as *Pardon the Interruption*.

Snyder called Shapiro and asked him to dinner. They ate and drank wine for three hours. "He never got to the point," Shapiro says.

The point was that Snyder liked him, saw a kindred spirit, wanted a friend. Their families began vacationing together, cruising the Mediterranean on large yachts.

They were standing at the bow of such a craft in the Monaco yacht harbor more than a year ago when Snyder asked, "What do you know about Six Flags?"

Shapiro, a lanky 36-year-old, said he had been a regular at a Six Flags park near his hometown outside Chicago.

"Would you ever be interested in running the company?"

A few months later Snyder and Shapiro were flying around the country on Snyder's jet trying to woo Six Flags shareholders in a bruising proxy fight that would install the duo at the top of the company. Knowing Snyder's reputation and Shapiro's intolerance for pushy bosses, the latter's friends took bets on how long the two would stay together.

What was the over-under on Shapiro and Snyder parting ways?

Shapiro is wagering on a long relationship. Snyder is now chair of Six Flags; Shapiro is CEO.

"Nobody walks into a meeting with Dan Snyder with an open mind," Shapiro says. "Businesspeople are wondering what his angle is. Casual people wonder what he wants from them."

"Dan wants people who can run with him," says Shapiro. "He's loyal. He's generous. He knows how to reward people."

Neither Snyder nor Shapiro has any experience running an amusement-park company. Six Flags stock has been tailing downward as of late. Its most recent results show a $40-million loss and a 14-percent drop in attendance. Moody's Investors Service downgraded its rating from "stable" to "negative." Snyder pumped in $3 million to support the stock. Shapiro says he has to rebuild the system from the ground up, but once he has it stabilized, it could grow into other businesses.


TRUE COPY

30

"Dan is the perfect chairman," Shapiro says. "He's there when you need him. He opens doors. He gives good counsel. He lets you do your job. He has no interest in day-to-day operations of theme parks."

But he is interested in playing.

"'The best call you can get on a Friday afternoon is from Dan Snyder: 'Had a tough week? Want to go to Monaco for the weekend?' "

Bill Regardie, a former magazine publisher and raconteur, poses an interesting question about Snyder:

"He's the best peddler I have seen in 40 years of covering Washington business. Best adman. Best salesman. Best direct marketer. And yet, when it comes to marketing Dan Snyder, you would think he was selling rat poison. Why? I don't understand."

Financier and friend Mark Jennings says, "Dan probably just can't get that interested in marketing himself. That's part of why I like him. He's not focused on his public image. I know people who are incredibly focused on their image.

"He's focused on what interests him, not on how to get the next great article written about himself."

My instinct is that Snyder never was a mean-spirited, bratty owner. He was an overeager fan who found himself owning his beloved team at the too-young age of 34. From doing business in the privacy of the boardroom, he was suddenly operating in the spotlight. He was, by his own admission, too impatient.

*Washington Post* columnist Sally Jenkins, his tormentor for years, says, "As a sports owner, he's obviously made progress. You have to give him credit for the Redskins' turnaround. He quite obviously made mistakes. He's done his best to rectify them."

I ask Snyder why his image hasn't improved. We are the last ones in the restaurant. Snyder is sipping cappuccino.

"I really haven't worked at it," he says.

Another winning season would help.

---

## Don't Miss Another Big Story—Get Our Weekend Newsletter

OUR MOST POPULAR STORIES OF THE WEEK, SENT EVERY SATURDAY.

Email Address

SUBSCRIBE

OR, SEE ALL OF OUR NEWSLETTERS. BY SIGNING UP, YOU AGREE TO OUR TERMS.

MORE:

# Join the conversation!

TRUE COPY

31

The Washington Post

# Snyder to Sell His Marketing Firm for $2 Billion

By Greg Schneider; Peter Behr
February 22, 2000

Washington Redskins owner Daniel M. Snyder yesterday agreed to sell his Bethesda marketing firm, Snyder Communications Inc., to Havas Advertising of France for stock worth about $2.1 billion.

The deal ends a remarkable voyage for Snyder Communications, which started from the ruins of a failed business only 12 years ago and generated enough money to help its founder become principal investor in last year's $800 million purchase of the Redskins.

Havas will pay Snyder investors the equivalent of $29.50 per share by giving them Havas shares that will trade on U.S. markets. That's a 44 percent premium over Snyder's Friday closing price of $20.50 a share.

Daniel Snyder stands to get more than $275 million worth of Havas stock for his 9.4 million shares of Snyder Communications.

The energetic, 35-year-old entrepreneur said he will hold on to the stock and not use it to pay down the $350 million he borrowed to buy the football team. But Havas's purchase of his company will leave him more time for football, he acknowledged.

"Absolutely. You can write that. That's what I want, to bring home a Super Bowl trophy for the Redskins," Snyder said in an interview.

The sale was set in motion late last year following an unsolicited offer for the company by the London-based WPP Group, for about $25 a share, according to sources. The overture occurred at a time when Snyder was deeply frustrated by his company's poor stock performance, which he felt was unjustified, associates said.

TRUE COPY

32

As other companies got into the bidding, Snyder said he decided to make the sale because a new round of marketing industry mergers was beginning, and "we wanted to be an organization that controlled our own destiny."

In December, Snyder hired the investment firm Deutsche Banc Alex. Brown to solicit offers. Other bidders, sources said, included the U.S. advertising firm Omnicom Groupseek and an Internet company whose identity has not been learned. WPP dropped out as the price climbed.

Snyder said he chose Havas based not just on its offered price but on the ability of the companies to blend together. With no conflicting clients and a need on Havas's part for stronger direct marketing capability, "the sum of both together really winds up being a tremendous powerhouse," Snyder said.

Following the deal, Havas will have $2.2 billion in annual sales and 20,000 employees in 75 countries. Nearly half of its business will be in the United States, up from about 30 percent for Havas today. Snyder Communications' revenue totaled $465 million over the nine months ended in September.

Havas said it plans $3 million worth of job cuts at Snyder's Bethesda headquarters, which employs about 700 workers. Snyder said those moves will involve only a small number of people in departments that overlap with the new company, such as regulatory reporting and legal affairs.

The transaction has been approved by the boards of both firms. Pending regulatory approval and the vote of shareholders, the companies expect the deal to close by the middle of the year.

The deal includes four basic Snyder entities: the advertising firm Arnold Communications, which created the campaign for the new Volkswagen Beetle; Bounty SCA Worldwide, a marketing services firm; Brann Worldwide, which is the world's biggest direct-marketing business; and Snyder's 17 percent interest in Circle.com, a recently formed Internet services unit based in Baltimore.

TRUE COPY

8/7/2020

Snyder to Sell His Marketing Firm for $2 Billion - The Washington Post

33

Snyder would remain at the helm of his company only until the deal closes, preparing for the transition. "Then I'm going to evaluate my options," he said. "Obviously, I've been paying a lot of attention to the Redskins and will continue to do so."

While he said he was "not going to be full time to the Redskins," he said he was anxious to have more time to prepare for this spring's draft of college players.

The deal "gives me a little more time, but that wasn't the driver for this," he said.

Football was on his mind during negotiations, though. Snyder said that Havas Chairman and chief executive Alain de Pouzilhac owns a rugby team in France. At a dinner in New York, the two men exchanged jerseys. "I told him he better become a Redskins fan," Snyder said.

Snyder; his sister Michele, the company's president; and several other key executives are expected to launch a new business venture once the Havas deal is concluded. Snyder remains co-chairman of Ventiv Health Inc., a health-care marketing company spun off from Snyder Communications last year.

Snyder also noted his involvement on the boards at Children's Hospital and the Center for Missing and Exploited Children, as well as with several New York investment partnerships.

Otherwise, Snyder was vague about his intentions. "I think in my lifetime I will be involved in many a commercial venture," he said. "What really excites me is two things: The business community . . . and second and most important is to win a Super Bowl for the Redskins."

Snyder is known for his demanding, relentless business drive. He started Snyder Communications after raising--and losing--several million dollars of investors' money in a unsuccessful college magazine venture. He then began focusing on an around-the-clock marketing push on Fortune 500 companies.


TRUE COPY

34

He and a small staff tackled any assignment they could bluster their way into, from distributing diapers to marketing long-distance telephone services for non-English-speaking immigrants.

In 1996, he took Snyder Communications public. Through three stock offerings, Snyder raised $626 million and used that money to buy more than a dozen advertising and marketing companies.

At its peak in 1998, revenue had grown tenfold to more than $800 million. Snyder Communications had become the largest direct-marketing firm in the world, a major contract seller for drug companies, and a communications manager for corporations such as International Business Machines Corp., Gillette Co. and Kellogg Co.

But while Snyder's revenue has steadily grown, the company's stock value has been in decline since its acquisition spree died off in 1998.

To help revive the company's standing on Wall Street, Snyder reorganized last fall. He spun off its health-care marketing division to form Ventiv Health and consolidated Internet services into a subsidiary called Circle.com, which has its own publicly traded "tracking stock."

None of these moves revived the Snyder stock, however. In April 1998, a share of Snyder was selling for more than $53; in October 1999 following the spinoffs, the stock hit a low of less than $9 a share.

"The moves created a lot of confusion [among investors], and in a high-growth market, confusion doesn't help you," said Snyder Chief Financial Officer Clay Perfall.

The stock price issue left the company founder greatly frustrated, associates said, and unhappy at financial analysts' speculation that his attention to his business had been distracted by his passion for the Redskins. That primed the pump for a sale when the outside bidders arrived.

💬 **0 Comments**

TRUE COPY

Snyder to Sell His Marketing Firm for $2 Billion - The Washington Post

35

Get a year of access for $29.
Cancel at any time.

**Get this offer now**

Already a subscriber? Sign in

TRUE COPY

36

Jul 18, 2018, 10:36am EDT

# Full List: The World's 50 Most Valuable Sports Teams Of 2018



**Kurt Badenhausen** Forbes Staff

SportsMoney

*I cover sports business with rare dips into b-schools, local economies*

🕐 **This article is more than 2 years old.**

The World Cup and NBA free agency have dominated the sports headlines this month. Soccer and basketball are global sports with incredible growth prospects, thanks to their international reach. More than three billion people tune in to watch the World Cup every four years. Nike uses NBA stars like LeBron James and Kevin Durant to pitch the wares of the sports giant around the globe.

But despite the global popularity of basketball and soccer, American football is still king on the financial ledger. The NFL lands 29 teams among the 50 most valuable sports teams in the world (only the Bills, Bengals and Lions missed the cut from the NFL). Football ranks well ahead of basketball (8 teams), soccer (7 teams) and baseball (6 teams).

TRUE COPY

37



Dallas Cowboys owner Jerry Jones and his star running back Ezekiel
Elliott.   2017 GETTY IMAGES

The NFL is still the dominant sport in the world's
biggest economy. Thirty-seven percent of Americans
picked football as their favorite sport to watch in the
latest Gallup Poll. Football is down from it's peak of 43%
a dozen years ago, but it still crushes basketball (11%),
baseball (9%) and soccer (7%).

**Recommended For You**                                    ∧

The Big Ten And Connecticut: A Tale Of Two Realities In College
Football

Major League Baseball's Pandemic Strategy Proves That A Non-
Bubble Can Indeed Burst

Ex-NHL Star Chris Pronger's Boutique Travel Company Wants To
Help Athletes Recharge

TV networks pay billions to satisfy viewers wanting NFL
action. NFL teams evenly divvied up $8.2 billion, or
$255 million per team, last season from shared league

TRUE COPY

28

revenue, with TV rights deals from CBS, NBC, Fox, ESPN and DirecTV the bulk of the money. Factor in a salary cap that restricts player costs to 50% of league revenue and NFL owners are minting money with average profits of $101 million per team in the sense of earnings before interest, taxes, deprecation and amortization.

Below is a breakdown of the world's 50 most valuable sports franchises. Click here for more on the top teams.

### Rank, Team, Value, 1-Year change (Sport)

1. Dallas Cowboys, $4.8 billion, 14% (NFL)

2. Manchester United, $4.123 billion, 12% (Soccer)

3. Real Madrid, $4.09 billion, 14% (Soccer)

4. Barcelona, $4.064 billion, 12% (Soccer)

5. New York Yankees, $4 billion, 8% (MLB)

6. New England Patriots, $3.7 billion, 9% (NFL)

7. New York Knicks, $3.6 billion, 9% (NBA)

8. Los Angeles Lakers, $3.3 billion, 10% (NBA)

8. New York Giants, $3.3 billion, 6% (NFL)

10. Golden State Warriors, $3.1 billion, 19% (NBA)

TRUE COPY

39

10. Washington Redskins, $3.1 billion, 5% (NFL)

12. Bayern Munich, $3.063 billion, 13% (Soccer)

13. San Francisco 49ers, $3.05 billion, 2% (NFL)

14. Los Angeles Dodgers, $3 billion, 9% (MLB)

14. Los Angeles Rams, $3 billion, 3% (NFL)

16. Chicago Cubs, $2.9 billion, 8% (MLB)

17. San Francisco Giants, $2.85 billion, 8% (MLB)

17. Chicago Bears, $2.85 billion, 6% (NFL)

19. Boston Red Sox, $2.8 billion, 4% (MLB)

19. Houston Texans, $2.8 billion, 8% (NFL)

21. New York Jets, $2.75 billion, 0% (NFL)

22. Philadelphia Eagles, $2.65 billion, 6% (NFL)

23. Chicago Bulls, $2.6 billion, 4% (NBA)

23. Denver Broncos, $2.6 billion, 8% (NFL)

25. Miami Dolphins, $2.575 billion, 8% (NFL)

26. Green Bay Packers, $2.55 billion, 9% (NFL)

27. Boston Celtics, $2.5 billion, 14% (NBA)

27. Baltimore Ravens, $2.5 billion, 9% (NFL)

TRUE COPY

Full List: The World's 50 Most Valuable Sports Teams Of 2018

40

29. Atlanta Falcons, $2.475 billion, 16% (NFL)

30. Manchester City, $2.474 billion, 19% (Soccer)

31. Pittsburgh Steelers, $2.45 billion, 9% (NFL)

32. Seattle Seahawks, $2.425 billion, 9% (NFL)

33. Minnesota Vikings, $2.4 billion, 9% (NFL)

34. Oakland Raiders, $2.38 billion, 13% (NFL)

35. Indianapolis Colts, $2.375 billion, 9% (NFL)

36. Brooklyn Nets, $2.3 billion, 28% (NBA)

36. Carolina Panthers, $2.3 billion, 11% (NFL)

38. Los Angeles Chargers, $2.275 billion, 9% (NFL)

39. Arsenal, $2.238 billion, 16% (Soccer)

40. Houston Rockets, $2.2 billion, 33% (NBA)

41. Los Angeles Clippers, $2.15 billion, 7% (NBA)

41. Arizona Cardinals, $2.15 billion, 6% (NFL)

43. New York Mets, $2.1 billion, 5% (MLB)

43. Kansas City Chiefs, $2.1 billion, 12% (NFL)

45. Jacksonville Jaguars, $2.075 billion, 6% (NFL)

46. Chelsea, $2.062 billion, 12% (Soccer)

TRUE COPY

Full List: The World's 50 Most Valuable Sports Teams Of 2018

41

47. Tennessee Titans, $2.05 billion, 2% (NFL)

48. New Orleans Saints, $2 billion, 14% (NFL)

49. Tampa Bay Buccaneers, $1.975 billion, 10% (NFL)

50. Cleveland Browns, $1.95 billion, 5% (NFL)

## More Reading:

## The Dallas Cowboys Lead The World's Most Valuable Sports Teams 2018

## The World's Highest-Paid Athletes

## The World's Richest Sports Team Owners

*Follow me on Twitter or LinkedIn. Send me a secure tip.*



**Kurt Badenhausen**

Follow

I am a senior editor at Forbes and focused mainly on the business of sports and our annual franchise valuations. I also spend a lot of my time digging into what athletes... **Read More**

Site Feedback      Tips      Corrections      Reprints & Permissions      Terms      Privacy

© 2020 Forbes Media LLC. All Rights Reserved.      Report a Security Issue      AdChoices

ADVERTISEMENT

TRUE COPY

8/7/2020                                    Daniel Snyder Lauded as Astute Businessman and Committed Philanthropist - entreprenerd.net

## ENTREPRENERD.NET
Entrepreneurs can be nerds too

HOME        ABOUT        PRIVACY POLICY

# Daniel Snyder Lauded as Astute Businessman and Committed Philanthropist

POSTED ON AUGUST 4, 2020 BY POLLY

Businessman Daniel Snyder represents the quintessential American success story. Born on November 23, 1964 in Maryland, Daniel Marc Snyder is the son of Arlette and Gerald Seymour "Gerry" Snyder. His father was a freelance writer who penned intriguing content for National Geographic and United Press International.

After attending elementary school in Silver Spring, Maryland, Dan Snyder's schooling continued in Henley-on-Thames, a small town adjacent to London. He attended private school from ages 12 to 14 before traveling to Queens, New York to live with his grandmother. Finally, Snyder moved back to Maryland with his family. He graduated from Charles W. Woodward High School in Rockville, Maryland.

At age 17, fledgling entrepreneur Daniel Snyder and his father launched a business that marketed bus trip packages to Philadelphia, Pennsylvania. The duo targeted their efforts to Washington Capitols' fans who wanted to watch their hockey team face off in Philadelphia. The event didn't unfold as planned, introducing Snyder to the vagaries of the business world.

### Multifaceted Career

After a brief foray into the academic arena, Dan Snyder left the University of Maryland, College Park at age 20. Shortly afterward, this resourceful young entrepreneur launched a jet-leasing business. He created an alternative method of transporting college students to Fort Lauderdale and Caribbean destinations during spring break weeks.

Encouraged by his jet-leasing results, Daniel Snyder acquired funding from real estate mogul Mortimer Zuckerman, and launched a college student magazine called Campus USA. Following an auspicious beginning, the magazine closed three years later due to insufficient advertising revenues. By that time, however, Snyder had forged a beneficial relationship with the well-connected Zuckerman.

At age 25, Daniel Snyder's next business venture took shape. Buoyed by the rise of segmented marketing, he and his sister Michele established Snyder Communications LP, a company that placed prominent companies' ads on businesses' interior display boards. Doctors' offices and college campuses were their first target markets.

This innovative business concept proved extremely successful. Snyder and his sister expanded the operation through organic methods and strategic acquisitions. One prominent target market included major United States' airports' private aircraft lounges, popular with well-heeled pilots and their guests.

Next, Snyder Communications became a major player in the outsourced marketing industry. The company added database marketing, direct marketing, and sponsored information displays to its services. Field sales, call centers, and proprietary product sampling rounded out its repertoire.

In September 1996, Snyder Communications debuted its initial public offering. With this action, 32-year-old Daniel Snyder became the youngest-ever CEO of a New York Stock Exchange-listed company.

Snyder Communications continued to expand through a series of aggressive acquisitions. By 1998, the company had over $1 billion in annual revenues and carried over 12,000 employees on its books.

In April 2000, the French advertising and marketing services group Havas purchased Snyder Communications in an all-stock transaction valued at more than US$2 billion. At the time, this was the largest transaction in the advertising/marketing industry's history.

### Business Accomplishments

Football has always been a part of Daniel Snyder's life. He is a longtime Washington Redskins fan, and attended numerous Sunday afternoon games with his father at RFK Stadium, the team's former home.



8/7/2020                    Daniel Snyder Lauded as Astute Businessman and Committed Philanthropist - entreprenerd.net

43

## ENTREPRENERD.NET
Entrepreneurs can be nerds too

HOME     ABOUT     PRIVACY POLICY



Solo 100 ml Unisex Perfume | SKINN
Skinn

Following the death of former owner Jack Kent Cooke, Dan Snyder jumped at the chance to purchase the Washington Redskins and their then two-year-old stadium. In May 1999, the package's $800 million price tag made it the most expensive transaction in sporting history.

Afterward, Dan Snyder renamed the stadium FedEx Field, obtaining $207 million in naming rights revenues from the package shipping giant. Snyder also entered into several lucrative sponsorship deals, and increased the number of club seats and suites. Collectively, Daniel Snyder's revenue enhancement strategies have proven very successful, more than doubling the Redskins' revenues through 2014.

Dan Snyder also launched a plan for airing the Washington Redskins' games on Washington, D.C.-market radio stations. In July 2006, his Red Zebra Broadcasting launched three sports radio stations, followed by the purchase of other mid-Atlantic regional radio stations.

In February 2007, Daniel Snyder further expanded his reach with an announcement that his RedZone Capital firm would purchase the nationally recognized Johnny Rockets diner chain. In 2013, his firm sold this 1950s-themed restaurant business to Sun Capital Partners.

### Philanthropic Efforts

Daniel Snyder has long embraced the value of philanthropy. He has demonstrated this enduring commitment by giving back to his local, national, and international communities. His $1 million contribution provided assistance to September 11 attack victims.

Snyder has also made significant donations to victims of three natural disasters. In 2004, Dan Snyder stepped up to pay the shipping costs for charitable food donations to people affected by the tsunami in Thailand and Indonesia. In 2005, he donated $600,000 to help Hurricane Katrina victims.

In 2016, Snyder played a key role in the Hurricane Matthew disaster relief efforts. Using his private plane, he sent emergency supplies to The Bahamas. He also provided much-needed medical supplies to Port-au-Prince, Haiti's Hospital Bernard Mevs.

Daniel Snyder has also demonstrated his commitment to charitable causes in the Washington, D.C. region. For many years, he has supported the well-known Youth For Tomorrow organization. Joe Gibbs, former Redskins head coach and Pro Football Hall of Fame member, established this well-regarded entity. In April 2010, Dan Snyder received Youth For Tomorrow's Distinguished Leader Award for his many contributions.

Snyder also desired to provide resources and opportunities to area Tribal Communities. In 2014, he established the Washington Redskins Original Americans Foundation to accomplish those goals.

Dan Snyder has also demonstrated ongoing support for the Washington Children's Hospital, the National Center for Missing and Exploited Children (NCMEC), and other organizations. In May 2014, the NCMEC presented Snyder and his wife Tanya with the Charles B. Wang International Children's Award for their untiring efforts to assist endangered children.

### Personal Profile

In 1994, Daniel Snyder married former fashion model Tanya Ivey. The couple has two daughters and a son together. In May 2008, Tanya began treatment for breast cancer. Following that life-changing experience, Tanya became a national spokesperson for breast cancer awareness.

Read more about Dan Snyder here: https://tribunehotreport.com/article-a2831645-redskins-owner-daniel-snyder-bought-16th-million-yacht-with-imax-theater



8/7/2020

The World's Most Valuable Sports Teams 2020

44



# THE WORLD'S MOST VALUABLE SPORTS TEAMS 2020

DAILY COVER  |  170,974 views  |  Jul 31, 2020, 06:30am EDT

GETTY IMAGES/ FORBES



**Kurt Badenhausen** Forbes Staff

SportsMoney

*I cover sports business with rare dips into b-schools, local economies*

# Fans are stuck at home, seasons are at risk, and revenue is plummeting. Things might seem terrible for professional

TRUE COPY

The World's Most Valuable Sports Teams 2020

## sports, but amazingly most of the world's top franchises are worth more this year than last.

I f you're wondering just how pandemic-resistant the world's leading sports franchises are, look no further than Fred Wilpon's New York Mets. The Amazin's, the No. 2 team in Major League Baseball's most valuable market, were put in play by Wilpon in February after nearly two decades of ownership, putting them on track to be the first big-market Major League Baseball franchise to be sold in eight years.

They are hardly a crown jewel. Wilpon was reluctant to keep pace with the league's rising payrolls, leaving the Mets without a World

TRUE COPY

46

Series win since 1986 and bleeding
cash long before the coronavirus
eliminated more than half the season
and all of the franchise's stadium
revenues.

That hasn't stopped an all-star list of
buyers from kicking the tires,
including hedge-fund titan Steve
Cohen and private-equity guru Josh
Harris, one of whom will likely end
up paying more than $2 billion for
the franchise, one of 57 teams worth
at least that amount. A decade ago,
there was only one that came even
close: U.K. soccer club Manchester
United, which was the most valuable
team on earth in 2010 at $1.83
billion.

That honor now belongs to
the Dallas Cowboys, who top
the *Forbes* ranking of the 50 Most
Valuable Sports Teams for the fifth
straight year, at $5.5 billion, edging
out the $5 billion New York Yankees.
For Cowboys owner Jerry Jones and
New York's Steinbrenner family, it
may as well be paper profit. Only one

TRUE COPY

8/7/2020                    The World's Most Valuable Sports Teams 2020

47

team in the top 35—MLB's Los
Angeles Dodgers, in 2012—has
changed hands in the past decade,
which explains how the Mets, No. 41
at $2.4 billion, became one of the
hottest tickets in sports.



Two-time Cy Young Award winner Jacob DeGrom will almost certainly have a new
boss signing his checks next season on his five-year, $137.5 million contract.   RICH
SCHULTZ/ GETTY IMAGES

"There is no lack of multi-billionaires
that want to get into the sports
business right now," says Sal
Galatioto, whose namesake
investment firm has handled team
transactions for the Chicago Cubs,
the Golden State Warriors, the
Philadelphia 76ers and other
marquee sports properties. "People



The World's Most Valuable Sports Teams 2020

48

will pay a premium. They buy these teams not just on the numbers, but on the brand value."

That value is dominated by the NFL, even after a ten-year run by the NBA lifted its average team value nearly sixfold, more than any other U.S. sports league. Football claims 27 spots on the ranking, a reflection not only of its massive stadium draws but also its TV appeal. Of the 100 top broadcasts in 2019, 88 were sporting events and 73 were NFL games. The NFL's current U.S. TV rights are worth $6.5 billion on average per year, a number expected to nearly double in a new deal currently being hashed out, according to sports media consultant Lee Berke of LHB Sports. To help afford it, Fox even backed out of a 12-year deal to broadcast golf's U.S. Open, with the savings expected to help bankroll a potential $2 billion-a-year NFL deal.

The NBA comes second with nine teams on the list, including three in the top five—the New York Knicks

TRUE COPY

49

($4.6 billion), the Los Angeles
Lakers ($4.4 billion) and the Golden
State Warriors ($4.3 billion)—with
the Brooklyn Nets in hot pursuit
after Alibaba billionaire Joe Tsai
finalized a $3.3 billion deal for the
franchise and operating rights to the
Barclays Center last year. Three
European soccer teams cracked the
top ten this year, led by Real Madrid
at $4.2 billion. The NHL is a no-
show once again, which is not
surprising for a league whose lower-
tier teams are passed around like
joints at a Grateful Dead show,
including five Arizona Coyotes sales
in 15 years.

The pain worsens even further down
the food chain. Stakes held by
limited partners of major teams
already come with a discount of 20%
or more to controlling stakes and
could face pressure if some partners
begin looking to offload their
interests to raise cash for other
businesses that may be ailing
because of the spread of Covid-19. A
number of minor league baseball

TRUE COPY

50

unlikely to be moved. The Cowboys delivered Jones operating profits of $420 million in 2018. While that is a record for a sports franchise, the league average is $102 million, which is why its average ownership tenure is four decades, with only one team changing hands in the past five years, a backlog of demand that is far from being met.

"It could take 30 years," says Galatioto, who knows at least half a dozen multi-billionaires looking to buy an NFL franchise. "That scarcity factor holds values up."

## 1. **Dallas Cowboys** (NFL)



©ICON SPORTSWIRE (A DIVISION OF XML TEAM SOLUTIONS) ALL RIGHTS RESERVED

## Value: **$5.5 billion**

### Owner: **Jerry Jones**

TRUE COPY

8/7/2020                    The World's Most Valuable Sports Teams 2020

51

Year Purchased: **1989**

Price Paid: **$150 million**

---

## 2. **New York Yankees** (MLB)

### Value: **$5 billion**

Owner: **Steinbrenner family**

Year Purchased: **1973**

Price Paid: **$8.8 million**

---

## 3. **New York Knicks** (NBA)

### Value: **$4.6 billion**

Owner: **Madison Square Garden Company**

Year Purchased: **1997**

Price Paid: **$300 million**

---

## 4. **Los Angeles Lakers** (NBA)

### Value: **$4.4 billion**

TRUE COPY

8/7/2020

The World's Most Valuable Sports Teams 2020

52

Owner: **Jerry Buss Family Trusts, Philip Anschutz**

Year Purchased: **1979, 1998**

Price Paid: **$20 million, $268 million**

---

### 5. **Golden State Warriors** (NBA)

Value: **$4.3 billion**

Owner: **Joe Lacob, Peter Guber**

Year Purchased: **2010**

Price Paid: **$450 million**

---

### 6. **Real Madrid** (soccer)



GETTY IMAGES

Value: **$4.24 billion**

Owner: **club members**

TRUE COPY

The World's Most Valuable Sports Teams 2020

53

teams are on the verge of bankruptcy while Vince McMahon's XFL startup folded after suspending its season in March.

———————————————

The pandemic shutdown hasn't been good for any owner, but the ones holding on to the top brands are

TRUE COPY

The World's Most Valuable Sports Teams 2020

54

Year Purchased: **not applicable**

---

## 7. **New England Patriots** (NFL)

## Value: **$4.1 billion**

Owner: **Robert Kraft**

Year Purchased: **1994**

Price Paid: **$172 million**

---

## 8. **Barcelona** (soccer)

## Value: **$4.02 billion**

Owner: **club members**

Year Purchased: **not applicable**

---

## 9. **New York Giants** (NFL)

## Value: **$3.9 billion**

Owner: **John Mara, Steven Tisch**

Year Purchased: **1925, 1991**

Price Paid: **$500, $150 million**

---

TRUE COPY

The World's Most Valuable Sports Teams 2020

55

### 10. **Manchester United** (soccer)

Value: **$3.81 billion**

Owner: **Glazer family**

Year Purchased: **2005**

Price Paid: **$1.4 billion**

---

### 11. **Los Angeles Rams** (NFL)

Value: **$3.8 billion**

Owner: **E. Stanley Kroenke**

Year Purchased: **2010**

Price Paid: **$750 million**

---

### 12. **San Francisco 49ers** (NFL)

Value: **$3.5 billion**

Owner: **Denise DeBartolo & John York**

Year Purchased: **1977**

TRUE COPY

The World's Most Valuable Sports Teams 2020

56

Price Paid: **$13 million**

---

## 13. **Chicago Bears** (NFL)

## Value: **$3.45 billion**

Owner: **McCaskey family**

Year Purchased: **1920**

Price Paid: **$100**

---

## 14 (tie). **Los Angeles Dodgers** (MLB)



GETTY IMAGES

## Value: **$3.4 billion**

Owner: **Guggenheim Baseball Management**

Year Purchased: **2012**

Price Paid: **$2 billion**

---

TRUE COPY

8/7/2020

The World's Most Valuable Sports Teams 2020

57

## 14 (tie). **Washington Football Team** (NFL)

### Value: **$3.4 billion**

Owner: **Daniel Snyder**

Year Purchased: **1999**

Price Paid: **$750 million**

---

## 16. **Boston Red Sox** (MLB)

### Value: **$3.3 billion**

Owner: **John Henry, Thomas Werner**

Year Purchased: **2002**

Price Paid: **$380 million**

---

## 17 (tie). **Chicago Bulls** (NBA)

### Value: **$3.2 billion**

Owner: **Jerry Reinsdorf**

Year Purchased: **1985**

TRUE COPY

The World's Most Valuable Sports Teams 2020

58

Price Paid: **$16.2 million**

---

## 17 (tie). **Chicago Cubs** (MLB)

Value: **$3.2 billion**

Owner: **Ricketts family**

Year Purchased: **2009**

Price Paid: **$700 million**

---

## 17 (tie). **New York Jets** (NFL)

Value: **$3.2 billion**

Owner: **Johnson family**

Year Purchased: **2000**

Price Paid: **$635 million**

---

## 20 (tie). **Boston Celtics** (NBA)

Value: **$3.1 billion**

TRUE COPY

8/7/2020

The World's Most Valuable Sports Teams 2020

59

Owner: **Wycliffe & Irving Grousbeck, Robert Epstein, Stephen Pagliuca**

Year Purchased: **2002**

Price Paid: **$360 million**

---

## 20 (tie). **Houston Texans** (NFL)



GETTY IMAGES

## Value: **$3.1 billion**

Owner: **Janice McNair**

Year Purchased: **1999**

Price Paid: **$600 million**

---

## 20 (tie). **San Francisco Giants** (MLB)

## Value: **$3.1 billion**

Owner: **Charles Johnson**

TRUE COPY

https://www.forbes.com/sites/kurtbadenhausen/2020/07/31/the-worlds-most-valuable-sports-teams-2020/#19d37b963c74

8/7/2020

The World's Most Valuable Sports Teams 2020

60

Year Purchased: **1993**

Price Paid: **$100 million**

## 23. **Philadelphia Eagles** (NFL)

## Value: **$3.05 billion**

Owner: **Jeffrey Lurie**

Year Purchased: **1994**

Price Paid: **$185 million**

## 24. **Bayern Munich** (soccer)

## Value: **$3.02 billion**

Owner: **club members**

Year Purchased: **not applicable**

## 25. **Denver Broncos** (NFL)

## Value: **$3 billion**

Owner: **Pat Bowlen Trust**

TRUE COPY

The World's Most Valuable Sports Teams 2020

61

Year Purchased: **1984**

Price Paid: **$78 million**

_____

## 26. **Oakland Raiders** (NFL)

# Value: **$2.9 billion**

Owner: **Mark Davis**

Year Purchased: **1966**

Price Paid: **$180,000**

_____

## 27. **Green Bay Packers** (NFL)

# Value: **$2.85 billion**

Owner: **shareholder-owned**

Year Purchased: **1921**

Price Paid: **$100**

_____

## 28. **Pittsburgh Steelers** (NFL)

TRUE COPY

8/7/2020                                    The World's Most Valuable Sports Teams 2020

*62*



GETTY IMAGES

## Value: **$2.8 billion**

Owner: **Daniel Rooney Trust,
Arthur Rooney II**

Year Purchased: **1933**

Price Paid: **$2,500**

---

## 29. **Seattle Seahawks** (NFL)

## Value: **$2.78 billion**

Owner: **Paul G. Allen Trust**

Year Purchased: **1997**

Price Paid: **$194 million**

---

## 30. **Miami Dolphins** (NFL)

## Value: **$2.76 billion**

Owner: **Stephen Ross**

TRUE COPY

The World's Most Valuable Sports Teams 2020

8/7/2020

63

Year Purchased: **2008**

Price Paid: **$1.1 billion**

---

## 31. **Atlanta Falcons** (NFL)

## Value: **$2.755 billion**

Owner: **Arthur Blank**

Year Purchased: **2002**

Price Paid: **$545 million**

---

## 32. **Baltimore Ravens** (NFL)

## Value: **$2.75 billion**

Owner: **Stephen Bisciotti**

Year Purchased: **2004**

Price Paid: **$600 million**

---

## 33. **Minnesota Vikings** (NFL)

## Value: **$2.7 billion**

TRUE COPY

8/7/2020

The World's Most Valuable Sports Teams 2020

64

Owner: **Zygmunt Wilf**

Year Purchased: **2005**

Price Paid: **$600 million**

## 34. **Manchester City** (soccer)



GETTY IMAGES

## Value: **$2.69 billion**

Owner: **Sheikh Mansour bin Zayed Al Nahyan**

Year Purchased: **2008**

Price Paid: **$385 million**

## 35. **Indianapolis Colts** (NFL)

## Value: **$2.65 billion**

Owner: **James Irsay**

Year Purchased: **1972**

TRUE COPY

8/7/2020

The World's Most Valuable Sports Teams 2020

65

Price Paid: **$14 million**

## 36. **Los Angeles Clippers** (NBA)

Value: **$2.6 billion**

Owner: **Steve Ballmer**

Year Purchased: **2014**

Price Paid: **$2 billion**

## 37. **Chelsea** (soccer)

Value: **$2.58 billion**

Owner: **Roman Abramovich**

Year Purchased: **2003**

Price Paid: **$233 million**

## 38 (tie). **Brooklyn Nets** (NBA)

Value: **$2.5 billion**

Owner: **Joseph Tsai**

TRUE COPY

8/7/2020

The World's Most Valuable Sports Teams 2020

C6

Year Purchased: **2019**

Price Paid: **$3.3 billion**

---

## 38 (tie). **Los Angeles Chargers** (NFL)

## Value: **$2.5 billion**

Owner: **Dean A. Spanos**

Year Purchased: **1984**

Price Paid: **$72 million**

---

## 40. **Houston Rockets** (NBA)



GETTY IMAGES

## Value: **$2.48 billion**

Owner: **Tilman Fertitta**

Year Purchased: **2017**

TRUE COPY

8/7/2020

The World's Most Valuable Sports Teams 2020

67

Price Paid: **$2.2 billion**

---

## 41 (tie). **Carolina Panthers** (NFL)

## Value: **$2.4 billion**

Owner: **David Tepper**

Year Purchased: **2018**

Price Paid: **$2.28 billion**

---

## 41 (tie). **Dallas Mavericks** (NBA)

## Value: **$2.4 billion**

Owner: **Mark Cuban**

Year Purchased: **2000**

Price Paid: **$280 million**

---

## 41 (tie). **New York Mets** (MLB)

## Value: **$2.4 billion**

TRUE COPY

8/7/2020                    The World's Most Valuable Sports Teams 2020

68

Owner: **Fred & Jeff Wilpon, Saul Katz**

Year Purchased: **2002**

Price Paid: **$391 million**

_____

## 44. Jacksonville Jaguars (NFL)

Value: **$2.33 billion**

Owner: **Shahid Khan**

Year Purchased: **2011**

Price Paid: **$770 million**

_____

## 45. Kansas City Chiefs (NFL)

Value: **$2.3 billion**

Owner: **Lamar Hunt Family**

Year Purchased: **1960**

Price Paid: **$25,000**

_____

## 46. New Orleans Saints (NFL)

TRUE COPY

8/7/2020

The World's Most Valuable Sports Teams 2020

69



GETTY IMAGES

Value: **$2.28 billion**

Owner: **Gayle Benson**

Year Purchased: **1985**

Price Paid: **$70.2 million**

---

## 47. **Arsenal** (soccer)

Value: **$2.27 billion**

Owner: **E. Stanley Kroenke**

Year Purchased: **2011**

Price Paid: **$1.1 billion**

---

## 48. **Arizona Cardinals** (NFL)

Value: **$2.25 billion**

TRUE COPY

8/7/2020

70

Owner: **William Bidwill**

Year Purchased: **1932**

Price Paid: **$50,000**

## 49 (tie). **St Louis Cardinals** (MLB)

Value: **$2.2 billion**

Owner: **William DeWitt Jr.**

Year Purchased: **1996**

Price Paid: **$150 million**

## 49 (tie). **Tampa Bay Buccaneers** (NFL)

Value: **$2.2 billion**

Owner: **Glazer family**

Year Purchased: **1995**

Price Paid: **$192 million**

## METHODOLOGY

The franchise values are based on *Forbes*' published valuations

TRUE COPY

71

during the past 14 months, with additional reporting by Mike Ozanian and Christina Settimi. The most recent soccer valuations were published in May 2019. Team values reflect enterprise values (equity plus debt). No teams from the NHL, Nascar, MLS or Formula One made the top 50. The highest-ranking franchise outside the NFL, the NBA, MLB and European soccer was hockey's New York Rangers, at 70th, with a value of $1.65 billion.

*Follow me on Twitter or LinkedIn. Send me a secure tip.*

 **Kurt Badenhausen**

I am a senior editor at Forbes and focused mainly on the business of sports and our annual franchise valuations. I also spend a lot of my time digging into what athletes... **Read More**

Site Feedback          Tips          Corrections
Reprints & Permissions       Terms       Privacy

© 2020 Forbes Media LLC. All Rights Reserved.
Report a Security Issue            AdChoices



72

HOPE / NEWS / CELEBRITY

# Washington Redskins owner Dan Snyder faces sex trafficking allegations; Internet says, 'He was on Epstein's list'

The minority shareholders are apparently looking at bringing him down citing inappropriate and unchaste behavior as one of the major reasons

By Prarthna Sarkar

Updated On : 00:10 PST, Jul 18, 2020



Daniel Snyder (Getty Images)

National Football League team Washington Redskins' majority owner Daniel Snyder has found himself in trouble yet again and this time it's allegedly for sex trafficking. The minority shareholders are apparently looking at bringing him down citing inappropriate and unchaste behavior as one of the major reasons.

Although there has been no official mention of this major development and has apparently only been teased as a "disappointing news" by the Washington Post, a Reddit page has revealed that the publication is all set to crack down on Daniel and so that he will be forced to give up his share in the team resulting in his removal. Allegedly, Jay Gruden, Larry Hess and Eric Schaffer are in trouble too.

Daniel had been at the center of similar controversies back in the day when the Redskins cheerleaders were sent off to Costa Rica for a week-long trip that included topless photoshoots. In a Times story, several unnamed girls shared detailed accounts of what went down at the resort they were put up in. This was followed by a spate of accusations against the Redskins' management team that they were pimping out cheerleaders to male sponsors and suite holders. "At one of my friend's shoots, we were basically standing around her like a human barricade because she was basically naked, so we could keep the guys from seeing her," a cheerleader told Times.

Meanwhile, fans are coming down hard on Daniel and possibly hoping that the alleged news about him being removed the team comes true.

"It's been the worst run sports franchise of the last 20 yrs and one man is to blame. I'm sure it's awful," a fan wrote, while another shared: "I can't imagine literally anything short of dan snyder single handedly running the wayfair sex trafficking ring out of the ref locker rooms in fedex field that could make that org look worse than they already have for years."

Meanwhile, other users on the internet wondered if the article would be about his alleged involvement in sex trafficking as one user wrote, "Dan Snyder was sex trafficking? Yeah I knew he was an unlikeable ass but I didn't think it would be that extreme. My god." Another added, "Dan Snyder. The Washington Redskins owner is getting popped for sex trafficking. He was on Epstein's list too. We've been known."

*MEA WorldWide (MEAWW) cannot independently verify the claims or accusations being made on the internet.*

TRUE COPY

## LIST OF URL's/WEBLINKS

73

https://meaww.com/washington-redskins-owner-dan-snyder-to-step-down-owing-to-sex-trafficking-allegations-fan-reactions

https://meaww.com/washington-redskins-dan-snyder-jeffrey-epstein-sexual-harrasment-sex-trafficking-scandal-name-change

https://meaww.com/washington-redskins-cheerleaders-2013-costa-rica-escorts-topless-photo-shoot-daniel-marc-snyder

TRUE COPY

74

Sent: Thursday, July 23, 2020 9:54 AM
To: 'cmacedo@arelaw.com' <cmacedo@arelaw.com>
Subject: MEAWW

Charles, thanks for the return call yesterday.  My client is willing to agree to take no action on the below articles if they are removed promptly, and MEAWW provides us with the name(s) of the person(s) or entity/ies that retained it to post these articles.  Please advise. All rights are reserved in the meantime.  Thanks.

https://meaww.com/washington-redskins-owner-dan-snyder-to-step-down-owing-to-sex-trafficking-allegations-fan-reactions
https://meaww.com/washington-redskins-dan-snyder-jeffrey-epstein-sexual-harrasment-sex-trafficking-scandal-name-change
https://meaww.com/washington-redskins-cheerleaders-2013-costa-rica-escorts-topless-photo-shoot-daniel-marc-snyder
https://www.facebook.com/917099451694033/posts/4280673092003302/?d=n
https://www.facebook.com/979235178835647/posts/3172807712811705/?d=n
https://www.facebook.com/979235178835647/posts/3170354373057039/?d=
https://www.facebook.com/917099451694033/posts/4284327454971199/?d=n


---

Jordan W. Siev
ReedSmith LLP
599 Lexington Avenue
New York, New York 10022
212.205.6085
jsiev@reedsmith.com
Fax 212.521.5450
Bio:  http://www.reedsmith.com/jordan_siev/


* * *
This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.
Disclaimer Version RS.US.201.407.01

COVID-19 ALERT: Our team is fully functioning and working remotely until stay at home orders permit our return to the office.

---

This e-mail transmission and any attachments are intended only for the party to whom it is addressed and may contain privileged or confidential information. If you are not the intended recipient, you are hereby notified that any use, dissemination or copying of this e-mail is prohibited. If you have received this e-mail in error, please contact the sender immediately by return e-mail or by telephone (212-336-8000) and delete all copies of the material. Thank you.

TRUE COPY

75

On Jul 24, 2020, at 2:44 PM, Siev, Jordan W. <JSiev@ReedSmith.com> wrote:

Charles, can you let me know if you will be representing MEAWW on this?  Thanks.

_____
**Jordan W. Siev**
**ReedSmith LLP**
**599 Lexington Avenue**
**New York, New York 10022**
**212.205.6085**
*jsiev@reedsmith.com*
**Fax 212.521.5450**
**Bio:  http://www.reedsmith.com/jordan_siev/**

TRUE COPY

*76*

**From:** Charles R. Macedo <cmacedo@ARELAW.com>
**Sent:** Friday, July 24, 2020 2:46 PM
**To:** Siev, Jordan W. <JSiev@ReedSmith.com>
**Subject:** Re: MEAWW

EXTERNAL E-MAIL - From cmacedo@ARELAW.com

Jordan:

I have not yet heard back from the client.

I will try following up again.

Best regards,

Charley

TRUE COPY

77

**From:** Alysha Tharani <alysha@meawwworld.com>
**Sent:** Friday, July 24, 2020 3:21 PM
**To:** Siev, Jordan W. <JSiev@ReedSmith.com>
**Cc:** Nirnay Chowdhary <nirnay@meawwworld.com>; Charles R. Macedo <cmacedo@arelaw.com>
**Subject:** MEAWW - Ref to Redskins articles & posts

EXTERNAL E-MAIL - From alysha@meawwworld.com

Hey Jordan,

Hope you are well and keeping safe under such times.

We received word from Charles about the issue your client has with the mentioned articles and facebook posts. We did crosscheck to see if you had tried to communicate directly through any of our mentioned email ids on our website for concerns to ensure we did not miss out on any communication from your end. However we could not find any.

In the light of your communication with Charles, we have obliged with your request and done the needful. Please feel free to check on the same. We are not aware of any person / entity retained from our end to post the same.

If there are any other concerns, please email me directly.

Thanks & take care,

--
Media Entertainment Arts World Wide | **Alysha Tharani**
**Chief Communications Officer**

* * *

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

Disclaimer Version RS.US.201.407.01

TRUE COPY

78

From: Charles R. Macedo <cmacedo@ARELAW.com>
Sent: Wednesday, July 29, 2020 4:52 PM
To: Siev, Jordan W. <JSiev@ReedSmith.com>
Cc: Alysha Tharani <alysha@meawwworld.com>
Subject: Re: MEAWW - Ref to Redskins articles & posts

EXTERNAL E-MAIL - From cmacedo@ARELAW.com

Hi I am not currently representing meaww in this matter.  Please communicate directly with Alyssa.

Charles R. Macedo
**Amster, Rothstein & Ebenstein LLP**
90 Park Avenue
New York, NY 10016
Gen 212 336 8000
Fax 212 336 8001
www.arelaw.com

cmacedo@arelaw.com
Dir 212 336 8074
Cell 914 419 8070

**COVID-19 ALERT: Our team is fully functioning and working remotely until stay at home orders permit our return to the office. To reach Charley Macedo, please use his email (cmacedo@arelaw.com) or cell (914 419 8070).  Be safe!**

On Jul 29, 2020, at 4:39 PM, Siev, Jordan W. <JSiev@reedsmith.com> wrote:

Charles, let me know when you can discuss this today.  Thanks.

Jordan W. Siev
ReedSmith LLP
599 Lexington Avenue
New York, New York 10022
212.205.6085
jsiev@reedsmith.com
Fax 212.521.5450
Bio:  http://www.reedsmith.com/jordan_siev/

TRUE COPY

79

**IN THE HIGH COURT OF DELHI AT NEW DELHI**
**(ORDINARY ORIGINAL CIVIL JURISDICTION)**
<u>C.S. (OS) No.     OF 2020</u>

<u>IN THE MATTER OF:</u>

Daniel Snyder, Through his SPA Holder                    ...Plaintiff

Versus

Eleven Internet Services LLP & Ors.                    ....Defendants

<u>AFFIDAVIT UNDER SECTION 65 A AND SECTION 65 B OF THE</u>
<u>INDIAN EVIDENCE ACT, 1872 OF COL. (RETD.) BHUSHAN LAL,</u>
<u>AGED ABOUT 54 YEARS, S/O SH. B.D SAPRA, SPA HOLDER FOR</u>
<u>PLAINTIFF HAVING ITS OFFICE AT 105A, INDRAPRAKASH</u>
<u>BUILDING, 21 BARAKHAMBA ROAD, NEW DELHI-110001NEW</u>
<u>DELHI-110001</u>

*I, Bhushan Lal, the Deponent herein, do solemnly affirm and declare as*
*under:*

1.      I am the SPA Holder for the Plaintiff duly authorized vide SPA dated

05.08.2020 executed at United States of America in the above suit

and competent to swear this affidavit. It was the part of my

responsibility to download relevant information pertaining to the

subject matter of the present suit including documentation available on

third party websites. Additionally it was also a part of my responsibility

to maintain emails and other documents as electronic records in the

form                    of                    word                    documents/PDF

TRUE COPY

80

Images/JPEG/GIF/DMP/TIFF/MICROFILM/COMPUTER

GENERATED MICRO FICHE. These electronic records have been

stored and maintained on a computer using a printer, both of which are

in my lawful control. I certify that the said computer system and

printer used for printing the documents mentioned herein below are in

good working condition and nothing has happened so as to affect the

authenticity of such electronic records.

2.  I say and submit that the printouts of the following documents are being

filed in support of the instant suit:

a) Copy     of     internet     printouts     from     the     website
   https://meaww.com/washington-redskins-owner-dan-snyder-to-
   step-down-owing-to-sex-trafficking-allegations-fan-reactions
   showing news article published on the Defendant No. 2 website

b) Copy     of     internet     printouts     from     the     website
   https://meaww.com/washington-redskins-dan-snyder-jeffrey-
   epstein-sexual-harrasment-sex-trafficking-scandal-name-change
   showing news article published on the Defendant No. 2 website.

c) Copies  of  internet  printouts  from  the  website  of  The
   Washingtonian  at  the  URL  washingtonian.com/2006/09/01/the-

81

dan-snyder-you-dont-know/ showing news article establishing the
reputation of the Plaintiff.

d) Copies of internet printouts from the website of The Washington
at                     the                     URL
https://www.washingtonpost.com/archive/business/2000/02/22/
snyder-to-sell-his-marketing-firm-for-2-billion/deab34bd-2e3e-
4ac6-84e3-52deff4364b9/ showing news article establishing the
reputation of the Plaintiff.

e) Copies of internet printouts from the website of Forbes at the
URL
https://www.forbes.com/sites/kurtbadenhausen/2018/07/18/full-
list-the-worlds-50-most-valuable-sports-teams-of-
2018/#679b6d2e6b0e showing news article establishing the
reputation of the Plaintiff's football team.

f) Copies     of     internet     printouts     from     the     website
https://www.entreprenerd.net/daniel-snyder-lauded-as-astute-
businessman-and-committed-philanthropist/ establishing the
reputation of the Plaintiff.

g) Copies     of     internet     printouts     from     the     website
https://www.forbes.com/sites/kurtbadenhausen/2020/07/31/the-

Q2

worlds-most-valuable-sports-teams-2020/#55923f6d3c74

establishing the reputation of the football team owned by the Plaintiff.

3.   I state that the printouts of the aforementioned webpages were received on a computer which is under my control and the printouts produced are accurate and their contents have not been altered in any manner whatsoever. The computer output documents are an exact replica of the information contained on the webpages of which the printouts have been taken. I say that the computer which was used to take the printouts from the websites was not malfunctioning at the time of taking prints.

4.   I say and submit that the copies of the following documents are being filed in support of the instant suit:

a)   Copy of SPA dated 05.08.2020 executed in the USA in favor of Col. (Retd.) Bhushan Lal from Plaintiff

b)   Email dated 23.07.2020 describing the correspondence between the Ld. Counsels for the Plaintiff and the representative of the Defendants seeking removal of the impugned news articles/posts/ URL's/weblinks further seeking information qua

names of persons/entities who had engaged the Defendants to publish the impugned news articles/posts.

c)    Email dated 24.07.2020 addressed by the Ld. Counsels for the Plaintiff to the counsels for the Defendants seeking information qua representation on behalf of the Defendants.

d)    Email dated 24.07.2020 issued by the Ld. Counsels for the Defendants apprising the Ld. Counsels for the Plaintiff that they had not received requisite sanction from the Defendants.

e)    Email dated 24.07.2020 addressed to the Ld. Counsels for the Plaintiff from the representative of the Defendants i.e. Ms. Alysha Tharani apprising the Ld. Counsel for the Plaintiff that the impugned weblinks had been removed and that there was nothing further required to be done at the end of the Defendants.

f)    Emails dated 29.07.2020 exchanged between the Ld. Counsels for the Plaintiff and Mr. Charles R. Macedo.

5.    I state that the above-mentioned copies have been made from scanned documents of the original documents which are maintained on a computer over which I have lawful control. The printouts of the said documents are accurate and their contents have not been altered in any

84

manner whatsoever. The afore-mentioned documents are an exact replica of the original documents.

6.     I say that the computer which was used to take the printout of the aforementioned documents was not malfunctioning at the time of taking prints.

**DEPONENT**

**VERIFICATION:**

I, Bhushan Lal, verify that the averments made in Para 1-6 of my affidavit are true to my knowledge, that no part of it is false and nothing has been concealed therefrom.

Verified at New Delhi on this 5th day of August, 2020.

**DEPONENT**